48 U.S. 283 (1849)
7 How. 283
GEORGE SMITH, PLAINTIFF IN ERROR,
v.
WILLIAM TURNER, HEALTH-COMMISSIONER OF THE PORT OF NEW YORK.
JAMES NORRIS, PLAINTIFF IN ERROR,
v.
THE CITY OF BOSTON.
Supreme Court of United States.

*287 The case of Smith v. Turner was argued at December term, 1845, by Mr. Webster and Mr. D.B. Ogden, for the plaintiff in error, and by Mr. Willis Hall and Mr. John Van Buren, for the defendant in error.
Mr. J. Prescott Hall, for the plaintiff in error.
*392 Mr. Justice McLEAN.

SMITH v. TURNER.
Under the general denomination of health laws in New York, and by the seventh section of an act relating to the marine hospital, it is provided, that "the health-commissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, in his name of office, the following sums from the master of every vessel that shall arrive in the port of New York, viz.: 
"1. From the master of every vessel from a foreign port, for himself and each cabin passenger, one dollar and fifty cents; for each steerage passenger, mate, sailor, or mariner, one dollar.
"2. From the master of each coasting-vessel, for each person *393 on board, twenty-five cents; but no coasting-vessel from the States of New Jersey, Connecticut, and Rhode Island shall pay for more than one voyage in each month, computing from the first voyage in each year."
The eighth section provides that the money so received shall be denominated "hospital moneys." And the ninth section gives "each master paying hospital moneys a right to demand and recover from each person the sum paid on his account." The tenth section declares any master, who shall fail to make the above payments within twenty-four hours after the arrival of his vessel in the port, shall forfeit the sum of one hundred dollars. By the eleventh section, the commissioners of health are required to account annually to the Comptroller of the State for all moneys received by them for the use of the marine hospital; "and if such moneys shall, in any one year, exceed the sum necessary to defray the expenses of their trust, including their own salaries, and exclusive of such expenses as are to be borne and paid as a part of the contingent charges of the city of New York, they shall pay over such surplus to the treasurer of the Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of the society."
The plaintiff in error was master of the British ship Henry Bliss, which vessel touched at the port of New York in the month of June, 1841, and landed two hundred and ninety steerage passengers. The defendant in error brought an action of debt on the statute against the plaintiff, to recover one dollar for each of the above passengers. A demurrer was filed, on the ground that the statute of New York was a regulation of commerce, and in conflict with the Constitution of the United States. The Supreme Court of the State overruled the demurrer, and the Court of Errors affirmed the judgment. This brings before this court, under the twenty-fifth section of the Judiciary Act, the constitutionality of the New York statute.
I will consider the case under two general heads: 
1. Is the power of Congress to regulate commerce an exclusive power?
2. Is the statute of New York a regulation of commerce?
In the eighth section of the first article of the Constitution it is declared that Congress shall have power "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes."
Before the adoption of the Constitution, the States, respectively, exercised sovereign power, under no other limitations than those contained in the Articles of Confederation. By the third section of the sixth article of that instrument, it was declared that "no State shall lay any imposts or duties which may *394 interfere with any stipulations in treaties entered into by the United States in Congress assembled"; and this was the only commercial restriction on State power.
As might have been expected, this independent legislation, being influenced by local interests and policy, became conflicting and hostile, insomuch that a change of the system was necessary to preserve the fruits of the Revolution. This led to the adoption of the Federal Constitution.
It is admitted that, in regard to the commercial, as to other powers, the States cannot be held to have parted with any of the attributes of sovereignty which are not plainly vested in the Federal government and inhibited to the States, either expressly or by necessary implication. This implication may arise from the nature of the power.
In the same section which gives the commercial power to Congress, is given power "to borrow money on the credit of the United States," "to establish a uniform rule of naturalization," "to coin money," "to establish post-offices and post-roads," "to constitute tribunals inferior to the Supreme Court," "to define and punish piracies and felonies committed on the high seas," "to declare war," "to provide and maintain a navy," &c., and "to make all laws which shall be necessary and proper for carrying into execution the foregoing powers."
Only one of these powers is, in the Constitution, expressly inhibited to the States; and yet, from the nature of the other powers, they are equally beyond State jurisdiction.
In the case of Holmes v. Jennison, 14 Peters, 570, the chief justice, in giving his own and the opinion of three of his brethren, says:  "All the powers which relate to our foreign intercourse are confided to the general government. Congress have the power to regulate commerce, to define and punish piracies," &c. "Where an authority is granted to the Union, to which a similar authority in the States would be absolutely and totally contradictory and repugnant, there the authority to the Federal government is necessarily exclusive, and the same power cannot be constitutionally exercised by the States." (p. 574.)
In Houston v. Moore, 5 Wheat. 23, the court say:  "We are altogether incapable of comprehending how two distinct wills can, at the same time, be exercised in relation to the same subject, to be effectual, and at the same time compatible with one another."
The court, again, in treating of the commercial power, say, in Gibbons v. Ogden, 9 Wheat. 196:  "It is the power to regulate; that is, to prescribe the rule by which commerce is to be governed. This power, like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and *395 acknowledges no limitations other than are prescribed in the Constitution." "The sovereignty of Congress, though limited to specified objects, is plenary as to those objects." "The power over commerce with foreign nations and among the several States is vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions," &c. And in the same case, page 199:  "Where, then, each government exercises the power of taxation, neither is exercising the power of the other; but when a State proceeds to regulate commerce with foreign nations, or among the several States, it is exercising the very power that is granted to Congress, and is doing the very thing which Congress is authorized to do."
And Mr. Justice Johnson, who gave a separate opinion in the same case, observes,  "The power to regulate commerce here meant to be granted was the power to regulate commerce which previously existed in the States." And again,  "The power to regulate commerce is necessarily exclusive."
In Brown v. The State of Maryland, 12 Peters, 446, the court say,  "It is not, therefore, matter of surprise that the grant of commercial power should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the States." This question, they remark, "was considered in the case of Gibbons v. Ogden, in which it was declared to be complete in itself, and to acknowledge no limitations," &c. And Mr. Justice Baldwin, in the case of Groves v. Slaughter, 15 Peters, 511, says,  "That the power of Congress to regulate commerce among the several States is exclusive of any interference by the States has been, in my opinion, conclusively settled by the solemn opinions of this court," in the two cases above cited. And he observes,  "If these decisions are not to be taken as the established construction of this clause of the Constitution, I know of none which are not yet open to doubt."
Mr. Justice Story, in the case of New York v. Miln, 11 Peters, 158, in speaking of the doctrine of concurrent power in the States to regulate commerce, says, that, in the case of Gibbons v. Ogden, "it was deliberately examined and deemed inadmissible by the court." "Mr. Chief Justice Marshall, with his accustomed accuracy and fulness of illustration, reviewed, at that time, the whole grounds of the controversy; and from that time to the present, the question has been considered, so far as I know, at rest. The power given to Congress to regulate commerce with foreign nations and among the States has been deemed exclusive, from the nature and objects of the power, and the necessary implications growing out of its exercise."
*396 When the commercial power was under discussion in the convention which formed the Constitution, Mr. Madison observed, that "he was more and more convinced that the regulation of commerce was in its nature indivisible, and ought to be wholly under one authority." Mr. Sherman said,  "The power of the United States to regulate trade, being supreme, can control interferences of the State regulations when such interferences happen; so that there is no danger to be apprehended from a concurrent jurisdiction." Mr. Langdon "insisted that the regulation of tonnage was an essential part of the regulation of trade, and that the States ought to have nothing to do with it." And the motion was carried, "that no State shall lay any duty on tonnage without the consent of Congress." (3 Madison Papers, 1585, 1586.)
The adoption of the above provision in the Constitution, and also the one in the same section,  "that no State shall, without the assent of the Congress, lay any imposts or duties on imports or exports, except what may be absolutely necessary for executing its inspection laws; and the net produce of all duties and imposts shall be for the use of the treasury of the United States; and all such laws shall be subject to the revision and control of the Congress,"  is a restriction, it is contended, upon the acknowledged power of the States.
The force of this argument was admitted by the court in the case of Gibbons v. Ogden, and it was answered by the allegation, that the restriction operated on the taxing power of the States. The same argument was used in the thirty-second number of the Federalist. I yield more to the authority of this position than to the stringency of the argument in support of it. To prohibit the exercise of a power by a State, as a general rule, admits the existence of such power. But this may not be universally true. Had there been no inhibition on the States as to "coining money and fixing the value thereof," or as to tonnage duties, it could not have been successfully contended that the States might exercise those powers. All duties are required to be uniform, and this could not be the result of State action. And the power to coin money and regulate its value, for the Union, is equally beyond the power of a State.
Doubts may exist as to the true construction of an instrument in the minds of its framers, and to obviate those doubts, additional, if not unnecessary, provisions may be inserted. This remark applies to the Constitution in the instances named, and in others.
A concurrent power in the States to regulate commerce is an anomaly not found in the Constitution. If such power exist, it may be exercised independently of the federal authority.
*397 It does not follow, as is often said, with little accuracy, that, when a State law shall conflict with an act of Congress, the former must yield. On the contrary, except in certain cases named in the Federal Constitution, this is never correct when the act of the State is strictly within its powers.
I am aware this court have held that a State may pass a bankrupt law, which is annulled when Congress shall act on the same subject. In Sturges v. Crowninshield, 4 Wheat. 122, the court say,  "Wherever the terms in which a power is granted by the Constitution to Congress, or wherever the nature of the power itself requires that it shall be exclusively exercised by Congress, the subject is as completely taken away from State legislatures as if they had been forbidden to act upon it." But they say,  "The power granted to Congress of establishing uniform laws on the subject of bankruptcy is not of this description."
The case of Wilson v. The Blackbird Creek Marsh Company, 2 Pet. 250, it is contended, recognizes the right of a State to exercise a commercial power, where no conflict is produced with an act of Congress.
It must be admitted that the language of the eminent chief justice who wrote the opinion is less guarded than his opinions generally were on constitutional questions.
A company was incorporated and authorized to construct a dam over Blackbird Creek, in the State of Delaware, below where the tide ebbed and flowed, in order to drain the marsh, and by that means improve the health of the neighbourhood. The plaintiffs, being desirous of ascending the creek, with their vessel, above the dam, removed a part of it as an obstruction, for which the company recovered damages. The chief justice in speaking of the structure of the dam, the drainage of the marsh, and the improvement of the health of the neighbourhood, says:  "Means calculated to produce these objects, provided they do not come into collision with the powers of the general government, are undoubtedly within those which are reserved to the States. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance." And he observes,  "If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows," &c., "we should feel not *398 much difficulty in saying that a State law coming in conflict with such act would be void. But Congress had passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several States,  a power which has not been so exercised as to affect the question."
The language of the chief justice must be construed in reference to the question before the court; to suppose that he intended to lay down the general proposition, that a State might pass any act to obstruct or regulate commerce which did not come in conflict with an act of Congress, would not only be unauthorized by the language used, and the facts of the case before the court, but it would contradict the language of the court in Gibbons v. Ogden, Brown v. Maryland, and every case in which the commercial power has been considered.
The chief justice was speaking of a creek which falls into the Delaware, and admitted in the pleadings to be navigable, but of so limited an extent that it might well be doubted whether the general regulation of commerce could apply to it. Hundreds of creeks within the flow of the tide were similarly situated. In such cases, involving doubt whether the jurisdiction may not be exclusively exercised by the State, it is politic and proper in the judicial power to follow the action of Congress. Over the navigable waters of a State, Congress can exercise no commercial power, except as regards an intercourse with other States of the Union or foreign countries. And doubtless there are many creeks made navigable by the flowing of the tide, or by the backwater from large rivers, which the general phraseology of an act to regulate commerce may not embrace. In all such cases, and many others that may be found to exist, the court could not safely exercise a jurisdiction not expressly sanctioned by Congress.
When the language of the court is applied to the facts of the above case, no such general principle as contended for is sanctioned. The construction of the dam was complained of, not as a regulation of commerce, but an obstruction of it; and the court held, that, "as Congress had not assumed to control State legislation over those small navigable creeks into which the tide flows, the judicial power could not do so. The act of the State was an internal and a police power to guard the health of its citizens. By the erection of the dam, commerce could only be affected as charged consequentially and contingently. The State neither assumed nor exercised a commercial power In this whole case, nothing more is found than a forbearance to exercise power over a doubtful object, which should ever characterize the judicial branch of the government.
*399 A concurrent power excludes the idea of a dependent power. The general government and a State exercise concurrent powers in taxing the people of the State. The objects of taxation may be the same, but the motives and policy of the tax are different, and the powers are distinct and independent. A concurrent power in two distinct sovereignties to regulate the same thing is as inconsistent in principle as it is impracticable in action. It involves a moral and physical impossibility. A joint action is not supposed, and two independent wills cannot do the same thing. The action of one, unless there be an arrangement, must necessarily precede the action of the other; and that which is first, being competent, must establish the rule. If the powers be equal; as must be the case, both being sovereign, one may undo what the other does, and this must be the result of their action.
But the argument is, that a State acting in a subordinate capacity, wholly inconsistent with its sovereignty, may regulate foreign commerce until Congress shall act on the same subject; and that the State must then yield to the paramount authority. A jealousy of the federal powers has often been expressed, and an apprehension entertained that they would impair the sovereignty of the States. But this argument degrades the States by making their legislation, to the extent stated, subject to the will of Congress. State powers do not rest upon this basis. Congress can in no respect restrict or enlarge State powers, though they may adopt a State law. State powers are at all times and under all circumstances exercised independently of the general government, and are never declared void or inoperative except when they transcend State jurisdiction. And on the same principle, the Federal authority is void when exercised beyond its constitutional limits.
The organization of the militia by a State, and also a State bankrupt law, may be superseded by the action of Congress. But this is not within the above principle. The action of the State is local, and may be necessary on both subjects, and that of Congress is general. In neither case is the same power exercised. No one doubts the power of a State to regulate its internal commerce.
It has been well remarked, that the regulation of commerce consists as much in negative as in positive action. There is not a Federal power which has been exerted in all its diversified means of operation. And yet it may have been exercised by Congress, influenced by a judicious policy and the instruction of the people. Is a commercial regulation open to State action because the Federal power has not been exhausted? No ingenuity can provide for every contingency; and if it *400 could, it might not be wise to do so. Shall free goods be taxed by a State because Congress have not taxed them? Or shall a State increase the duty, on the ground that it is too low? Shall passengers, admitted by act of Congress without a tax, be taxed by a State? The supposition of such a power in a State is utterly inconsistent with a commercial power, either paramount or exclusive, in Congress.
That it is inconsistent with the exclusive power will be admitted; but the exercise of a subordinate commercial power by a State is contended for. When this power is exercised, how can it be known that the identical thing has not been duly considered by Congress? And how can Congress, by any legislation, prevent this interference? A practical enforcement of this system, if system it may be called, would overthrow the Federal commercial power.
Whether I consider the nature and object of the commercial power, the class of powers with which it is placed, the decision of this court in the case of Gibbons v. Ogden, reiterated in Brown v. The State of Maryland, and often reasserted by Mr. Justice Story, who participated in those decisions, I am brought to the conclusion, that the power "to regulate commerce with foreign nations, and among the several States," by the Constitution, is exclusively vested in Congress.
I come now to inquire, under the second general proposition, Is the statute of New York a regulation of foreign commerce?
All commercial action within the limits of a State, and which does not extend to any other State or foreign country, is exclusively under State regulation. Congress have no more power to control this than a State has to regulate commerce "with foreign nations and among the several States." And yet Congress may tax the property within a State, of every description, owned by its citizens, on the basis provided in the Constitution, the same as a State may tax it. But if Congress should impose a tonnage duty on vessels which ply between ports within the same State, or require such vessels to take out a license, or impose a tax on persons transported in them, the act would be unconstitutional and void. But foreign commerce and commerce among the several States, the regulation of which, with certain constitutional exceptions, is exclusively vested in Congress, no State can regulate.
In giving the commercial power to Congress the States did not part with that power of self-preservation which must be inherent in every organized community. They may guard against the introduction of any thing which may corrupt the morals, or endanger the health or lives of their citizens. Quarantine or health laws have been passed by the States, and regulations of police for their protection and welfare.
*401 The inspection laws of a State apply chiefly to exports, and the State may lay duties and imposts on imports or exports to pay the expense of executing those laws. But a State is limited to what shall be "absolutely necessary" for that purpose. And still further to guard against the abuse of this power, it is declared that "the net produce of all duties and imposts laid by a State on imports or exports shall be for the use of the Treasury of the United States; and all such laws shall be subject to the revision and control of Congress."
The cautious manner in which the exercise of this commercial power by a State is guarded shows an extreme jealousy of it by the convention; and no doubt the hostile regulations of commerce by the States, under the Confederation, had induced this jealousy. No one can read this provision, and the one which follows it in relation to tonnage duties, without being convinced that they cover, and were intended to cover, the entire subject of foreign commerce. A criticism on the term import, by which to limit the obvious meaning of this paragraph, is scarcely admissible in constructing so grave an instrument.
Commerce is defined to be "an exchange of commodities." But this definition does not convey the full meaning of the term. It includes "navigation and intercourse." That the transportation of passengers is a part of commerce is not now an open question. In Gibbons v. Ogden, this court say,  "No clear distinction is perceived between the powers to regulate vessels in transporting men for hire and property for hire." The provision of the Constitution, that "the migration or importation of such persons as any of the States now existing shall think proper to admit shall not be prohibited by Congress prior to the year 1808," is a restriction on the general power of Congress to regulate commerce. In reference to this clause, this court say, in the above case,  "This section proves that the power to regulate commerce applies equally to the regulation of vessels employed in transporting men who pass from place to place voluntarily, and to those who pass involuntarily."
To encourage foreign emigration was a cherished policy of this country at the time the Constitution was adopted. As a branch of commerce the transportation of passengers has always given a profitable employment to our ships, and within a few years past has required an amount of tonnage nearly equal to that of imported merchandise.
Is this great branch of our commerce left open to State regulation on the ground that the prohibition refers to an import, and a man is not an import?
Pilot laws, enacted by the different States, have been referred *402 to as commercial regulations. That these laws do regulate commerce, to a certain extent, is admitted; but from what authority do they derive their force? Certainly not from the States. By the fourth section of the act of the 7th of August, 1789, it is provided,  "That all pilots in the bays, inlets, rivers, harbours, and ports of the United States shall continue to be regulated in conformity with the existing laws of the States, respectively, wherein such pilots may be, or with such laws as the States may respectively hereafter enact for the purpose, until further legislative provision shall be made by Congress." These State laws, by adoption, are the laws of Congress, and as such effect is given to them. So the laws of the States which regulate the practice of their courts are adopted by Congress to regulate the practice of the Federal courts. But these laws, so far as they are adopted, are as much the laws of the United States, and it has often been so held, as if they had been specially enacted by Congress. A repeal of them by the State, unless future changes in the acts be also adopted, does not affect their force in regard to Federal action.
In the above instances, it has been deemed proper for Congress to legislate by adopting the law of the States. And it is not doubted that this has been found convenient to the public service. Pilot laws were in force in every commercial State on the seaboard when the Constitution was adopted; and on the introduction of a new system, it was prudent to preserve, as far as practicable, the modes of proceeding with which the people of the different States were familiar. In regard to pilots, it was not essential that the laws should be uniform,  their duties could be best regulated by an authority acquainted with the local circumstances under which they were performed; and the fact that the same system is continued shows that the public interest has required no change.
No one has yet drawn the line clearly, because, perhaps, no one can draw it, between the commercial power of the Union and the municipal power of a State. Numerous cases have arisen, involving these powers, which have been decided, but a rule has necessarily been observed as applicable to the circumstances of each case. And so must every case be adjudged.
A State cannot regulate foreign commerce, but it may do many things which more or less affect it. It may tax a ship or other vessel used in commerce the same as other property owned by its citizens. A State may tax the stages in which the mail is transported, but this does not regulate the conveyance of the mail any more than taxing a ship regulates commerce. And yet, in both instances, the tax on the property in some degree affects its use.
*403 An inquiry is made whether Congress, under "the power to regulate commerce among the several States," can impose a tax for the use of canals, railroads, turnpike roads, and bridges, constructed by a State or its citizens? I answer, that Congress has no such power. The United States cannot use any one of these works without paying the customary tolls. The tolls are imposed, not as a tax, in the ordinary sense of that term, but as compensation for the increased facility afforded by the improvement.
The act of New York now under consideration is called a health law. It imposes a tax on the master and every cabin passenger of a vessel from a foreign port, of one dollar and fifty cents; and of one dollar on the mate, each steerage passenger; sailor, or mariner. And the master is made responsible for the tax, he having a right to exact it of the others. The funds so collected are denominated hospital moneys, and are applied to the use of the marine hospital; the surplus to be paid to the treasurer of the Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of that society.
To call this a health law would seem to be a misapplication of the term. It is difficult to perceive how a health law can be extended to the reformation of juvenile offenders. On the same principle, it may be made to embrace all offenders, so as to pay the expenses incident to an administration of the criminal law. And with the same propriety it may include the expenditures of any branch of the civil administration of the city of New York, or of the State. In fact, I can see no principle on which the fund can be limited, if it may be used as authorized by the act. The amount of the tax is as much within the discretion of the legislature of New York as the objects to which it may be applied.
It is insisted that if the act, as regards the hospital fund, be within the power of the State, the application of a part of the fund to other objects, as provided in the act, cannot make it unconstitutional. This argument is unsustainable. If the State has power to impose a tax to defray the necessary expenses of a health regulation, and this power being exerted, can the tax be increased so as to defray the expenses of the State government? This is within the principle asserted.
The case of The City of New York v. Miln, 11 Peters, 102, is relied on with great confidence as sustaining the act in question. As I assented to the points ruled in that case, consistency, unless convinced of having erred, will compel me to support the law now before us, if it be the same in principle. The law in Miln's case required that "the master or commander of any ship or other vessel arriving at the port of New York shall, *404 within twenty-four hours after his arrival, make a report, in writing, on oath or affirmation, to the mayor of the city of New York, of the name, place of birth and last legal settlement, age, and occupation of every person brought as a passenger; and of all persons permitted to land at any place during the voyage, or go on board of some other vessel, with the intention of proceeding to said city; under the penalty on such master or commander, and the owner or owners, consignee or consignees, of such ship or vessel, severally and respectively, of seventy-five dollars for each individual not so reported." And the suit was brought against Miln as consignee of the ship Emily, for the failure of the master to make report of the passengers on board of his vessel.
In their opinion this court say,  "The law operated on the territory of New York, over which that State possesses an acknowledged and undisputed jurisdiction for every purpose of internal regulation"; and "on persons whose rights and duties are rightfully prescribed and controlled by the laws of the respective States, within whose territorial limits they are found." This law was considered as an internal police regulation, and as not interfering with commerce.
A duty was not laid upon the vessel or the passengers, but the report only was required from the master, as above stated. Now, every State has an unquestionable right to require a register of the names of the persons who come within it to reside temporarily or permanently. This was a precautionary measure to ascertain the rights of the individuals, and the obligations of the public, under any contingency which might occur. It opposed no obstruction to commerce, imposed no tax nor delay, but acted upon the master, owner, or consignee of the vessel, after the termination of the voyage, and when he was within the territory of the State, mingling with its citizens, and subject to its laws.
But the health law, as it is called, under consideration, is altogether different in its objects and means. It imposes a tax or duty on the passengers, officers, and sailors, holding the master responsible for the amount at the immediate termination of the voyage, and necessarily before the passengers have set their feet on land. The tax on each passenger, in the discretion of the legislature, might have been five or ten dollars, or any other sum, amounting even to a prohibition of the transportation of passengers; and the professed object of the tax is as well for the benefit of juvenile offenders as for the marine hospital. And it is not denied that a considerable sum thus received has been applied to the former object. The amount and application of this tax are only important to show the consequences of the exercise of this power by the States. The principle involved is vital to the commercial power of the Union.
*405 The transportation of passengers is regulated by Congress. More than two passengers for every five tons of the ship or vessel are prohibited, under certain penalties; and the master is required to report to the collector a list of the passengers from a foreign port, stating the age, sex, and occupation of each, and the place of their destination. In England, the same subject is regulated by act of Parliament, and the same thing is done, it is believed, in all commercial countries. If the transportation of passengers be a branch of commerce, of which there can be no doubt, it follows that the act of New York, in imposing this tax, is a regulation of commerce. It is a tax upon a commercial operation,  upon what may, in effect, be called an import. In a commercial sense, no just distinction can be made, as regards the law in question, between the transportation of merchandise and passengers. For the transportation of both the ship-owner realizes a profit, and each is the subject of a commercial regulation by Congress. When the merchandise is taken from the ship, and becomes mingled with the property of the people of the State, like other property, it is subject to the local law; but until this shall take place, the merchandise is an import, and is not subject to the taxing power of the State, and the same rule applies to passengers. When they leave the ship, and mingle with the citizens of the State, they become subject to its laws.
In Gibbons v. Ogden, the court held that the act of laying "duties or imposts on imports or exports" is derived from the taxing power; and they lay much stress on the fact, that this power is given in the same sentence as the power to "lay and collect taxes." "The power," they say, "to regulate commerce is given" in a separate clause, "as being entirely distinct from the right to levy taxes and imposts, and as being a new power, not before conferred"; and they remark, that, had not the States been prohibited, they might, under the power to tax, have levied "duties on imports or exports." (9 Wheat. 201.)
The Constitution requires that all "duties and imposts shall be uniform," and declares that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another." Now, it is inexplicable to me how thirteen or more independent States could tax imports under these provisions of the Constitution. The tax must be uniform throughout the Union; consequently the exercise of the power by any one State would be unconstitutional, as it would destroy the uniformity of the tax. To secure this uniformity was one of the motives which led to the adoption of the Constitution. The want of it produced collisions in the commercial regulations of the States. But if, as is contended, these *406 provisions of the Constitution operate only on the Federal government, and the States are free to regulate commerce by taxing its operations in all cases where they are not expressly prohibited, the Constitution has failed to accomplish the great object of those who adopted it.
These provisions impose restrictions on the exercise of the commercial power, which was exclusively vested in Congress; and it is as binding on the States as any other exclusive power with which it is classed in the Constitution.
It is immaterial under what power duties on imports are imposed. That they are the principal means by which commerce is regulated no one can question. Whether duties shall be imposed with the view to protect our manufactures, or for purposes of revenue only, has always been a leading subject of discussion in Congress; and also what foreign articles may be admitted free of duty. The force of the argument, that things untouched by the regulating power have been equally considered with those of the same class on which it has operated, is not admitted by the counsel for the defendant. But does not all experience sustain the argument? A large amount of foreign articles brought into this country for several years have been admitted free of duty. Have not these articles been considered by Congress? The discussion in both houses of Congress, the report by the committees of both, and the laws that have been enacted, show that they have been duly considered.
Except to guard its citizens against diseases and paupers, the municipal power of a State cannot prohibit the introduction of foreigners brought to this country under the authority of Congress. It may deny to them a residence, unless they shall give security to indemnify the public should they become paupers. The Slave States have the power, as this court held in Groves v. Slaughter, to prohibit slaves from being brought into them as merchandise. But this was on the ground, that such a prohibition did not come within the power of Congress "to regulate commerce among the several States." It is suggested that, under this view of the commercial power, slaves may be introduced into the Free States. Does any one suppose that Congress can ever revive the slave trade? And if this were possible, slaves thus introduced would be free.
As early as May 27th, 1796, Congress enacted, that "the President be authorized to direct the revenue-officers commanding forts and revenue-cutters to aid in the execution of quarantine, and also in the execution of the health laws of the States respectively." And by the act of February 25th, 1799, which repealed the above act, more enlarged provisions were enacted, requiring the revenue-officers of the United States to conform *407 to and aid in the execution of the quarantine and health laws of the States. In the first section of this law there is a proviso, that "nothing therein shall enable any State to collect a duty of tonnage or impost without the consent of Congress."
A proviso limits the provisions of the act into which it is introduced. But this proviso may be considered as not restricted to this purpose. It shows with what caution Congress guarded the commercial power, and it is an authoritative provision against its exercise by the States. An impost, in its enlarged sense, means any tax or tribute imposed by authority, and applies as well to a tax on persons as to a tax on merchandise. In this sense it was no doubt used in the above act. Any other construction would be an imputation on the intelligence of Congress.
If this power to tax passengers from a foreign country belongs to a State, a tax, on the same principle, may be imposed on all persons coming into or passing through it from any other State of the Union. And the New York statute does in fact lay a tax on passengers on board of any coasting-vessel which arrives at the port of New York, with an exception of passengers in vessels from New Jersey, Connecticut, and Rhode Island, who are required to pay for one trip in each month. All other passengers pay the tax every trip.
If this may be done in New York, every other State may do the same, on all the lines of our internal navigation. Passengers on a steamboat which plies on the Ohio, the Mississippi, or on any of our other rivers, or on the Lakes, may be required to pay a tax, imposed at the discretion of each State within which the boat shall touch. And the same principle will sustain a right in every State to tax all persons who shall pass through its territory on railroad-cars, canal-boats, stages, or in any other manner. This would enable a State to establish and enforce a non-intercourse with every other State.
The ninth section of the first article of the Constitution declares,  "Nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another." But if the commercial power of the Union over foreign commerce does not exempt passengers brought into the country from State taxation, they can claim no exemption under the exercise of the same power among the States. In McCulloch v. The State of Maryland, 4 Wheat. 431, this court say,  "That there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, with respect to those very measures, is declared to be supreme over that which exerts the control, is a proposition not to be denied."
*408 The officers and crew of the vessel are as much the instruments of commerce as the ship, and yet they are taxed under this health law of New York as such instruments. The passengers are taxed as passengers, being the subjects of commerce from a foreign country. By the fourteenth article of the treaty of 1794, with England, it is stipulated that the people of each country may freely come, with their ships and cargoes, to the other, subject only to the laws and statutes of the two countries respectively. The statutes here referred to are those of the Federal government, and not of the States. The general government only is known in our foreign intercourse.
By the forty-sixth section of the act of March, 1799, the wearing apparel and other personal baggage, and the tools or implements of a mechanical trade, from a foreign port, are admitted free of duty. These provisions of the treaty and of the act are still in force, and they have a strong bearing on this subject. They are, in effect, repugnant to the act of New York.
It is not doubted that a large portion, perhaps nine tenths, of the foreign passengers landed at the port of New York pass through the State to other places of residence. At such places, therefore, pauperism must be increased much more by the influx of foreigners than in the city of New York. If, by reason of commerce, a burden is thrown upon our commercial cities, Congress should make suitable provisions for their relief. And I have no doubt this will be done.
The police power of the State cannot draw within its jurisdiction objects which lie beyond it. It meets the commercial power of the Union in dealing with subjects under the protection of that power, yet it can only be exerted under peculiar emergencies and to a limited extent. In guarding the safety, the health, and morals of its citizens, a State is restricted to appropriate and constitutional means. If extraordinary expense be incurred, an equitable claim to an indemnity can give no power to a State to tax objects not subject to its jurisdiction.
The Attorney-General of New York admitted, that, if the commercial power were exclusively vested in Congress, no part of it can be exercised by a State. The soundness of this conclusion is not only sustainable by the decisions of this court, but by every approved rule of construction. That the power is exclusive seems to be as fully established as any other power under the Constitution which has been controverted.
A tax or duty upon tonnage, merchandise, or passengers is a regulation of commerce, and cannot be laid by a State, except under the sanction of Congress and for the purposes specified in the Constitution. On the subject of foreign commerce, including the transportation of passengers, Congress have adopted *409 such regulations as they deemed proper, taking into view our relations with other countries. And this covers the whole ground. The act of New York which imposes a tax on passengers of a ship from a foreign port, in the manner provided, is a regulation of foreign commerce, which is exclusively vested in Congress; and the act is therefore void.

NORRIS v. CITY OF BOSTON.
This is a writ of error, which brings before the court the judgment of the Supreme Court of the State of Massachusetts.
"An act relating to alien passengers," passed the 20th of April, 1837, by the legislature of Massachusetts, contains the following provisions: 
"§ 1. When any vessel shall arrive at any port or harbour within this State, from any port or place without the same, with alien passengers on board, the officer or officers whom the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land such passengers, are hereby authorized and required to appoint, shall go on board such vessels and examine into the condition of said passengers.
"§ 2. If, on such examination, there shall be found among said passengers any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the officer so examining, to maintain themselves, or who have been paupers in any other country, no such alien passenger shall be permitted to land, until the master, owner, consignee, or agent of such vessel shall have given to such city or town a bond in the sum of one thousand dollars, with good and sufficient security, that no such lunatic or indigent passenger shall become a city, town, or State charge within ten years from the date of said bond.
"§ 3. No alien passenger, other than those spoken of in the preceding section, shall be permitted to land, until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger so landing; and the money so collected shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers."
The plaintiff being an inhabitant of St. John's, in the Province of New Brunswick and kingdom of Great Britain, arriving in the port of Boston, from that place, in command of a schooner called the Union Jack, which had on board nineteen alien passengers, for each of which two dollars were demanded of the plaintiff, and paid by him, on protest that the exaction was illegal. An action being brought, to recover back this *410 money, against the city of Boston, in the Court of Common Pleas, under the instructions of the court, the jury found a verdict for the defendant, on which judgment was entered; and which was affirmed on a writ of error to the Supreme Court.
Under the first and second sections of the above act, the persons appointed may go on board of a ship from a foreign port, which arrives at the port of Boston with alien passengers on board, and examine whether any of them are lunatics, idiots, maimed, aged, or infirm, incompetent to maintain themselves, or have been paupers in any other country, and not permit such persons to be put on shore, unless security shall be given that they shall not become a city, town, or State charge. This is the exercise of an unquestionable power in the State to protect itself from foreign paupers and other persons who would be a public charge; but the nineteen alien passengers for whom the tax was paid did not come, nor any one of them, within the second section. The tax of two dollars was paid by the master for each of these passengers before they were permitted to land. This, according to the view taken in the above case of Smith v. Turner, was a regulation of commerce, and not being within the power of the State, the act imposing the tax is void.
The fund thus raised was no doubt faithfully applied for the support of foreign paupers, but the question is one of power, and not of policy. The judgment of the Supreme Court, in my opinion, should be reversed, and this cause be remanded to that court, with instructions to carry out the judgment of this court.
Mr. Justice WAYNE.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
I agree with Mr. Justice McLean, Mr. Justice Catron, Mr. Justice McKinley, and Mr. Justice Grier, that the laws of Massachusetts and New York, so far as they are in question in these cases, are unconstitutional and void. I would not say so, if I had any, the least, doubt of it; for I think it obligatory upon this court, when there is a doubt of the unconstitutionality of a law, that its judgment should be in favor of its validity. I have formed my conclusions in these cases with this admission constantly in mind.
Before stating, however, what they are, it will be well for me to say, that the four judges and myself who concur in giving the judgment in these cases do not differ in the grounds upon which our judgment has been formed, except in one particular, in no way at variance with our united conclusion; *411 and that is, that a majority of us do not think it necessary in these cases to reaffirm, with our brother McLean, what this court has long since decided, that the constitutional power to regulate "commerce with foreign nations, and among the several States, and with the Indian tribes," is exclusively vested in Congress, and that no part of it can be exercised by a State.
I believe it to be so, just as it is expressed in the preceding sentence. And in the sense in which those words were used by this court in the case of Gibbons v. Ogden, 9 Wheat. 198. All that was decided in that case remains unchanged by any subsequent opinion or judgment of this court. Some of the judges of it have, in several cases, expressed opinions that the power to regulate commerce is not exclusively vested in Congress. But they are individual opinions, without judicial authority to overrule the contrary conclusion, as it was given by this court in Gibbons v. Ogden.
Still, I do not think it necessary to reaffirm that position in these cases, as a part of our judgments upon them. Its exclusiveness in Congress will, it is true, be an unavoidable inference from some of the arguments which I shall use upon the power of Congress to regulate commerce; but it will be seen that the argument, as a whole, will be a proper and apt foundation for the conclusion to which five of us have come,  that the laws of Massachusetts and New York, so far as they are resisted by the plaintiffs in the cases before us, are tax acts, in the nature of regulations acting upon the commerce of the United States, such as no State can now constitutionally pass.
For the acts of Massachusetts and New York imposing taxes upon passengers, and for the pleadings upon which these cases have been brought to this court, I refer to the opinion of Mr. Justice Catron. They are fully and accurately stated. I take pleasure in saying that I concur with him in all the points made in his opinion, and in his reasoning in support of them. They are sustained by such minute references to the legislation of Congress and to treaty stipulations, that nothing of either is left to be added. As an argument, it closes this controversy against any other view of the subject-matter, in opposition to my learned brother's conclusions.
His leading positions are, that the acts of Massachusetts and New York are tax or revenue acts upon the commerce of the United States, as that commerce has been regulated by the legislation of Congress and by treaty stipulations; that the power to regulate commerce having been acted upon by Congress indicates how far the power is to be exercised for the United States as a nation, with which there can be no interference *412 by any State legislation; that a treaty permitting the ingress of foreigners into the United States, with or without any other stipulation than a reciprocal right of ingress for our people into the territories of the nation with which the treaty may be made, prevents a State from imposing a poll-tax or personal impost upon foreigners, either directly or indirectly, for any purpose whatever, as a condition for being landed in any part of the United States, whether such foreigners shall come to it for commercial purposes, or as immigrants, or for temporary visitation.
Those of us who are united with Mr. Justice Catron in giving the judgments in these cases concur with him in those opinions. Mr. Justice McKinley and Mr. Justice Grier have just said so, my own concurrence has been already expressed, and the second division of Mr. Justice McLean's opinion contains conclusions identical with those of Mr. Justice Catron concerning the unconstitutionality of the laws of Massachusetts and New York, on account of the conflict between them with the legislation of Congress and with treaty stipulations. I also concur with Mr. Justice McKinley in his interpretation of the ninth section of the first article of the Constitution; also with Mr. Justice Grier, in his opinion in the case of Norris v. The City of Boston.
I have been more particular in speaking of the opinions of Messrs. Justices McLean and Catron than I would otherwise have been, and of the points of agreement between them, and of the concurrence of Messrs. Justices McKinley and Grier and myself in all in which both opinions agree, because a summary may be made from them of what the court means to decide in the cases before us. In my view, after a very careful perusal of those opinions, and of those also of Mr. Justice McKinley and Mr. Justice Grier, I think the court means now to decide, 
1. That the acts of New York and Massachusetts imposing a tax upon passengers, either foreigners or citizens, coming into the ports in those States, either in foreign vessels or vessels of the United States, from foreign nations or from ports in the United States, are unconstitutional and void, being in their nature regulations of commerce contrary to the grant in the Constitution to Congress of the power to regulate commerce with foreign nations and among the several States.
2. That the States of this Union cannot constitutionally tax the commerce of the United States for the purpose of paying any expense incident to the execution of their police laws; and that the commerce of the United States includes an intercourse or persons, as well as the importation of merchandise.
3. That the acts of Massachusetts and New York in question *413 in these cases conflict with treaty stipulations existing between the United States and Great Britain, permitting the inhabitants of the two countries "freely and securely to come, with their ships and cargoes, to all places, ports, and rivers in the territories of each country to which other foreigners are permitted to come, to enter into the same, and to remain and reside in any parts of said territories, respectively; also, to hire and occupy houses and warehouses for the purposes of their commerce, and generally the merchants and traders of each nation, respectively, shall enjoy the most complete protection and security for their commerce, but subject, always, to the laws and statutes of the two countries, respectively"; and that said laws are therefore unconstitutional and void.
4. That, the Congress of the United States having by sundry acts passed at different times admitted foreigners into the United States with their personal luggage and tools of trade free from all duty or imposts, the acts of Massachusetts and New York imposing any tax upon foreigners or immigrants for any purpose whatever, whilst the vessel is in transitu to her port of destination, though said vessel may have arrived within the jurisdictional limits of either of the States of Massachusetts or New York, and before the passengers have been landed, are in violation of said acts of Congress, and therefore unconstitutional and void.
5. That the acts of Massachusetts and New York, so far as they impose any obligation upon the owners or consignees of vessels, or upon the captains of vessels or freighters of the same, arriving in the ports of the United States within the said States, to pay any tax or duty of any kind whatever, or to be in any way responsible for the same, for passengers arriving in the United States or coming from a port in the United States, are unconstitutional and void; being contrary to the constitutional grant to Congress of the power to regulate commerce with foreign nations and among the several States, and to the legislation of Congress under the said power, by which the United States have been laid off into collection districts, and ports of entry established within the same, and commercial regulations prescribed, under which vessels, their cargoes and passengers, are to be admitted into the ports of the United States, as well from abroad as from other ports of the United States. That the act of New York now in question, so far as it imposes a tax upon passengers arriving in vessels from other ports in the United States, is properly in this case before this court for construction, and that the said tax is unconstitutional and void. That the ninth section of the first article of the Constitution includes within it the migration of other persons, *414 as well as the importation of slaves, and in terms recognizes that other persons as well as slaves may be the subjects of importation and commerce.
6. That the fifth clause of the ninth section of the first article of the Constitution, which declares that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another State; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another," is a limitation upon the power of Congress to regulate commerce for the purpose of producing entire commercial equality within the United States, and also a prohibition upon the States to destroy such equality by any legislation prescribing a condition upon which vessels bound from one State shall enter the ports of another State.
7. That the acts of Massachusetts and New York, so far as they impose a tax upon passengers, are unconstitutional and void, because each of them so far conflicts with the first clause of the eighth section of the first article of the Constitution, which enjoins that all duties, imposts, and excises shall be uniform throughout the United States; because the constitutional uniformity enjoined in respect to duties and imposts is as real and obligatory upon the States, in the absence of all legislation by Congress, as if the uniformity had been made by the legislation of Congress; and that such constitutional uniformity is interfered with and destroyed by any State imposing any tax upon the intercourse of persons from State to State, or from foreign countries to the United States.
8. That the power in Congress to regulate commerce with foreign nations and among the several States includes navigation upon the high seas, and in the bays, harbours, lakes, and navigable waters within the United States, and that any tax by a State in any way affecting the right of navigation, or subjecting the exercise of the right to a condition, is contrary to the aforesaid grant.
9. That the States of this Union may, in the exercise of their police powers, pass quarantine and health laws, interdicting vessels coming from foreign ports, or ports within the United States, from landing passengers and goods, prescribe the places and time for vessels to quarantine, and impose penalties upon persons for violating the same; and that such laws, though affecting commerce in its transit, are not regulations of commerce prescribing terms upon which merchandise and persons shall be admitted into the ports of the United States, but precautionary regulations to prevent vessels engaged in commerce from introducing disease into the ports to which they are bound, and that the States may, in the exercise of such police power, without *415 any violation of the power in Congress to regulate commerce, exact from the owner or consignee of a quarantined vessel, and from the passengers on board of her, such fees as will pay to the State the cost of their detention and of the purification of the vessel, cargo, and apparel of the persons on board.
Having done what I thought it was right to do to prevent hereafter any misapprehension of what the court now means to decide, I will give some reasons, in addition to those which have been urged by my associates, in support of our common result. In the first place, let it be understood, that, in whatever I may say upon the power which Congress has "to regulate commerce with foreign nations, and among the several States, and with the Indian tribes," the internal trade of a State is not meant to be included; that not being in any way within the regulating power of Congress.
In the consideration, too, of the power in Congress to regulate commerce, I shall not rely, in the first instance, upon what may be constitutionally done in many commercial particulars, as well under the treaty-making power as by the legislation of Congress. My first object is to show the plenitude of the power in Congress from the grant itself, without aid from any other clause in the Constitution. The treaty-making power for commercial purposes, however, and other clauses in the Constitution relating to commerce, may afterwards be used to enforce and illustrate the extent and character of the power which Congress has to regulate commerce. It is a grant of legislative power, susceptible, from its terms and the subject-matter, of definite and indisputable interpretation.
Any mere comment upon the etymology of the words "regulate" and "commerce" would be unsatisfactory in such a discussion. But if their meaning, as they were used by the framers of the Constitution, can be made precise by the subject-matter, then it cannot be doubted that it was intended by them that Congress should have the legislative power to regulate commerce with foreign nations, and among the several States, and with the Indian tribes, to the exclusion of any regulation for such commerce by any one of the States.
All commerce between nations is permissive or conventional. The first includes every allowance of it, under what is termed by writers upon international law the liberty or freedom of commerce,  its allowance by statutes, or by the orders of any magistracy having the power to exercise the sovereignty of a nation in respect to commerce. Conventional commerce is, of course, that which nations carry on with each other under treaty stipulations. With colonial commerce  another distinct kind, between nations and their colonies, which the laws *416 of nations permit the former to monopolize  we have nothing to do upon this occasion.
Now, what commerce was in fact, at least so far as European nations were concerned, had been settled beyond all dispute before our separation from the mother country. It was well known to the framers of the Constitution, in all its extent and variety. Hard denials of many of its privileges had taught them what it was. They were familiar with the many valuable works upon trade and international law which were written and published, and which had been circulated in England and in the Colonies from the early part of the last century up to the beginning of the Revolution. It is not too much to say, that our controversies with the mother country upon the subject had given to the statesmen in America in that day more accurate knowledge of all that concerned trade in all its branches and rights, and a more prompt use of it for any occasion, than is now known or could be used by the statesmen and jurists of our own time. Their knowledge, then, may well be invoked to measure the constitutional power of Congress to regulate commerce.
Commerce between nations or among states has several branches. Martens, in his Summary of the Laws of Nations says,  "It consists in selling the superfluity; in purchasing articles of necessity, as well productions as manufactures; in buying from one nation and selling to another, or in transporting the merchandise from the seller to the buyer to gain the freight."
"Generally speaking, the commerce in Europe is so far free, that no nation refuses positively and entirely to permit the subjects of another nation, when even there is no treaty between them, to trade with its possessions in or out of Europe, or to establish themselves in its territory for that purpose. A state of war forms here a natural exception. However, as long as there is no treaty existing, every state retains its natural right to lay on such commerce whatever restriction it pleases. A nation is then fully authorized to prohibit the entry or exportation of certain merchandise, to institute customs and to augment them at pleasure, to prescribe the manner in which the commerce with its dominions shall be carried on, to point out the places where it shall be carried on, or to exempt from it certain parts of its dominions, to exercise freely its sovereign power over the foreigners living in its territories, to make whatever distinctions between the nations with whom it trades it may find conducive to its interests."
In all of the foregoing particulars Congress may act legislatively. It is conceded that the States may not do so in any *417 one of them; and if, in virtue of the power to lay taxes, the United States and the States may act in that way concurrently upon foreigners when they reside in a State, it does not follow that the States may impose a personal impost upon them, as the condition of their being permitted to land in a port of the United States. "Duties on the entry of merchandise are to be paid indiscriminately by foreigners as well as subjects. Personal imposts it is customary not to exact from foreigners till they have for some time been inhabitants of the state." (Martens, p. 97.)
Keeping, then, in mind what commerce is, and how far a nation may legally limit her own commercial transactions with another state, we cannot be at a loss to determine, from the subject-matter of the clause in the Constitution, that the meaning of the terms used in it is to exclude the States from regulating commerce in any way, except their own internal trade, and to confide its legislative regulation completely and entirely to Congress. When I say completely and entirely to Congress, I mean all that can be included in the term "commerce among the several States," subject, of course, to the right of the States to pass inspection laws in the mode prescribed by the Constitution, to the prohibition of any duty upon exports, either from one State to another State or to foreign countries, and to that commercial uniformity which the Constitution enjoins respecting all that relates to the introduction of merchandise into the United States, and those who may bring it for sale, whether they are citizens or foreigners, and all that concerns navigation, whether vessels are employed in the transportation of passengers or freight, or both, including, also, all the regulations which the necessities and safety of navigation may require. "Inspection laws, quarantine laws, health laws of every description, as well as laws for regulating the internal commerce of a State, and those which respect turnpike-roads, ferries, &c., are component parts of that immense mass of legislation which embraces every thing within the territory of a State not surrendered to the general government."
But the conclusion derived from the subject-matter of the clause, as I have just stated it, is strengthened particularly by what may be done in respect to commerce by treaty, and by other clauses in the Constitution relating to commerce. Martens (p. 151) says,  "The mere general liberty of trade, such as it is acknowledged at present in Europe, being too vague to secure to a nation all the advantages it is necessary it should derive from its commerce, commercial powers have been obliged to have recourse to treaties for their mutual benefit. The number of these treaties is considerably augmented since the *418 sixteenth century. However they may differ in their conditions, they turn generally on these three points:  1. On commerce in time of peace. 2. On the measures to be pursued with respect to commerce and commercial subjects in case of rupture between the parties. 3. On the commerce of the contracting party that may happen to remain neuter, while the other contracting party is at war with a third power. With respect to the first point the custom is,  1. To settle in general the privileges that the contracting powers grant reciprocally to their subjects. 2. To enter into the particulars of the rights to be enjoyed by their subjects, as well with respect to their property as to their personal rights. Particular care is usually taken to provide for the free enjoyment of their religion; for their right to the benefit of the laws of the country; for the security of the books of commerce, &c. 3. To mention specifically the kinds of merchandise which are to be admitted, to be imported or exported, and the advantages to be granted relatively to customs, tonnage, &c.
"With respect to the rights and immunities in case of a rupture between the parties, the great objects to be obtained are,  1. An exemption from seizure of the person or effects of the subjects residing in the territory of the other contracting power. 2. To fix the time which they shall have to remove with their property out of the territory. 3. Or to point out the conditions on which they may be permitted to remain in the enemy's country during the war.
"In specifying the rights of commerce to be enjoyed by the neutral power, it is particularly necessary,  1. To exempt its vessels from embargo. 2. To specify the merchandise which is to be accounted contraband of war, and to settle the penalties in case of contravention. 3. To agree on the manner in which vessels shall be searched at sea. 4. To stipulate whether neutral bottoms are to make neutral goods or not."
It seems to me, when such regulations of commerce as may be made by treaty are considered in connection with that clause in the Constitution giving to Congress the power to regulate it by legislation, and also in connection with the restraints upon the States in the tenth section of the first article of the Constitution, in respect to treaties and commerce, that the States have parted with all power over commerce, except the regulation of their internal trade. The restraints in that section are, that no State shall enter into any treaty, alliance, or confederation; no State shall, without the consent of Congress, lay any duties on imports or exports, except what may be necessary for executing its inspection laws; no State shall, without the consent of Congress, lay any duty of tonnage, *419 or enter into any agreement or compact with another State or with a foreign power.
The States, then, cannot regulate commerce by a treaty or compact, and before it can be claimed that they may do so in any way by legislation, it must be shown that the surrender which they have made to a common government to regulate commerce for the benefit of all of them has been done in terms which necessarily imply that the same power may be used by them separately, or that the power in Congress to regulate commerce has been modified by some other clause in the Constitution. No such modifying clause exists. The terms used do not, in their ordinary import, admit of any exception from the entireness of the power in Congress to regulate commerce with foreign nations, and among the several States, and with the Indian tribes. The exercise of any such power of regulation by the States, or any one or more of them, would conflict with the constitutional authority of the United States to regulate commerce by legislation and by treaty, and would measurably replace the States in their commercial attitude to each other as they stood under the Articles of Confederation, and not as they meant to be when "we, the people of the United States," in their separate sovereignties, as they existed under the Articles of Confederation, superseded the latter by their ratification of "the Constitution for the United States of America."
In what I have said concerning commercial regulations under the treaty-making power, I do not mean to be understood as saying that by treaty all regulation of commerce can be made, independently of legislation by Congress. That question I do not enter into here, for in such cases as are now before the court I have no right to do so. It has only been alluded to by me to prevent any such inference from being made.
Apply the foregoing reasoning to the acts of Massachusetts and New York, and whatever may be the motive for such enactments or their legislative denomination, if they practically operate as regulations of commerce, or as restraints upon navigation, they are unconstitutional. When they are considered in connection with the existing legislation of Congress in respect to trade and navigation, and with treaty stipulations, they are certainly found to be in conflict with the supreme law of the land.
But those acts conflict also with other clauses in the Constitution relating to commerce and navigation; also, with that clause which declares that duties, imposts, and excises shall be uniform throughout the United States. Not in respect to excises, for those being taxes upon the consumption or retail sale *420 of commodities, the States have a power to lay them, as well as Congress. Not so, however, as to duties and impost the first, in its ordinary taxing sense, being taxes or customs upon merchandise; and an impost being also, in its restrained sense, a duty upon imported goods, but also, in its more enlarged meaning, any tax or imposition upon persons. Notwithstanding what may have otherwise been said, I was brought to the conclusion, in my consideration of the taxing power of Congress before these cases were before us, that there was no substantial reason for supposing it was used by the framers of the Constitution exclusively in its more confined sense.
But I return to those clauses with which I have said the acts in question conflict. It will be conceded by all, that the fifth clause of the ninth section of the first article of the Constitution, declaring that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another," was intended to establish among them a perfect equality in commerce and navigation. That all should be alike, in respect to commerce and navigation, is an enjoined constitutional equality, which can neither be interrupted by Congress nor by the States. When Congress enacts regulations of commerce or revenue, it does so for the United States, and the equality exists. When a State passes a law in any way acting upon commerce, or one of revenue, it can only do so for itself and the equality is destroyed. In such a case the Constitution would be violated, both in spirit and in letter.
Again, it is declared in the first clause of the eighth section of the first article of the Constitution, that all duties, imposts, and excises shall be uniform throughout the United States; that is, first, that when Congress lays duties, imposts, or excises, they shall be uniform; and secondly, that if, in the exercise of the taxing power, Congress shall not lays duties or imposts upon persons and particular things imported, the States shall not destroy the uniformity, in the absence of regulation, by taxing either. Things imported, it is admitted, the States cannot tax, whether Congress has made them dutiable articles or free goods; but persons, it is said, they can, because a State's right to tax is only restrained in respect to imports and exports, and, as a person is not an import, a tax or duty may be laid upon him as the condition of his admission into the State.
But this is not a correct or full view of the point. A State's right to tax may only be limited to the extent mentioned; but that does not give the State the right to tax a foreigner or person for coming into one of the States of the United States. That would be a tax or revenue act, in the nature of a regulation of commerce, acting upon navigation. It is not a disputable *421 point, that, under the power given to Congress to lay and collect taxes, duties, imposts, and excises, it may, in the exercise of its power to regulate commerce, tax persons as well as things, as the condition of their admission into the United States. To lay and collect taxes, duties, and imposts gives to Congress a plenary power over all persons and things for taxation, except exports. Such is the received meaning of the word taxes in its most extended sense, and always so when it is not used in contradistinction to terms of taxation, having a limited meaning as to the objects to which, by usage, the terms apply. It is in the Constitution used in both senses. In its extended sense, when it is said that Congress may lay and collect taxes; and in a more confined sense, in contradistinction to duties, imposts, and excises.
The power, then, to tax, and the power to regulate commerce, give to Congress the right to tax persons who may come into the United States, as a regulation of commerce and navigation. I have already mentioned, among the restraints which nations may impose upon the liberty or freedom of commerce, those which may be put upon foreigners coming into or residing within their territories. This right exists to its fullest extent, as a portion of the commercial rights of nations, when not limited by treaties.
The power to regulate commerce with foreign nations and among the several States having been given to Congress, Congress may, but the States cannot, tax persons for coming into the United States.
It is urged, however, in reply to what has just been said, that, as the power to regulate commerce and the right to levy taxes are distinct and substantive powers, the first cannot be used to limit the right of the States to tax, beyond the prohibition upon them not to tax exports or imports. The proposition is rightly stated, but what is gained in these cases from it? Nothing. The sums directed to be paid by or for passengers are said to be taxes which the States have a right to impose, in virtue of their police powers, either to prevent the evils of pauperism or to protect their inhabitants from apprehended disease. But the question in these cases is, not whether the States may or may not tax, but whether they can levy a tax upon passengers coming into the United States under the authority and sanction of the laws of Congress and treaty stipulations.
The right in a nation or state occurs  not in all cases, for there are international exceptions  upon all persons and things when they come or are brought within the territory of a state. Not, however, because the person or thing is within the territory, but because they are under the sovereignty or politica *422 jurisdiction of the state. If not within the latter, the right to tax does not arise until that event occurs. States may have territorial jurisdiction for most of the purposes of sovereignty, without political jurisdiction for some of them.
The distinction is not mine. It has been long since made by jurists and writers upon national law, because the history of nations, from an early antiquity until now, shows such relations between them. The framers of the Constitution acted upon it throughout, in all the sovereign powers which they proposed that the States should yield to the United States. Martens properly says, that, to have a just idea of the states of which Europe is composed, we must distinguish those which are absolutely sovereign from those which are but demi-sovereign. The states of the German empire, for instance, and the Italian princes who acknowledge their submission to the empire,  and the German states, in their present Diet for great national purposes, with a vicar at its head, overtopping in might and majesty, but with regulated power, all before who have been emperors of Germany. I do not mean to say that the States of this Union are demi-sovereign to the general government in the sense in which some of the nations in Europe are to other nations; but that such connection between those nations furnishes the proof of the distinction between territorial sovereignty and political sovereignty. The sovereignty of these States and that of the United States, in all constitutional particulars, have a different origin. But I do mean to say, that the distinction between territorial and political jurisdiction arises, whether the association be voluntary between states, or otherwise. Whenever one power has an exterritorial right over the territory or sovereignty of another power, it is called by writers "a partial right of sovereignty." Is not that exactly the case between the United States, as a nation, and the States? Do not the constitutional powers of the United States act upon the territory, as well as upon the sovereignty, of the States, to the extent of what was their sovereignty before they yielded it to the United States? Can any one of the sovereign powers of the United States be carried out by legislation, without acting upon the territory and sovereignty of the States? This being so, Congress may say, and does say, whence a voyage may begin to the United States, and where it may end in a State of the United States. Though in its transit it enters the territory of a State, the political jurisdiction of the State cannot interfere with it by taxation in any way until the voyage has ended; not until the persons who may be brought as passengers have been landed, or the goods which may have been entered as merchandise have passed from the hands of the importer, or have been *423 made by himself a portion of the mass of the general property of the State. It is upon this distinction between territorial and political jurisdiction that the case of Brown v. Maryland rests. Without it, it has no other foundation, although it is not so expressed in the opinion of the court.
In these cases the laws complained of meet the vessels when they have arrived in the harbour, on the way to the port to which they are bound, before the passengers have been landed. And before they are landed they are met by superadded conditions in the shape of a tax, with which it is said they must comply, or which the captain must pay for them, before they are permitted to land. Certainly it is not within the political jurisdiction of a State, in such circumstances of a voyage, to tax passengers.
But it is said, notwithstanding, that the tax may be laid in virtue of police power in the States, never surrendered by them to the United States. A proper understanding of the police power of a nation will probably remove the objection from the minds of those who made it. What is the supreme police power of a state? It is one of the different means used by sovereignty to accomplish that great object, the good of the state. It is either national or municipal, in the confined application of that word to corporations and cities. It was used in the argument invariably in its national sense. In that sense it comprehends the restraint which nations may put upon the liberty of entry and passage of persons into different countries, for the purposes of visitation or commerce.
The first restraint that nations reserve to themselves is the right to be informed of the name and quality of every foreigner that arrives. That, and no more than that, was Miln's case. (11 Peters.) Nations have a right to keep at a distance all suspected persons; to forbid the entry of foreigners or foreign merchandise of a certain description, as circumstances may require. In a word, it extends to every person and every thing in the territory; and foreigners are subject to it, as well as subjects to the state, except only ministers and other diplomatic functionaries; and they are bound to observe municipal police, though not liable to its penalties.
"The care of hindering what might trouble the internal tranquillity and security of the state is the basis of the police, and authorizes the sovereign to make laws and establish institutions for that purpose, and as every foreigner living in the state ought to concur in promoting the object, even those who enjoy the right exterritorially (such as sovereigns and ministers) cannot dispense with observing the laws of police, although in case of transgression they cannot be punished like native or temporary subjects of the state."
*424 Police powers, then, and sovereign powers are the same, the former being considered so many particular rights under that name or word collectively placed in the hands of the sovereign. Certainly the States of this Union have not retained them to the extent of the preceding enumeration. How much of it have the States retained? I answer, unhesitatingly, all necessary to their internal government. Generally, all not delegated by them in the Articles of Confederation to the United States of America; all not yielded by them under the Constitution of the United States. Among them, qualified rights to protect their inhabitants by quarantine from disease; imperfect and qualified, because the commercial power which Congress has is necessarily connected with quarantine. And Congress may, by adoption, presently and for the future, provide for the observance of such State laws, making such alterations as the interests and conveniences of commerce and navigation may require, always keeping in mind that the great object of quarantine shall be secured.
Such has been the interpretation of the rights of the States to quarantine, and of that of Congress over it, from the beginning of the Federal government. Under it the States and the United States, both having measurably concurrent rights of legislation in the matter, have reposed quietly and without any harm to either, until the acts now in question caused this controversy. The act of February 25th, 1799, (1 Stat. at Large, 619,) will show this.
By that act, collectors, revenue-officers, masters and crews of revenue-cutters, and military officers in command of forts upon the coast, are required to aid in the execution of the State's quarantine laws. But then, and it may be observed particularly in reference to the acts of Massachusetts and New York now in question, the law provides that nothing in the act "shall enable a State to collect a duty of tonnage or impost without the consent of Congress"; that no part of the cargo of any vessel shall in any case be taken out, otherwise than as by law is allowed, or according to the regulations thereinafter established; thus showing that the State's quarantine power over the cargo for the purpose of purifying it or the vessel has been taken away. By the second section of the same act, the power of the States in respect to warehouses and other buildings for the purification of the cargo is also taken away, and exclusively assumed by the United States. And by the third section, in order that the States may be subjected to as little expense as possible, and that the safety of the public revenue may not be lessened, it is provided that the United States, under the orders of the President of the United States, shall purchase or erect *425 suitable warehouses, with wharves and inclosures for goods and merchandise taken from vessels subject to quarantine, or other restraint, pursuant to the health laws of any State. And in regard to the word imposts, in the first section of the act, I may here remark, though I have heretofore given its meaning, that it means in the act, as well as it does in the Constitution, personal imposts upon a foreigner enjoying the protection of a State, or it may be a condition of his admission (Martens, p. 97), as well as any tax or duty upon goods; and Martens, as well as all other jurists and writers upon international law, uses the word in the sense I have said it has, also, as "imposts on real estates and duties on the entry and consumption of merchandises." (pp. 97, 98.)
But, further, by the police power in the States they have reserved the right to be informed of the name and quality of every foreigner that arrives in the State. This, and no more than this, was Miln's case, in 11 Peters. But after they have been landed, as is said in Miln's case. And it was surprising to me, in the argument of these cases, that that admission in Miln's case was overlooked by those who spoke in favor of the constitutionality of the laws of Massachusetts and New York; for the right of New York to a list of passengers, notwithstanding the passenger laws of the United States, is put upon the ground that those laws "affect passengers whilst on their voyage, and until they shall have landed." And "after that, and when they shall have ceased to have any connection with the ship, and when, therefore, they shall have ceased to be passengers, the acts of Congress applying to them as such, and only professing to legislate in relation to them as such, have then performed their office, and can with no propriety of language be said to come in conflict with the law of a State, whose operation only begins where that of the laws of Congress ends." That is, that the passenger acts, as my brother Catron has shown in his opinion, extend to his protection from all State interference, by taxation or otherwise, from the time of his embarcation abroad until he is landed in the port of the United States for which the vessel sailed.
The States have also reserved the police right to turn off from their territories paupers, vagabonds, and fugitives from justice. But they have not reserved the use of taxation universally as the means to accomplish that object, as they had it before they became the United States. Having surrendered to the United States the sovereign police power over commerce, to be exercised by Congress or the treaty-making power, it is necessarily a part of the power of the United States to determine who shall come to and reside in the United States for *426 the purposes of trade, independently of every other condition of admittance which the States may attempt to impose upon such persons. When it is done in either way, the United States, of course, subject the foreigner to the laws of the United States, and cannot exempt him from the internal power of police of the States in any particular in which it is not constitutionally in conflict with the laws of the United States. And in this sense it is that, in treaties providing for such mutual admission of foreigners between nations, it is universally said, "but subject always to the laws and statutes of the two countries respectively"; but certainly not to such of the laws of a State as would exclude the foreigner, or which add another condition to his admission into the United States.
And, further, I may here remark that this right of taxation claimed for the States upon foreign passengers is inconsistent with the naturalization clause in the Constitution, and the laws of Congress regulating it. If a State can, by taxation or otherwise, direct upon what terms foreigners may come into it, it may defeat the whole and long-cherished policy of this country and of the Constitution in respect to immigrants coming to the United States.
But I have said the States have the right to turn off paupers, vagabonds, and fugitives from justice, and the States where slaves are have a constitutional right to exclude all such as are, from a common ancestry and country, of the same class of men. And when Congress shall legislate,  if it be not disrespectful for one who is a member of the judiciary to suppose so absurd a thing of another department of the government,  to make paupers, vagabonds, suspected persons, and fugitives from justice subjects of admission into the United States, I do not doubt it will be found and declared, should it ever become a matter for judicial decision, that such persons are not within the regulating power which the United States have over commerce. Paupers, vagabonds, and fugitives never have been subjects of rightful national intercourse, or of commercial regulations, except in the transportation of them to distant colonies to get rid of them, or for punishment as convicts. They have no rights of national intercourse; no one has a right to transport them, without authority of law, from where they are to any other place, and their only rights where they may be are such as the law gives to all men who have not altogether forfeited its protection.
The States may meet such persons upon their arrival in port, and may put them under all proper restraints. They may prevent them from entering their territories, may carry them out or drive them off. But can such a police power be rightfully *427 exercised over those who are not paupers, vagabonds, or fugitives from justice? The international right of visitation forbids it. The freedom or liberty of commerce allowed by all European nations to the inhabitants of other nations does not permit it; and the constitutional obligations of the States of this Union to the United States, in respect to commerce and navigation and naturalization, have qualified the original discretion of the States as to who shall come and live in the United States. Of the extent of those qualifications, or what may be the rights of the United States and the States individually in that regard, I shall not speak now.
But it was assumed that a State has unlimited discretion, in virtue of its unsurrendered police power, to determine what persons shall reside in it. Then it was said to follow, that the State can remove all persons who are thought dangerous to its welfare; and to this right to remove, it was said, the right to determine who shall enter the State is an inseparable incident.
That erroneous proposition of the State's discretion in this matter has led to all the more mistaken inferences made from it. The error arose from its having been overlooked that a part of the supreme police power of a nation is identical, as I have shown it to be, with its sovereignty over commerce. Or, more properly speaking, the regulation of commerce is one of those particular rights collectively placed in the hands of the sovereign for the good of the State. Until it is shown that the police power in one of its particulars is not what it has just been said to be, the discretion of a State of this Union to determine what persons may come to and reside in it, and what persons may be removed from it, remains unproved. It cannot be proved, and the laws of Massachusetts and New York derive no support from police power in favor of their constitutionality.
Some reliance in the argument was put upon the cases of Holmes v. Jennison, 14 Pet. 540, Groves v. Slaughter, 15 Pet. 449, and Prigg v. Commonwealth of Pennsylvania, 16 Pet. 539, to maintain the discretion of a State to say who shall come to and live in it. Why either case should have been cited for such a purpose I was at a loss to know, and have been more so from a subsequent examination of each of them.
All that is decided in the case of Holmes v. Jennison is, that the States of this Union have no constitutional power to give up fugitives from justice to the authorities of a nation from which they have fled. That it is not an international obligation to do so, and that all authority to make treaties for such a purpose is in the United States.
*428 The point ruled in the case of Groves v. Slaughter is, that the State of Mississippi could constitutionally prohibit negroes from being brought into that State for sale as merchandise, but that the provision in her constitution required legislation before it acted upon the subject-matter.
The case of Prigg v. The Commonwealth of Pennsylvania is inapplicable to the cases before us, except in the support which it gives to the construction of the police power, as stated in this opinion,  that it is applicable to idlers, vagabonds, paupers, and, I may add, fugitives from justice, and suspected persons.
Miln's case I will speak of hereafter, and now only say that no point was ruled in it, either in respect to commerce or the right of the State to a list of passengers who may come by sea into New York after they are landed, which gives any countenance or support to the laws now in question.
The fear expressed, that if the States have not the discretion to determine who may come and live in them, the United States may introduce into the Southern States emancipated negroes from the West Indies and elsewhere, has no foundation. It is not an allowable inference from the denial of that position, or the assertion of the reverse of it.
All the political sovereignty of the United States, within the States, must be exercised according to the subject-matter upon which it may be brought to bear, and according to what was the actual condition of the States in their domestic institutions when the Constitution was formed, until a State shall please to alter them. The Constitution was formed by States in which slavery existed, and was not likely to be relinquished, and States in which slavery had been, but was abolished, or for the prospective abolition of which provision had been made by law. The undisturbed continuance of that difference between the States at that time, unless as it might be changed by a State itself, was the recognized condition in the Constitution for the national Union. It has that, and can have no other, foundation.
Is it not acknowledged by all that the ninth section of the first article of the Constitution is a recognition of that fact? There are other clauses in the Constitution equally, and some of them more, expressive of it.
That is a very narrow view of the Constitution which supposes that any political sovereign right given by it can be exercised, or was meant to be used, by the United States in such a way as to dissolve, or even disquiet, the fundamental organization of either of the States. The Constitution is to be interpreted by what was the condition of the parties to it when it *429 was formed, by their object and purpose in forming it, and by the actual recognition in it of the dissimilar institutions of the States. The exercise of constitutional power by the United States, or the consequences of its exercise, are not to be concluded by the summary logic of ifs and syllogisms.
It will be found, too, should this matter of introducing free negroes into the Southern States ever become the subject of judicial inquiry, that they have a guard against it in the Constitution, making it altogether unnecessary for them to resort to the casus gentis extraordinarius, the casus extrem necessitatis of nations, for their protection and preservation. They may rely upon the Constitution, and the correct interpretation of it, without seeking to be relieved from any of their obligations under it, or having recourse to the jus necessitatis for self-preservation.
I have purposely refrained from repeating any thing that has been said in the opinions of my learned brothers, with whom I am united in pronouncing the laws of Massachusetts and New York in question unconstitutional. What they have said for themselves they have also said for me, and I do not believe that I have said any thing in this opinion which is not sanctioned by them.
Having said all that I mean to say directly concerning the cases before us, I will now do what I have long wished to do, but for which a proper opportunity has not been presented before. It is to make a narrative in respect to the case of The City of New York v. Miln, reported in 11 Peters, 102, that hereafter the profession may know definitely what was and what was not decided in that case by this court. It has been much relied upon in the cases before us for what was not decided by the court.
The opinion given by Mr. Justice Barbour in that case, though reported as the opinion of the court, had not at any time the concurrence of a majority of its members, except in this particular,  that so much of the act of New York as required the captain of a vessel to report his passengers as the act directs it to be done was a police regulation, and therefore was not unconstitutional or a violation of the power of Congress to regulate commerce. In that particular, and in that only, and, as it is said in the conclusion of the opinion, "that so much of the section of the act of the legislature of New York as applies to the breaches assigned in the declaration does not assume to regulate commerce between the port of New York and foreign ports, and that so much of said act is constitutional." (11 Peters, 143.) But as to all besides in that opinion as to the constitutional power of Congress to regulate commerce,  except *430 the disclaimer in the 132d page, that it was not intended to enter into any examination of the question, whether the power to regulate commerce be or be not exclusive of the States,  and especially the declaration that persons were not the subjects of commerce, the opinion had not the assent of a majority of the members of this court, nor even that of a majority of the judges who concurred in the judgment. The report of the case in Peters, and the opinion of Mr. Justice Baldwin, accidentally excluded from the report, without the slightest fault in the then reporter of the court or in the clerk, but which we have in full in Baldwin's View of the Constitution, published in the same year, fully sustain what I have just said. I mention nothing from memory, and stand upon the record for all that I have said, or shall say, concerning the case.
The court then consisted of seven justices, including the chief justice; all of us were present at the argument; all of us were in consultation upon the case; all of us heard the opinions read, which were written by Messrs. Justices Thompson and Barbour, in the case; and all of us, except Mr. Justice Baldwin, were present in this room when Mr. Justice Barbour read the opinion which appears in Peters as the opinion of the court.
The case had been argued by counsel on both sides, as if the whole of the act of New York were involved in the certificate of the division of opinion by which it was brought before this court. The point certified was in these words:  "That the act of the legislature of New York, mentioned in the plaintiff's declaration, assumes to regulate trade and commerce between the ports of New York and foreign ports, and is unconstitutional and void."
In the consultation of the judges upon the case, as the report shows, the first point considered by us was one of jurisdiction. That is, that the point certified was a submission of the whole case, which is not permitted, and was not a specific point arising on the trial of the cause. The court thought it was the latter, principally for the reason given by Mr. Justice Thompson, as it appears in his opinion. That reason was, that the question arose upon a general demurrer to the declaration, and that the certificate under which the cause was sent to this court contains the pleadings upon which the question arose, which show that no part of the act was drawn in question, except that which relates to the neglect of the master to report to the mayor or recorder an account of his passengers, according to the requisitions of the act. In the discussion of the case, however, by the judges, the nature and exclusiveness of the power in Congress to regulate commerce was much considered. There was a divided mind among us about it. Four of the *431 court being of the opinion, that, according to the Constitution and the decisions of this court in Gibbons v. Ogden and in Brown v. Maryland, the power in Congress to regulate commerce was exclusive. Three of them thought otherwise. And to this state of the court is owing the disclaimer in the opinion, already mentioned by me, that the exclusiveness of the power to regulate commerce was not in the case a point for examination.
But there was another point of difference among the judges in respect to what was commerce under the constitutional grant to Congress, particularly whether it did not include an intercourse of persons and passengers in vessels. Two of the court  the report of the case shows it  thought, in the language of the opinion, that "persons are not subjects of commerce." Mr. Justice Thompson declined giving any opinion on that point, and repeated it in the opinion published by him. Four of the justices, including Mr. Justice Baldwin, thought that commerce did comprehend the intercourse of persons or passengers. For this statement I refer to the opinion of Mr. Justice Thompson, to the dissenting opinion of Mr. Justice Story, to the opinion of Mr. Justice Baldwin, to the constantly avowed opinion of Mr. Justice McLean, and to what has always been known by the justices of this court to be my own opinion upon this point.
In this state of the opinions of the court, Mr. Justice Thompson was designated to write an opinion,  that the law in question was a police regulation, and not unconstitutional. He did so, and read to the court the opinion, which he afterwards published. It was objected to by a majority of the court, on account of some expressions in it concerning the power of Congress to regulate commerce, and as our differences could not be reconciled, Mr. Justice Thompson said he would read it as his own.
Then Mr. Justice Barbour was asked to write an opinion for the majority of the court. He did so, and read that which is printed as such, in our last conference of that term, the night before the adjournment of the court. The next day it was read in court, all of the judges being present when it was read, except Mr. Justice Baldwin. In the course of that morning's sitting, or immediately after it, Mr. Justice Baldwin, having examined the opinion, objected to its being considered the opinion of the court, on account of what was said in it concerning the power of Congress to regulate commerce, and what was commerce. He sought Mr. Justice Barbour, with the view of having it erased from the opinion, declaring, as all the rest of us knew, that his objection to the opinion of *432 Mr. Justice Thompson was on account of what it contained upon the subject of commerce; that his objection to the reasoning upon the same matter in Mr. Justice Barbour's opinion was stronger, and that he had only assented that an opinion for the court should be written, on the understanding that so much of the act of New York as was in issue by the pleadings should be treated as a regulation, not of commerce, but police. Without his concurrence, no opinion could have been written. Unfortunately, Mr. Justice Barbour had left the court-room immediately after reading his opinion, already prepared to leave Washington in a steamer which was in waiting for him. Mr. Justice Baldwin did not see him. The court was adjourned. Then there was no authority to make any alteration in what had been read as the opinion of the court. Mr. Justice Baldwin wished it, but, under the circumstances of preparation which each judge was making for his departure from Washington, nothing was done, and Mr. Justice Baldwin determined to neutralize what he objected to in the opinion by publishing in the reports his own opinion of the case. That was not done, but he did so contemporarily with the publication of the reports, in his View of the Constitution. There it is, to speak for itself, and it shows, as I have said, that so much of the opinion in the case of New York v. Miln as related to commerce did not have the assent of Mr. Justice Baldwin, and therefore not the assent of a majority of the court.
How, then, did the case stand? Mr. Justice Thompson gave his own opinion, agreeing with that of Mr. Justice Barbour, that so much of the section of the act of the legislature of New York as applies to the breaches assigned in the declaration does not assume to regulate commerce between the port of New York and foreign ports, and that so much of said section is constitutional, but giving his own views of the commercial question as it stood in relation to the case. The attitude of Mr. Justice Baldwin with respect to the opinion has just been told. Mr. Justice Story dissented from every part of the opinion, on the ground that the section of the act in controversy was a regulation of commerce, which a State could not constitutionally pass. Mr. Justice McLean is here to speak for himself, and he did then speak as he has done to-day in these cases concerning the power in Congress to regulate commerce being exclusive, and held that persons are the subjects of commerce as well as goods, contrary to what is said in the opinion (136th page), that persons are not. I certainly objected to the opinion then, for the same reasons as Mr. Justice McLean. Thus there were left of the seven judges but two, the Chief Justice and Mr. Justice Barbour, in favor of the opinion as a whole.
*433 I have made this narrative and explanation, under a solemn conviction of judicial duty, to disabuse the public mind from wrong impressions of what this court did decide in that case; and particularly from the misapprehension that it was ever intended by this court, in the case of New York v. Miln, to reverse or modify, in any way or in the slightest particular, what had been the judgments and opinions expressed by this court in the cases of Gibbons v. Ogden and Brown v. Maryland. And I am happy in being able to think, notwithstanding the differing opinions which have been expressed concerning what was decided in those cases, that they are likely to stand without reversal.
The chief justice, the morning after I had read the foregoing statement in the case of New York v. Miln, made another to counteract it, in which he says his recollections differ from mine in several particulars. I do not complain of it in any way. But it enables me to confirm my own in some degree from his, and in every other particular in which it does not give such assistance, the facts related by me are indisputable, being all in the report of the case in Peters, from which I took them. They are in exact coincidence, too, with my own recollections.
The only fact in my statement not altogether, but in part, taken from the record, is Mr. Justice Baldwin's discontent with the opinion written by Mr. Justice Barbour, and his wish that it might not as a whole be published in our volume of reports as the opinion of the court. The chief justice admits that Mr. Justice Baldwin did apply to him after the adjournment of the court, and before they left Washington, for that purpose. Now if, by mistake or oversight, a judge shall fall into an admission, which more care afterwards enables him to recall and correct before the judgment has been published, but after it has been read, whatever may be the operation of the judgment, does it follow that the argument in the opinion in which the judgment is given continues to be the law of the court? And if the same judge, after more careful and matured thought, publishes contemporarily his opinion, differing from the dictum which had escaped his notice, will that make it law? Is it not plain that it is a case of mistake, which cannot make the law? And if his coöperation is essential to the validity of the original opinion, from those who may advocate it being thrown into the minority by his withdrawal, and his declaration that he never meant to coöperate in it in the particular objected to, can it be said that it ever was the law of the court? Is it at all an uncommon thing in the English and American law reports, that a case is published as law which is *434 deemed afterwards not to be so, on account of error in its publication, from its not having been really the opinion of the court when it was published? Mistake in all cases restores things to the correct condition in which they were before the mistake was made, except where the policy of the law has determined that it shall be otherwise. A single mistaken and misstated case is not within that policy. Long acquiescence, or repeated judicial decisions, may be, and then only because the interests of society have been accommodated to the error.
But the chief justice says that he has the strongest reason to suppose that Mr. Justice Baldwin became satisfied, because, in his opinion in the case of Groves v. Slaughter, he quotes the case of New York v. Miln with approbation, when speaking in that case of the difference between commercial and police powers.
I certainly cannot object to the opinion of Mr. Justice Baldwin in Groves v. Slaughter being a test between the chief justice and myself in this matter; for Mr. Justice Baldwin's opinion in that case is the strongest proof that could have been given four years afterwards, by himself, that he never was reconciled to the opinion of Mr. Justice Barbour in Miln's case as a whole. For instance, in that opinion he does not leave the exclusive power of Congress to regulate commerce to the disclaimer in Miln's case, that it was not the intention of the judges to decide that point in that case. He says,  "That the power of Congress to regulate commerce among the States is exclusive of any interference by the States has been, in my opinion, conclusively settled by the solemn opinions of this court in Gibbons v. Ogden, 9 Wheat. 186-222; and in Brown v. Maryland, 12 Wheat. 438-446. If these decisions are not to be taken as the established construction of this clause of the Constitution, I know of none which are not yet open to doubt, nor can there be any adjudications of this court which must be considered as authoritative upon any question, if these are not to be so on this." And the learned judge goes on to say,  "Cases may indeed arise, wherein there may be found difficulty in discriminating between regulations of commerce among the several States and the regulation of the internal police of a State, but the subject-matter of such regulations of either description will lead to the true line which separates them, when they are examined with a disposition to avoid a collision between the powers granted to the Federal government by the people of the several States and those which they reserved exclusively to themselves. Commerce among the States, as defined by this court, is trade, traffic, intercourse, and dealing in articles of commerce between States by its citizens *435 or others, and carried on in more than one State. Police relates only to the internal concerns of one State; and commerce within it is purely a matter of internal regulation, when confined to those articles which have become so distributed as to form items in the common mass of property. It follows, that any regulation which affects the commercial intercourse between any two or more States, referring solely thereto, is within the powers granted exclusively to Congress, and that those regulations which affect only the commerce carried on within one State, or which refer only to subjects of internal police, are within the powers reserved." And then it is that the sentence follows cited by the chief justice to show that he had reason to suppose that Mr. Justice Baldwin had become satisfied. The citation made by me from his opinion shows what his opinion was in respect to the power of Congress to regulate commerce, confirming what I have said in my statement, that four of us were of the same opinion when that point was touched upon in the case of Miln, and that Mr. Justice Baldwin refused to sanction what was said by Mr. Justice Thompson in respect to it in the opinion written by him for the court in Miln's case. And that he was not satisfied as to that sentence of Mr. Justice Barbour's opinion in which it is said that persons are not the subjects of commerce, is manifest from that part of his opinion in Groves v. Slaughter in which he says that commerce is "trade, traffic, intercourse";  intercourse, in the sense of commerce, meaning, as it always does, "connection by reciprocal dealings between persons and nations." But, further, the chief justice says that Mr. Justice Baldwin called upon him and said there was a sentence or paragraph in the opinion with which he was dissatisfied, and wished altered, thus confirming all that I have said in respect to the case in what is in it concerning persons not being the subjects of commerce, that being the only declaration in the opinion relating to commerce, it having been previously declared that the exclusiveness of the regulation of commerce in Congress was not to be decided. All that was meant to be decided in Miln's case was, that the regulation stated in the certificate of division of opinion between the judges in the Circuit Court was not a regulation of commerce, but one of police. In respect to our lamented brother Barbour not knowing the dissatisfaction of our brother Baldwin and other members of the court with the opinion, I know that he did know it. In regard to the chief justice's declaration, that he had never heard any further dissatisfaction expressed with the opinion by Mr. Justice Baldwin, and never at any time, until this case came before us, heard any from any other member of the court *436 who had assented to or acquiesced in the opinion; while, of course, that must be taken to be so, as far as the chief justice is concerned, I must say that I have never, in any instance, heard the case of Miln cited for the purpose of showing that persons are not within the regulating power of Congress over commerce, without at once saying to the counsel that that point had not been decided in that case. I have repeatedly done so in open court, and, as I supposed, was heard by every member of it. I have only said, in reply to the chief justice's statement, what was necessary to show that it was not decided in Miln's case, by this court, that persons are not within the power of Congress to regulate commerce.
Indeed, it would be most extraordinary if the case of Gibbons v. Ogden could be considered as having been reversed by a single sentence in the opinion of New York v. Miln; upon a point, too, not in any way involved in the certificate of the division of opinion by which that case was brought to this court. The sentence is, that "they [persons] are not the subjects of commerce; and, not being imported goods, cannot fall within a train of reasoning founded upon the construction of a power given to Congress to regulate commerce, and the prohibition to the States from imposing a duty on imported goods."
In the case of Gibbons v. Ogden the court said,  "Commerce is traffic; but it is something more. It is intercourse. It describes the commercial intercourse between nations in all its branches, and is regulated by prescribing rules for carrying on that intercourse."
Again:  "These words comprehend every species of commercial intercourse between the United States and foreign nations. No sort of trade can be carried on between this country and any other to which this power does not extend." "In regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several States. It would be a very useless power if it could not pass those lines." "If Congress has the power to regulate it, that power must be exercised whenever the subject exists. If it exists within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State." "The power of Congress comprehends navigation within the limits of every State in the Union, so far as that navigation may be connected with commerce with foreign nations, or among the several States." "It is the power to regulate; that is, to prescribe the rule by which commerce is governed." "Vessels have always been employed to a greater or less extent in the transportation of *437 passengers, and have never been supposed, on that account, withdrawn from the control or protection of Congress. Packets which ply along the coast, as well as those which make voyages between Europe and America, consider the transportation of passengers as an important part of their business. Yet it never has been suspected that the general laws of navigation did not apply to them. A coasting-vessel employed in the transportation of passengers is as much a portion of the American marine as one employed in the transportation of cargo."
In my opinion, the case of Gibbons v. Ogden rules the cases before us. If there were no other reasons, with such an authority to direct my course, I could not refrain from saying that the acts of Massachusetts and New York, so far as they are in question, are unconstitutional and void.
The case of Gibbons v. Ogden, in the extent and variety of learning, and in the acuteness of distinction with which it was argued by counsel, is not surpassed by any other case in the reports of courts. In the consideration given to it by the court, there are proofs of judicial ability, and of close and precise discrimination of most difficult points, equal to any other judgment on record. To my mind, every proposition in it has a definite and unmistakable meaning. Commentaries cannot cover them up or make them doubtful.
The case will always be a high and honorable proof of the eminence of the American bar of that day, and of the talents and distinguished ability of the judges who were then in the places which we now occupy.
There were giants in those days, and I hope I may be allowed to say, without more than judicial impressiveness of manner or of words, that I rejoice that the structure raised by them for the defence of the Constitution has not this day been weakened by their successors.
Mr. Justice CATRON.

SMITH v. TURNER.
The first question arising in this controversy is, whether the legislation of New York, giving rise to the suit, is a regulation of commerce; and this must be ascertained, in a great degree, from a due consideration of the State laws regulating the port of the city of New York in respect to navigation and intercourse. They are embodied in a system running through various titles in the Revised Statutes. The sections on which the action before us is founded will be found in Vol. I. pp. 445, 446. Title fourth purports to treat of the marine hospital and its funds, then, in 1829, erected on Staten Island, under the superintendence *438 of a health-officer, who is to be a physician, and certain commissioners of health. By section seventh, it is provided, that "the health-commissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, in his name of office, the following sums from the master of every vessel that shall arrive in the port of New York, viz.:  1. From the master of every vessel from a foreign port, for himself and every cabin passenger, one dollar and fifty cents; and for each steerage passenger, mate, sailor, or marine, one dollar. 2. From the master of each coasting-vessel, for each person on board, twenty-five cents; but no coasting-vessel from the States of New Jersey, Connecticut, and Rhode Island shall pay for more than one voyage in each month, computing from the first voyage in each year."
"Sec. 8. The moneys so received shall be denominated `hospital moneys,' and shall be appropriated to the use of the marine hospital, deducting a commission to the health-commissioner of two and one half per cent. for collection."
Turner, the health-commissioner, sued Smith, as master of the ship Henry Bliss, a British vessel, coming from Liverpool, in England, for the amount of money claimed as due from the defendant under the above provisions, because he brought in two hundred and ninety-five steerage passengers, who were British subjects, immigrating into the United States, and intending to become inhabitants thereof.
By section ninth, the master paying the hospital money may recover from each person for whom it was paid the sum paid on his account, in case of a foreign vessel; and by section tenth, the master of a coasting-vessel shall pay the tax in twenty-four hours after the vessel arrives in port, under the penalty of one hundred dollars.
The eleventh section directs the health-commissioners annually to account to the Comptroller of the State for the moneys received by them by means of the tax for the use of the marine hospital, and if such moneys shall in any one year exceed the sum necessary to defray the expenses of their trust, including salaries, &c., they shall pay over such surplus to the Society for the Reformation of Juvenile Delinquents in the city of New York, for the use of that society.
By the act of April 25th, 1840, the Comptroller of the State was authorized to draw on the treasurer, annually, for twenty years, a sum not exceeding fifteen thousand dollars in each year, for the benefit of the State hospital in the city, and a sum of eight thousand dollars is there recognized as payable to the Society for the Reformation of Juvenile Delinquents; and the *439 city hospital is bound by the act to support at least twenty indigent persons from any part of the State. Thus a State hospital is also supported out of the fund, as well as an institution for young culprits, imposing an annual charge on the fund of twenty-three thousand dollars, having no necessary connection with commerce; and, by the act of 1841, three medical dispensaries are endowed out of the fund to an amount of four thousand five hundred dollars.
The ship Henry Bliss was engaged in foreign commerce when she arrived in the port of New York, and when the tax was demanded of Smith, the master, by Turner, the health-commissioner. The baggage of passengers was on board, and also their tools of trade, if they had any, and of course the passengers were on board, for the master is sued, in one count, for landing them after the demand. The tax of two hundred and ninety-five dollars was therefore demanded before the voyage was ended, or the money earned for carrying passengers and their goods. The vessel itself was undoubtedly regulated by our acts of Congress, and also by our treaty with Great Britain of 1815,  the national character of the vessel being British. She had full liberty to land, and so the goods on board belonging to trade and coming in for sale stood regulated, and could be landed and entered at the custom-house. And by the same treaty, passengers on board coming to the United States in pursuit of commerce in buying and selling were free to land. The master and crew were of the ship and navigation, and stood equally regulated with the ship. The property of passengers could not be taxed or seized, being expressly and affirmatively protected by the act of 1799. It was an import, and whilst it continued in form of an import, could be landed and transferred by the owners inland. This is the effect of the decision in Brown v. The State of Maryland. As the State power had nothing left to act upon but the person simply, nor any means of collecting the tax from passengers, it was levied on the master, of necessity, in a round sum.
As the ship was regulated, and was free to land all the property on board, the question arises, whether these immigrant passengers were not also regulated, and entitled by law to accompany their goods and to land, exempt from State taxation.
The record states, that "the two hundred and ninety-five passengers imported in the ship Henry Bliss belonged to Great Britain, and intended to become inhabitants of the United States."
By the laws of nations, all commerce by personal intercourse is free until restricted; nor has our government at any time proposed to restrain by taxation such immigrants as the record describes.
*440 Our first step towards establishing an independent government was by the Declaration of Independence. By that act it was declared that the British king had endeavoured to prevent the population of the colonies by obstructing the laws for the naturalization of foreigners, and refusing to pass others to encourage their migration hither, and raising the conditions of new appropriations of lands. During the Confederation, the States passed naturalization laws for themselves, respectively, in which there was great want of uniformity, and therefore the Constitution provided that Congress should have power "to establish a uniform rule of naturalization." In execution of this power, Congress passed an act at its second session, (March 26th, 1790,) providing that any alien, being a free white person, who shall have resided in the United States two years, and in any one State one year, may become a citizen by taking an oath to support the Constitution in a court of record, and such step shall naturalize all the children of such person under twenty-one years of age. In 1795, another act was passed (ch. 20), requiring five years residence; and on the 26th of April, 1802, (ch. 28,) the naturalization laws were amended. This act is now in force, with slight alterations. Under these laws have been admitted such numbers, that they and their descendants constitute a great part of our population. Every department of science, of labor, occupation, and pursuit, is filled up, more or less, by naturalized citizens and their numerous offspring. From the first day of our separate existence to this time has the policy of drawing hither aliens, to the end of becoming citizens, been a favorite policy of the United States; it has been cherished by Congress with rare steadiness and vigor. By this policy our extensive and fertile country has been, to a considerable extent, filled up by a respectable population, both physically and mentally, one that is easily governed and usually of approved patriotism. We have invited to come to our country from other lands all free white persons, of every grade and of every religious belief, and when here to enjoy our protection, and at the end of five years to enjoy all our rights, except that of becoming President of the United States. Pursuant to this notorious and long established policy, the two hundred and ninety-five passengers in the Henry Bliss arrived at the port of New York.
Keeping in view the spirit of the Declaration of Independence with respect to the importance of augmenting the population of the United States, and the early laws of naturalization, Congress, at divers subsequent periods, passed laws to facilitate and encourage more and more the immigration of Europeans into the United States for the purpose of settlement and residence.
*441 The twenty-third section of the general collection act of the 2d of March, 1799, requires that every master of a vessel arriving in the United States shall have on board a manifest, in writing, signed by such master, of the goods, wares, and merchandise on board such vessel, "together with the name or names of the several passengers on board the said ship or vessel, distinguishing whether cabin or steerage passengers, or both, with their baggage, specifying the number and description of packages belonging to each respectively."
The twenty-fifth section of the same act makes it the duty of the master to produce, on his arrival within four leagues of the coast, such manifest to such officer or officers of the customs as shall first come on board his said ship or vessel; and by the twenty-sixth section, a fine of five hundred dollars is imposed on the master for not producing such manifest.
By the thirtieth section of the same act, the master is required, within twenty-four hours after his arrival from a foreign port, to repair to the office of the collector and make report of the arrival of his ship; "and within forty-eight hours after such arrival, shall make a further report in writing to the collector of the district, which report shall be in the form, and shall contain all the particulars, required to be inserted in a manifest"; and he is required to make oath or solemn affirmation to the truth of such report. But the material section of that act is the forty-sixth. That section declares, that "the wearing apparel, and other personal baggage, and the tools or implements of a mechanical trade only, of persons who arrive in the United States shall be free of duty." The same section prescribes a form of declaration, that the packages contain no goods or merchandise other than the wearing apparel, personal baggage, and tools of trade belonging to the person making the declaration, or his family. Before the property exempt from duty is allowed to be landed, a permit to do so must be obtained from the collector of the port, and each owner is bound to pay a fee for such privileges, for the support of the revenue-officers.
It is quite obvious, from these proceedings, that the passengers who were thus in the contemplation of Congress were, for the most part, immigrants, or persons coming to settle in the United States with their families. The act of the 27th of April, 1816, section second, reënacts, in substance, that part of the forty-sixth section of the act of the 2d of March, 1799, above quoted. Exemptions and privileges in favor of passengers arriving in the United States are carried still further, by the provisions of the fourth subdivision of the ninth section of the duty act of the 30th of August, 1842. Among articles *442 declared by that act to be free of duty are "wearing apparel in actual use, and other personal effects, not merchandise, professional books, instruments, implements and tools of trade, occupation, or employment, of persons arriving in the United States." This provision is very broad. It not only exempts from duty tools of mechanical trades, but all instruments and implements of occupation and employment, and also all professional books, without limitation of value or numbers.
A still further enlargement of these privileges and exemptions is contained in the duty act of the 30th of July, 1846; for the eleventh section of that act (schedule 1), in addition to the passengers' articles made free by the act of 1842, declares free from duty "household effects, old and in use, of persons or families from foreign countries, if used abroad by them, and not intended for any other person or persons."
Now, is it possible to reconcile State laws, laying direct and heavy taxes on every immigrant passenger and every member of his family, with this careful, studied, and ever-increasing security of immigrants against every legal burden or charge of any kind? Could Congress have done more than it has done, unless it had adopted what would have been justly regarded as a strange act of legislation, the insertion of passengers themselves in the list of free articles?
The first and one of the principal acts to be performed on bringing ships and goods from foreign countries into the United States is the production of a manifest; and in such manifest, along with the specifications of the cargo, the names and description of the passengers, with a specification of their packages of property, are to be inserted. Then comes a direct exemption of all such property from duties. All agree, that, if Congress had included the owners, and declared that immigrants might come into the country free of tax, these State laws would be void; and can any man say, in the face of the legislation of Congress from 1799 to 1846, that the will of Congress is not as clearly manifested as if it had made such a direct declaration? It is evident that, by these repeated and well-considered acts of legislation, Congress has covered, and has intended to cover, the whole field of legislation over this branch of commerce. Certain conditions and restraints it has imposed; and subject to these only, and acting in the spirit of all our history and all our policy, it has opened the door widely and invited the subjects of other countries to leave the crowded population of Europe and come to the United States, and seek here new homes for themselves and their families. We cannot take into consideration what may or may not be the policy adopted or cherished by particular States; some States may *443 be more desirous than others that immigrants from Europe should come and settle themselves within their limits; and in this respect no one State can rightfully claim the power of thwarting by its own authority the established policy of all the States united.
The foregoing conclusions are fortified by the provisions of the act of March 2d, 1819. It provides that not more than two passengers shall be brought or carried to each five tons' measure of the vessel, under a severe penalty; and if the number exceeds the custom-house measure by twenty persons, the vessel itself shall be forfeited, according to the ninety-first section of the act of 1799. The kind and quantity of provisions are prescribed, as well as the quantity of water, and if the passengers are put on short allowance, a right is given to them to recover at the rate of three dollars a day to each passenger, and they are allowed to recover the same in the manner seamen's wages are recovered, that is, in a summary manner, in a District Court of the United States. The master is also required, when the vessel arrives in the United States, at the same time that he delivers a manifest of his cargo, and if there be none, then when he makes entry of the vessel, to deliver and report to the collector, by manifest, all the passengers taken on board the ship at any foreign port or place, designating age, sex, and occupation, the country to which they severally belong, and that of which it is their intention to become inhabitants; which manifest shall be sworn to as manifests of cargo are, and subject to the same penalties. These regulations apply to foreign vessels as well as to our own, which bring passengers to the United States.
1. By the legislation of Congress, the passenger is allowed to sue in a court of the United States, and there to appear in person, as a seaman may, and have redress for injuries inflicted on him by the master during the voyage.
2. The passenger is allowed to appear at the custom-house with his goods, consisting often of all his personal property, and there, if required, take the oath prescribed by the acts of Congress, and get his property relieved from taxation. The clothes on his person, and the money in his purse, from which the tax is sought, may freely land as protected imports; and yet the State laws under consideration forbid the owner to land; they hold him out of the courts, and separate him from his property, until, by coercion, he pays to the master for the use of the State any amount of tax the State may at its discretion set upon him and upon his family; and this on the assumption that Congress has not regulated in respect to his free admission.
*444 And how does the assumption stand, that a poll-tax may be levied on all passengers, notwithstanding our commercial treaties? By the fourteenth article of the treaty of 1794 (known as Jay's treaty), and which article was renewed by our treaty with Great Britain of 1815, it was stipulated that reciprocal liberty of commerce should exist between the United States and all the British territories in Europe:  "That the inhabitants of Great Britain shall have liberty freely and securely to come with their ships and cargoes to our ports, to enter the same, and to remain and reside in any part of our territories; also, to hire and occupy houses and warehouses for the purposes of their commerce." And that no higher or other duties should be imposed on British vessels than were by our laws imposed on American vessels coming into our ports from Great Britain, and that our people should have reciprocal rights in the British ports and territories.
The taxes under consideration are imposed on all persons engaged in commerce who are aliens, no matter where they are from. We have commercial treaties of the same import with the one above recited with almost every nation whose inhabitants prosecute commerce to the United States; all these are free to come and enter our country, so far as a treaty can secure the right. Many thousands of men are annually engaged in this commerce. It is prosecuted, for a great portion of the territory of the United States, at and through the two great ports where these taxes have been imposed; and it is a matter of history, that the greater portion of our foreign commerce enters these ports. There aliens must come as passengers to prosecute commerce and to trade, and the question is, Can the States tax them out, or tax them at all, in the face of our treaties expressly providing for their free and secure admission?
It is thus seen to what dangerous extents these State laws have been pushed; and that they may be extended, if upheld by this court, to every ferry-boat that crosses a narrow water within the flow of tide which divides States, and to all boats crossing rivers that are State boundaries, is evident.
These laws now impose taxes on vessels through their masters, in respect to the masters and crews, and all passengers on board, when the vessel commences and ends its voyage within sight and hearing of the port where the tax is demandable, making no distinction between citizens and aliens. They tax, through the masters, all American vessels coming from other States (including steamboats) protected by coasting licenses, under United States authority, and also exempt by the Constitution from paying duties in another State. They tax, through the masters, foreign vessels protected by the Constitution *445 from tonnage duties, save by the authority of Congress, and who are also protected by treaty stipulations. They tax passengers who are owners and agents of the vessel, and accompany the ship. They tax owners, agents, and servants who accompany goods brought in for sale, and who are by our treaties at full liberty freely to come and reside in any part of our territories in pursuit of foreign commerce.
The tax is demandable from the master on entering the port, and the law provides that, when he pays the money to the State collector, the master may, by way of remedy over, recover by suit from each passenger the sum paid on his account. And it is insisted that the master had still a better remedy in the carrier's lien on goods of passengers, which he might detain, and by this means coerce payment at once before the vessel landed.
Plainly, this latter was the principal mode of distress contemplated by the State authorities, as wives and children could not be sued, nor have they any property, and therefore property of heads of families could only be reached on their account.
Now what do these laws require the master to do? As the agent of New York, and as her tax-collector, he is required to levy the tax on goods of passengers, and make it out of property which is beyond the reach of the State laws; and yet the thing is to be done by force of these same State laws. Suppose it to be true, that this forcing the master to levy a distress on protected goods is yet no tax on him or his vessel, and therefore, in that respect, the law laying the tax does not violate the Constitution; all this would only throw the tax from one protected subject to another,  it would shift the burden from the master and vessel on to the goods of the passenger, which are as much protected by the Constitution and acts of Congress as the master and vessel.
And how would this assumption, that a State law may escape constitutional invasion, by giving a remedy over, operate in practice?
Before the Constitution existed, the States taxed the commerce and intercourse of each other. This was the leading cause of abandoning the Confederation and forming the Constitution,  more than all other causes it led to the result; and the provision prohibiting the States from laying any duty on imports or exports, and the one which declares that vessels bound to or from one State shall not be obliged to enter, clear, or pay duties in another, were especially intended to prevent the evil. Around our extensive seaboard, on our great lakes, and through our great rivers, this protection is relied on against State assumption and State interference. Throughout the *446 Union, our vessels of every description go free and unrestrained, regardless of State authority. They enter at pleasure, depart at pleasure, and pay no duties. Steamboats pass for thousands of miles on rivers that are State boundaries, not knowing nor regarding in whose jurisdiction they are, claiming protection under these provisions of the Constitution. If they did not exist, such vessels might be harassed by insupportable exactions. If it be the true meaning of the Constitution, that a State can evade them by declaring that the master may be taxed in regard to passengers, on the mere assertion that he shall have a remedy over against the passengers, citizens and aliens, and that the State may assess the amount of tax at discretion, then the old evil will be revived, as the States may tax at every town and village where a vessel of any kind lands. They may tax on the assumption of self-defence, or on any other assumption, and raise a revenue from others, and thereby exempt their own inhabitants from taxation.
If the first part of the State law is void, because it lays a duty on the vessel, under the disguise of taxing its representative, the master, how can the after part, giving the master a remedy over against passengers, be more valid than its void antecedent? All property on board belonging to passengers is absolutely protected from State taxation. And how can a State be heard to say, that truly she cannot make distress on property for want of power, but still that she can create the power in the master to do that which her own officers cannot do?
In the next place, the Constitution, by article first, section eighth, provides, that "the Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States."
Such taxes may be laid on foreign commerce as regulations of revenue; these regulations are the ordinary ones to which the Constitution refers. Congress has no power to lay any but uniform taxes when regulating foreign commerce to the end of revenue,  taxes equal and alike at all the ports of entry, giving no one a preference over another. Nor has Congress power to lay taxes to pay the debts of a State, nor to provide by taxation for its general welfare. Congress may tax for the treasury of the Union, and here its power ends.
The question, whether the power to regulate commerce and navigation is exclusive in the government of the United States, or whether a State may regulate within its own waters and ports in particular cases, does not arise in this cause. The question here is, whether a State can regulate foreign commerce *447 by "a revenue measure," for the purposes of its own treasury. If the State taxes, with the consent of Congress, the vessel directly, by a tonnage duty, or indirectly, by taxing the master and crew, or taxes the cargo by an impost, or assumes to tax passengers, or to regulate in any other mode, she assumes to exercise the jurisdiction of Congress, and to regulate navigation engaged in foreign commerce; she does that which Congress has the power to do, and is restrained by the Constitution within the same limits to which Congress is restricted. And as Congress cannot raise money for the benefit of a State treasury, so neither can a State exercise the same power for the same purpose.
Again: give the argument all the benefit that it claims; concede the full municipal power in the State to tax all persons within her territory, as a general rule, whether they have been there a year or an hour; and still she could not impose a capitation tax on these passengers by the hand of her own tax-collector. The tax was demanded whilst they were on board. All the property they brought with them, the clothes and moneys on their persons, were imports; that is, "property imported or brought into this country from another country." No duty could be laid on it by the State; as, until it was separated from the ship, it belonged to foreign commerce, and was an import. Had the tax been imposed directly on the passengers, as a poll-tax is on land, and had the heads of families been bound to pay for their wives, children, and servants, and had the collector, with the tax-list in his hand (which was an execution in fact), gone on board, he would have found no property that was not protected, which he could touch by way of distress to make the money. The passengers could defy him, could turn about, go to another port in the next State, land, and go their way. Here, then, a demand was made for a most stringent tax, which could not be enforced at the time and place of demand from anybody, without violating the Constitution, various acts of Congress, and a most important commercial treaty.
It has also been urged on the court, with great earnestness, that, as this tax is levied for the support of alien paupers and purposes of city police, and as the police power has not been taken from the States, that the "object" for which it was imposed brings it within the State power. City police is part of the State police, and on this assumption a poll-tax on foreigners might be imposed to maintain almost the entire municipal power throughout the State, embracing the administration of justice in criminal cases, as well as numerous city expenses, together with the support of the poor. The objects *448 and assumptions might, indeed, be endless. Were this court once to hold that aliens belonging to foreign commerce, and passengers coming from other States, could have a poll-tax levied on them on entering any port of a State, on the assumption that the tax should be applied to maintain State police powers, and by this means the States treasury could be filled, the time is not distant when States holding the great inlets of commerce might raise all necessary revenues from foreign intercourse, and from intercourse among the States, and thereby exempt their own inhabitants from taxation altogether. The money once being in the treasury, the State legislature might apply it to any and every purpose, at discretion, as New York has done; and if more was needed, the capitation tax might be increased at discretion, the power to tax having no other limitation.
The passengers in this instance were not subjects of any police power or sanatory regulation, but healthy persons of good moral character, as we are bound to presume, nothing appearing to the contrary; nor had the State of New York manifested by her legislation any objection to such persons entering the State.
Again: it was urged that the States had the absolute power to exclude all aliens before the Constitution was formed, and that this power remained unsurrendered and unimpaired; that it might be exercised in any form that the States saw proper to adopt; and having the power to admit or reject at pleasure, the States might, as a condition to admission, demand from all aliens a sum of money, and if they refused to pay, the States might keep them out, nor could Congress or a treaty interfere. If such power existed in the State of New York, it has not been exerted in this instance. That it was intended to impose a condition hostile to the admission of the passengers, in respect to whom the master was sued, is without the slightest foundation. They were not hindered or interfered with in any degree by the State law. It is a general revenue measure, and declares that the health-commissioner shall demand, and be entitled to receive, and in case of neglect or refusal shall sue for and recover, from the master of every vessel from a foreign port that shall arrive in the port of New York, for himself and each cabin passenger, one dollar and fifty cents; and for each steerage passenger, mate, sailor, or marine, one dollar; and from the master of each coasting-vessel, for each person on board, twenty-five cents. No restraint is imposed on passengers, either of foreign vessels or of coasting-vessels. In the one case, as in the other, the merchants, traders, and visitors in the cabin, and the immigrants in the steerage, were equally free to *449 come into the harbour, and equally welcome to enter the State. She does not address herself to them at all, but demands a revenue duty from the master, making the presence of passengers the pretext. We have to deal with the law as we find it, and not with an imaginary case that it might involve, but undoubtedly does not.
For the reason just stated, I had not intended to examine the question presenting the State right claimed, but it has become so involved in the discussions at the bar and among the judges, that silence cannot be consistently observed. The assumption is, that a State may enforce a non-intercourse law excluding all aliens, and having power to do this, she may do any act tending to that end, but short of positive prohibition. If the premises be true, the conclusion cannot be questioned.
The Constitution was a compromise between all the States of conflicting rights among them. They conferred on one government all national power, which it would be impossible to make uniform in a process of legislation by several distinct and independent State governments; and in order that the equality should be preserved as far as practicable and consistent with justice, two branches of the national legislature were created. In one, the States are represented equally, and in the other, according to their respective populations. As part of the treaty-making power, the States are equal. The action of the general government by legislation or by treaty is the action of the States and of their inhabitants; these the Senate, the House of Representatives, and the President represent. This is the federal power. In the exercise of its authority over foreign commerce it is supreme. It may admit or it may refuse foreign intercourse, partially or entirely.
The Constitution is a practical instrument, made by practical men, and suited to the territory and circumstances on which it was intended to operate. To comprehend its whole scope, the mind must take in the entire country and its local governments. There were at the time of its adoption thirteen States. There existed a large territory beyond them already ceded by Virginia, and other territory was soon expected to be ceded by North Carolina and Georgia. New States were in contemplation, far off from ports on the ocean, through which ports aliens must come to our vacant territories and new States, and through these ports foreign commerce must of necessity be carried on by our inland population. We had several thousand miles of sea-coast; we adjoined the British possessions on the east and north for several thousand miles, and were divided from them by lines on land to a great extent; and on the west and south we were bounded for three thousand miles and more *450 by the possessions of Spain. With neither of these governments was our intercourse by any means harmonious at that time.
Provision had to be made for foreign commerce coming from Europe and other quarters, by navigation in pursuit of profitable merchandise and trade, and also to regulate personal intercourse among aliens coming to our shores by navigation in pursuit of trade and merchandise, as well as for the comfort and protection of visitors and travellers coming in by the ocean.
Then, again, on our inland borders, along our extensive lines of separation from foreign nations, trade was to be regulated; but more especially was personal intercourse to be governed by standing and general rules, binding the people of each nation on either side of the line. This could only be done by treaty of nation with nation. If the individual States had retained national power, and each might have treated for itself, any one might have broken its treaty and given cause of war, and involved other States in the war; therefore all power to treat, or have foreign intercourse, was surrendered by the States; and so were the powers to make war and to naturalize aliens given up. These were vested in the general government for the benefit of the whole. This became "the nation" known to foreign governments, and was solely responsible to them for the acts of all the States and their inhabitants.
The general government has the sole power by treaty to regulate that foreign commerce which consists in navigation, and in buying and selling. To carry on this commerce, men must enter the United States (whose territory is a unit to this end) by the authority of the nation; and what may be done in this respect will abundantly appear by what has been done from our first administration under the Constitution to the present time, without opposition from State authority, and without being questioned, except by a barren and inconsistent theory, that admits exclusive power in the general government to let in ships and goods, but denies its authority to let in the men who navigate the vessels, and those who come to sell the goods and purchase our productions in return.
Our first commercial treaty with Great Britain was that of 1794, made under the sanction of President Washington's administration. By the fourteenth article, already referred to, the inhabitants of the king of Great Britain, coming from his Majesty's territories in Europe, had granted to them liberty, freely and securely, and without hindrance or molestation, to come with their ships and cargoes to the lands, countries, cities, ports, places, and rivers within our territories, to enter the same, to resort there, to remain and reside there, without limitation *451 of time; and reciprocal liberty was granted to the people and inhabitants of the United States in his Majesty's European territories; but subject always, as to what respects this article, to the laws and statutes of the two countries respectively. This stipulation was substantially renewed by the treaty of 1815, article first. In the British dominions our inhabitants were to abide by the general laws of Great Britain, and in our territories the subjects and inhabitants of that country were to abide by the laws of the United States, and also by the laws of any State where they might be. But the treaty does not refer to laws of exclusion. The State laws could not drive out those admitted by treaty without violating it, and furnishing cause of war; nor could State laws interpose any hindrance or molestation to the free liberty of coming. We have similar treaties with many other nations of the earth, extending over much of its surface, and covering populations more than equal to one half of its inhabitants. Millions of people may thus freely come and reside in our territories without limitation of time, and after a residence of five years, by taking the proper steps, may be admitted to citizenship under our naturalization laws. Thousands of such persons have been admitted, and we are constantly admitting them now; and when they become citizens they may go into every State without restraint, being entitled "to all the privileges and immunities of citizens of the several States."
And as respects intercourse across our line of separation from the British possessions in America, it is agreed, by the third article of the treaty of 1794, "that it shall at all times be free to his Majesty's subjects and to the citizens of the United States, and also to the Indians dwelling on either side of said boundary-line, freely to pass and repass, by land or inland navigation, into the respective territories and countries of the two parties on the continent of America, (the country within the limits of the Hudson's Bay Company only excepted,) and to navigate all the lakes, rivers, and waters thereof; and freely to carry on trade and commerce with each other." Tolls and rates of ferriage are to be the same, on either side of the line, that natives pay on that side.
Although this treaty was abrogated by the war of 1812, still I understand that it was intended to be renewed, so far as it regulated intercourse at our inland borders, by the second article of the treaty of 1815.
Thus have stood fact and practice for half a century, in the face of the theory, that individual States have the discretionary power to exclude aliens, because the power was reserved to the States, is exclusively in them, and remains unimpaired by the Constitution.
*452 It is also insisted that the States may tax all persons and property within their respective jurisdictions, except in cases where they are affirmatively prohibited. This is a truism not open to denial. Certainly the States may tax their own inhabitants at discretion, unless they have surrendered the power. But constitutional exceptions to the State power are so broad as to render the claim valueless in the present instance. The States cannot lay export duties, nor duties on imports, nor tonnage duties on vessels. If they tax the master and crew, they indirectly lay a duty on the vessel. If the passengers on board are taxed, the protected goods  the imports  are reached.
In short, when the tax in question was demandable by the State law, and demanded, the ship rode in the harbour of New York, with all persons and property on board, as a unit belonging to foreign commerce. She stood as single as when on the open ocean, and was as exempt from the State taxing power.
For the reasons here given, I think the judgment of the State court should be reversed because that part of the State law on which it is founded was void.
GRIER, J.
I concur with this opinion of my brother Catron.
NOTE.  I here take occasion to say, that the State police power was more relied on and debated in the cause of Norris v. The City of Boston than in this cause. In that case I had prepared an opinion, and was ready to deliver it when I delivered this opinion in open court. But being dissatisfied with its composition, and agreeing entirely with my brother Grier on all the principles involved in both causes, and especially on the State power of exclusion in particular instances, I asked him to write out our joint views in the cause coming up from Massachusetts. This he has done to my entire satisfaction, and therefore I have said nothing here on the reserved powers of the States to protect themselves, but refer to that opinion as containing my views on the subject, and with which I fully concur throughout.
Mr. Justice McKINLEY.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
I have examined the opinions of Mr. Justice McLean and Mr. Justice Catron, and concur in the whole reasoning upon the main question, but wish to add, succinctly, my own views upon a single provision of the Constitution.
The first clause of the ninth section and first article of the *453 Constitution provides, that "the migration or importation of such persons as any of the States now existing shall think proper to admit shall not be prohibited by the Congress prior to the year 1808; but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person."
On the last argument of this cause, no reference was made to this clause of the Constitution; nor have I ever heard a full and satisfactory argument on the subject. Yet on a full examination of this clause, connected with other provisions of the Constitution, it has had a controlling influence on my mind in the determination of the case before us. Some of my brethren have insisted that the clause here quoted applies exclusively to the importation of slaves. If the phrase, "the migration or importation of such persons," was intended by the Convention to mean slaves only, why, in the assertion of the taxing power, did they, in the same clause, separate migration from importation, and use the following language:  "But a tax or duty may be imposed on such importation, not exceeding ten dollars for each person"? All will admit, that, if the word migration were excluded from the clause, it would apply to slaves only. An unsuccessful attempt was made in the Convention to amend this clause by striking out the word migration, and thereby to make it apply to slaves exclusively. In the face of this fact, the debates in the Convention, certain numbers of the Federalist, together with Mr. Madison's report to the legislature of Virginia in 1799,  eleven years after the adoption of the Constitution,  are relied on to prove that the words migration and importation are synonymes, within the true intent and meaning of this clause. The acknowledged accuracy of language and clearness of diction in the Constitution would seem to forbid the imputation of so gross an error to the distinguished authors of that instrument.
I have been unable to find any thing in the debates of the Convention, in the Federalist, or the report of Mr. Madison, inconsistent with the construction here given. Were they, however, directly opposed to it, they could not, by any known rule of construction, control or modify the plain and unambiguous language of the clause in question. The conclusion, to my mind, is therefore irresistible, that there are two separate and distinct classes of persons intended to be provided for by this clause.
Although they are both subjects of commerce, the latter class only is the subject of trade and importation. The slaves are not immigrants, and had no exercise of volition in their transportation from Africa to the United States.
The owner was bound to enter them at the custom-house as *454 any other article of commerce or importation, and to pay the duty imposed by law, whilst the persons of the first class, although subjects of commerce, had the free exercise of volition, and could remove at pleasure from one place to another; and when they determined to migrate or remove from any European government to the United States, they voluntarily dissolved the bond of allegiance to their sovereign, with the intention to contract a temporary or permanent allegiance to the government of the United States, and if transported in an American ship, that allegiance commenced the moment they got on board. They were subject to, and protected by, the laws of the United States, to the end of their voyage.
Having thus shown that there are two separate and distinct classes included in, and provided for by, the clause of the Constitution referred to, the question arises, how far the persons of the first class are protected, by the Constitution and laws of the United States, from the operation of the statute of New York now under consideration. The power was conferred on Congress to prohibit migration and importation of such persons into all the new States, from and after the time of their admission into the Union, because the exemption from the prohibition of Congress was confined exclusively to the States then existing, and left the power to operate upon all the new States admitted into the Union prior to 1808. Four new States having been thus admitted within that time, it follows, beyond controversy, that the power of Congress over the whole subject of migration and importation was complete throughout the United States after 1808.
The power to prohibit the admission of "all such persons" includes, necessarily, the power to admit them on such conditions as Congress may think proper to impose; and therefore, as a condition, Congress has the unlimited power of taxing them. If this reasoning be correct, the whole power over the subject belongs exclusively to Congress, and connects itself indissolubly with the power to regulate commerce with foreign nations. How far, then, are these immigrants protected, upon their arrival in the United States, against the power of State statutes? The ship, the cargo, the master, the crew, and the passengers are all under the protection of the laws of the United States, to the final termination of the voyage; and the passengers have a right to be landed and go on shore, under the protection and subject to these laws only, except so far as they may be subject to the quarantine laws of the place where they are landed; which laws are not drawn in question in this controversy. The great question here is, Where does the power of the United States over this subject end, and where does the *455 State power begin? This is, perhaps, one of the most perplexing questions ever submitted to the consideration of this court.
A similar question arose in the case of Brown v. The State of Maryland, 12 Wheat. 419, in which the court carried out the power of Congress to regulate commerce with foreign nations, upon the subject then under consideration, to the line which separates it from the reserved powers of the States, and plainly established the power of the States over the same subject-matter beyond that line.
The clause of the Constitution already referred to in this case, taken in connection with the provision which confers on Congress the power to pass all laws necessary and proper for carrying into effect the enumerated and all other powers granted by the Constitution, seems necessarily to include the whole power over this subject; and the Constitution and laws of the United States being the supreme law of the land, State power cannot be extended over the same subject. It therefore follows, that passengers can never be subject to State laws until they become a portion of the population of the State, temporarily or permanently; and this view of the subject seems to be fully sustained by the case above referred to. Were it even admitted that the State of New York had power to pass the statute under consideration, in the absence of legislation by Congress on this subject, it would avail nothing in this case, because the whole ground had been occupied by Congress before that act was passed, as has been fully shown by the preceding opinion of my brother Catron. The laws referred to in that opinion show conclusively that the passengers, their moneys, their clothing, their baggage, their tools, their implements, &c., are permitted to land in the United States without tax, duty, or impost.
I therefore concur in the opinion, that the judgment of the court below should be reversed.
Mr. Justice Catron concurs in the foregoing opinion, and adopts it as forming part of his own, so far as Mr. Justice McKinley's individual views are expressed, when taken in connection with Mr. Justice Catron's opinion.
Mr. Justice GRIER.

NORRIS v. CITY OF BOSTON.
As the law of Massachusetts which is the subject of consideration in this case differs in some respects from that of New York, on which the court have just passed in the case of Smith v. Turner, I propose briefly to notice it. In so doing, it is not *456 my purpose to repeat the arguments urged in vindication of the judgment of the court in that case, and which equally apply to this, but rather to state distinctly what I consider the point really presented by this case, and to examine some of the propositions assumed, and arguments urged with so much ability by the learned counsel of the defendants.
The plaintiff in this case is an inhabitant of St. John's, in the Province of New Brunswick and kingdom of Great Britain. He arrived at the port of Boston in June, 1837, in command of a schooner belonging to the port of St. John's, having on board nineteen alien passengers. Prior to landing, he was compelled to pay to the city of Boston the sum of two dollars each for permission to land said passengers. This sum of thirty-eight dollars was paid under protest, and this suit instituted to recover it back.
The demand was made, and the money received from the plaintiff, in pursuance of the following act of the legislature of Massachusetts, passed on the 20th of April, 1837, and entitled, "An act relating to alien passengers."
"§ 1. When any vessel shall arrive at any port or harbour within this State, from any port or place without the same, with alien passengers on board, the officer or officers whom the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land such passengers, are hereby authorized and required to appoint, shall go on board such vessels and examine into the condition of such passengers.
"§ 2. If, on such examination, there shall be found among said passengers any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the officer so examining, to maintain themselves, or who have been paupers in any other country, no such alien passenger shall be permitted to land until the master, owner, consignee, or agent of such vessel shall have given to such city or town a bond in the sum of one thousand dollars, with good and sufficient surety, that no such lunatic or indigent passenger shall become a city, town, or State charge within ten years from the date of said bond.
"§ 3. No alien passengers, other than those spoken of in the preceding section, shall be permitted to land until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger so landing; and the money so collected shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct, for the support of foreign paupers.
"§ 4. The officer or officers required in the first section of this act to be appointed by the mayor and aldermen, or the selectmen, *457 respectively, shall, from time to time, notify the pilots of the port of said city or town of the place or places where the said examination is to be made, and the said pilots shall be required to anchor all such vessels at the place so appointed, and require said vessels there to remain till such examination shall be made; and any pilot who shall refuse or neglect to perform the duty imposed upon him by this section, or who shall, through negligence or design, permit any alien passenger to land before such examination shall be had, shall forfeit to the city or town a sum not less than fifty nor more than two thousand dollars.
"§ 5. The provisions of this act shall not apply to any vessel coming on shore in distress, or to any alien passengers taken from any wreck where life is in danger."
It must be borne in mind (what has been sometimes forgotten), that the controversy in this case is not with regard to the right claimed by the State of Massachusetts, in the second section of this act, to repel from her shores lunatics, idiots, criminals, or paupers, which any foreign country, or even one of her sister States, might endeavour to thrust upon her; nor the right of any State, whose domestic security might be endangered by the admission of free negroes, to exclude them from her borders. This right of the States has its foundation in the sacred law of self-defence, which no power granted to Congress can restrain or annul. It is admitted by all, that those powers which relate to merely municipal legislation, or what may be more properly called internal police, are not surrendered or restrained; and that it is as competent and necessary for a State to provide precautionary measures against the moral pestilence of paupers, vagabonds, and convicts, as it is to guard against the physical pestilence which may arise from unsound and infectious articles imported. The case of New York v. Miln asserts this doctrine, and no more. The law under consideration in that case did not interfere with passengers as such, either directly or indirectly, who were not paupers. It put forth no claim to tax all persons for leave to land and pass through the State to other States, or a right to regulate the intercourse of foreign nations with the United States, or to control the policy of the general government with regard to immigrants.
But what is the claim set up in the third section of the act under consideration, with which alone we have now to deal?
It is not the exaction of a fee or toll from passengers for some personal service rendered to them, nor from the master of the vessel for some inspection or other service rendered either to the vessel or its cargo. It is not a fee or tax for a *458 license to foreigners to become denizens or citizens of the Commonwealth of Massachusetts; for they have sought no such privilege, and, so far as is yet known, may have been on their way to some other place.
It is not an exercise of the police power with regard to paupers, idiots, or convicts. The second section effectually guards against injury from them. It is only after the passenger has been found, on inspection, not to be within the description whose crimes or poverty require exclusion, that the master of the vessel is taxed for leave to land him. Had this act commenced with the third section, might it not have been truly entitled, "An act to raise revenue off vessels engaged in the transportation of passengers"? Its true character cannot be changed by its collocation, nor can it be termed a police regulation because it is in the same act which contains police regulations.
In its letter and its spirit it is an exaction from the master, owner, or consignee of a vessel engaged in the transportation of passengers, graduated on the freight or passage-money earned by the vessel. It is, in fact, a duty on the vessel, not measured by her tonnage, it is true, but producing a like result, by merely changing the ratio. It is a taxation of the master, as representative of the vessel and her cargo.
It has been argued that this is not a tax on the master or the vessel, because in effect it is paid by the passenger having enhanced the price of his passage. Let us test the value of this argument by its application to other cases that naturally suggest themselves. If this act had, in direct terms, compelled the master to pay a tax or duty levied or graduated on the ratio of the tonnage of his vessel, whose freight was earned by the transportation of passengers, it might have been said, with equal truth, that the duty was paid by the passenger, and not by the vessel. And so, if it had laid an impost on the goods of the passenger imported by the vessel, it might have been said, with equal reason, it was only a tax on the passenger at last, as it comes out of his pocket, and, graduating it by the amount of his goods, affects only the modus or ratio by which its amount is calculated. In this way, the most stringent enactments may be easily evaded.
It is a just and well-settled doctrine established by this court, that a State cannot do that indirectly which she is forbidden by the Constitution to do directly. If she cannot levy a duty or tax from the master or owner of a vessel engaged in commerce graduated on the tonnage or admeasurement of the vessel, she cannot effect the same purpose by merely changing the ratio, and graduating it on the number of masts, or of mariners, *459 the size and power of the steam-engine, or the number of passengers which she carries. We have to deal with things, and we cannot change them by changing their names. Can a State levy a duty on vessels engaged in commerce, and not owned by her own citizens, by changing its name from a "duty on tonnage" to a tax on the master, or an impost upon imports, by calling it a charge on the owner or supercargo, and justify this evasion of a great principle by producing a dictionary or a dictum to prove that a ship-captain is not a vessel, nor a supercargo an import?
The Constitution of the United States, and the powers confided by it to the general government, to be exercised for the benefit of all the States, ought not to be nullified or evaded by astute verbal criticism, without regard to the grand aim and object of the instrument, and the principles on which it is based. A constitution must necessarily be an instrument which enumerates, rather than defines, the powers granted by it. While we are not advocates for a latitudinous construction, yet "we know of no rule for construing the extent of such powers other than is given by the language of the instrument which confers them, taken in connection with the purpose for which they are conferred."
Before proceeding to examine the more prominent and plausible arguments which have been urged in support of the power now claimed by the State of Massachusetts, it may be proper to notice some assumptions of fact which have been used for the purpose of showing the necessity of such a power, from the hardships which it is supposed would otherwise be inflicted on those States which claim the right to exercise it.
It was assumed as a fact, that all the foreigners who arrived at the ports of Boston and New York, and afterwards became paupers, remained in those cities, and there became a public charge; and that, therefore, this tax was for their own benefit, or that of their class. But is this the fact? Of the many ten thousands who yearly arrive at those ports, how small a proportion select their residence there! Hundreds are almost daily transferred from the vessels in which they arrive to the railroad-car and steamboat, and proceed immediately on their journey to the Western States. Are Boston, New York, and New Orleans, through which they are compelled to pass, the only cities of the Union which have to bear the burden of supporting such immigrants as afterwards become chargeable as paupers? It may well be questioned whether their proportion of this burden exceeds the ratio of their great wealth and population. But it appears by the second section of the act now before us, that all persons whose poverty, age, or infirmities render them *460 incompetent to maintain themselves are not permitted to land until a bond has been given, in the sum of one thousand dollars, with sufficient security, that they will not become a city, town, or State charge within ten years. By the stringency of these bonds, the poor, the aged, and the infirm are compelled to continue their journey and migrate to other States; and yet, after having thus driven off all persons of this class, and obtained an indemnity against loss by them if they remain, it is complained of as a hardship, that the State should not be allowed to tax those who, on examination, are found not to be within this description,  who are not paupers, nor likely to become such; and that this exaction should be demanded, not for a license to remain and become domiciled in the State, but for leave to pass through it. But admitting the hardship of not permitting these States to raise revenue by taxing the citizens of other States, or immigrants seeking to become such, the answer still remains, that the question before the court is not one of feeling or discretion, but of power.
The arguments in support of this power in a State to tax vessels employed in the transportation of passengers assume,  1st. That it is a tax upon passengers or persons, and not upon vessels. 2d. That the States are sovereign, and that "the sovereign may forbid the entry of his territory either to foreigners in general or in particular cases, or for certain purposes, according as he may think it advantageous to the State; and since the lord of the territory may, whenever he thinks proper, forbid its being entered, he has power to annex what conditions he pleases to the permission to enter"; that the State of Massachusetts, having this power to exclude altogether, may therefore impose as a condition for a license to pass through her territory any amount of tax she may see fit; and this is but the exercise of the police power reserved to the States, and which cannot be controlled by the government of the Union. 3d. That it is but an exercise of the municipal power which every State has, to tax persons and things within her jurisdiction, and with which other States have no concern.
Let us assume, for the sake of argument, that this is not a duty on the vessel, nor an interference with commercial regulations made by Congress, but a tax on persons transported in the vessel, and carry out the propositions based on this hypothesis to their legitimate results.
It must be admitted that it is not an exercise of the usual power to tax persons resident within a State, and their property; but is a tax on passengers qua passengers. It is a condition annexed to a license to them to pass through the State, on their journey to other States. It is founded on a claim by a *461 State of the power to exclude all persons from entering her ports or passing through her territory.
It is true, that, if a State has such an absolute and uncontrolled right to exclude, the inference that she may prescribe the conditions of entrance, in the shape of a license or a tax, must necessarily follow. The conclusion cannot be evaded if the premises be proved. A right to exclude is a power to tax; and the converse of the proposition is also true, that a power to tax is a power to exclude; and it follows, as a necessary result, from this doctrine, that those States in which are situated the great ports or gates of commerce have a right to exclude, if they see fit, all immigrants from access to the interior States, and to prescribe the conditions on which they shall be allowed to proceed on their journey, whether it be the payment of two or of two hundred dollars. Twelve States of this Union are without a seaport. The United States have, within and beyond the limits of these States, many millions of acres of vacant lands. It is the cherished policy of the general government to encourage and invite Christian foreigners of our own race to seek an asylum within our borders, and to convert these waste lands into productive farms, and thus add to the wealth, population, and power of the nation. Is it possible that the framers of our Constitution have committed such an oversight, as to leave it to the discretion of some two or three States to thwart the policy of the Union, and dictate the terms upon which foreigners shall be permitted to gain access to the other States? Moreover, if persons migrating to the Western States may be compelled to contribute to the revenue of Massachusetts, or New York, or Louisiana, whether for the support of paupers or penitentiaries, they may with equal justice be subjected to the same exactions in every other city or State through which they are compelled to pass; and thus the unfortunate immigrant, before he arrives at his destined home, be made a pauper by oppressive duties on his transit. Besides, if a State may exercise this right of taxation or exclusion on a foreigner, on the pretext that he may become a pauper, the same doctrine will apply to citizens of other States of this Union; and thus the citizens of the interior States, who have no ports on the ocean, may be made tributary to those who hold the gates of exit and entrance to commerce. If the bays and harbours in the United States are so exclusively the property of the States within whose boundaries they lie, that, the moment a ship comes within them, she and all her passengers become the subjects of unlimited taxation before they can be permitted to touch the shore, the assertion, that this is a question with which the citizens of other States have no *462 concern, may well be doubted. If these States still retain all the rights of sovereignty, as this argument assumes, one of the chief objects for which this Union was formed has totally failed, and "we may again witness the scene of conflicting commercial regulations and exactions which were once so destructive to the harmony of the States, and fatal to their commercial interests abroad."
To guard against the recurrence of these evils, the Constitution has conferred on Congress the power to regulate commerce with foreign nations, and among the States. That, as regards our intercourse with other nations and with one another, we might be one people,  not a mere confederacy of sovereign States for the purposes of defence or aggression.
Commerce, as defined by this court, means something more than traffic,  it is intercourse; and the power committed to Congress to regulate commerce is exercised by prescribing rules for carrying on that intercourse. "But in regulating commerce with foreign nations, the power of Congress does not stop at the jurisdictional lines of the several States. It would be a very useless power if it could not pass those lines. The commerce of the United States with foreign nations is that of the whole United States. Every district has a right to participate in it. The deep streams which penetrate our country in every direction pass through the interior of almost every State in the Union, and furnish the means for exercising this right. If Congress has the power to regulate it, that power must be exercised wherever the subject exists. If it exists within the States, if a foreign voyage may commence or terminate at a port within a State, then the power of Congress may be exercised within a State." (Gibbons v. Ogden, 9 Wheat. 195.)
The question, whether this power is exclusive, is one on which the majority of this court have intimated different opinions at different times; but it is one of little practical importance in the present case, for this power has not lain dormant, like those for enacting a uniform bankrupt law, and for organizing the militia. The United States have made treaties, and have regulated our intercourse with foreign nations by prescribing its conditions. No single State has, therefore, a right to change them. To what purpose commit to Congress the power of regulating our intercourse with foreign nations and among the States, if these regulations may be changed at the discretion of each State? And to what weight is that argument entitled which assumes, that, because it is the policy of Congress to leave this intercourse free, therefore it has not been regulated, and each State may put as many restrictions upon it as she pleases?
*463 The argument of those who challenge the right to exercise this power for the States of Massachusetts and New York, on the ground that it is a necessary appurtenant to the police power, seems fallacious, also, in this respect. It assumes, that, because a State, in the exercise of her acknowledged right, may exclude paupers, lunatics, &c., therefore she may exclude all persons, whether they come within this category or not. But she may exclude putrid and pestilential goods from being landed on her shores; yet it does not follow that she may prescribe what sound goods may be landed, or prohibit their importation altogether. The powers used for self-defence and protection against harm cannot be perverted into weapons of offence and aggression upon the rights of others. A State is left free to impose such taxes as she pleases upon those who have elected to become residents or citizens; but it is not necessary to her safety or welfare that she should exact a transit duty on persons or property for permission to pass to other States.
It has been argued, also, that, as the jurisdiction of the State extends over the bays and harbours within her boundaries for the purpose of punishing crimes committed thereon, therefore her jurisdiction is absolute for every purpose to the same extent; and that, as she may tax persons resident on land and their ships engaged in commerce, she has an equal right to tax the persons or property of foreigners or citizens of other States, the moment their vessels arrive within her jurisdictional limits. But this argument is obnoxious to the imputation of proving too much, and therefore not to be relied on as proving any thing. For if a State has an absolute right to tax vessels and persons coming from foreign ports, or those of other States, before they reach the shore, and as a condition for license to land in her ports, she may tax to any amount, and neither Congress nor this court can restrain her in the exercise of that right; it follows, also, as a necessary consequence, that she may exclude all vessels but her own from entering her ports, and may grant monopolies of the navigation of her bays and rivers. This the State of New York at one time attempted, but was restrained by the decision of this court in the case of Gibbons v. Ogden.
In conclusion, we are of opinion, 
1st. That the object of the constitutional prohibition to the States to lay duties on tonnage and imposts on imports was to protect both vessel and cargo from State taxation while in transitu; and this prohibition cannot be evaded, and the same result effected, by calling it a tax on the master or passengers.
2d. That the power exercised in these cases to prohibit the *464 immigration of foreigners to other States, except on prescribed conditions, and to tax the commerce or intercourse between the citizens of these States, is not a police power, nor necessary for the preservation of the health, the morals, or the domestic peace of the States who claim to exercise it.
3d. That the power to tax this intercourse necessarily challenges the right to exclude it altogether, and thus to thwart the policy of the other States and the Union.
4th. That Congress has regulated commerce and intercourse with foreign nations and between the several States, by willing that it shall be free, and it is therefore not left to the discretion of each State in the Union either to refuse a right of passage to persons or property through her territory, or to exact a duty for permission to exercise it.
CATRON, J.
I concur with the foregoing opinion of Mr. Justice Grier.
Mr. Chief Justice TANEY, dissenting.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
I do not concur in the judgment of the court in these two cases, and proceed to state the grounds on which I dissent.
The constitutionality of the laws of Massachusetts and New York in some respects depends upon the same principles. There are, however, different questions in the two cases, and I shall make myself better understood by examining separately one of the cases, and then pointing out how far the same reasoning applies to the other, and in what respect there is a difference between them; and, first, as to the case from Massachusetts.
This law meets the vessel after she has arrived in the harbour, and within the territorial limits of the State, but before the passengers have landed, and while they are still afloat on navigable water. It requires the State officer to go on board and examine into the condition of the passengers, and provides that, if any lunatic, idiot, maimed, aged, or infirm person, incompetent, in the opinion of the examining officer, to maintain themselves, or who have been paupers in any other country, shall be found on board, such alien passenger shall not be permitted to land until the master, owner, consignee, or agent of the vessel shall give bond, with sufficient security, that no such lunatic or indigent person shall become a city, town, or State charge within ten years from the date of the bond. These provisions are contained in the first two sections. It is the third section that has given rise to this controversy, and which *465 enacts that no alien passengers other than those before spoken of shall be permitted to land until the master, owner, consignee, or agent of the vessel shall pay to the boarding officer the sum of two dollars for each passenger so landing; the money thus collected to be appropriated to the support of foreign paupers.
This law is a part of the pauper laws of the State, and the provision in question is intended to create a fund for the support of alien paupers, and to prevent its own citizens from being burdened with their support.
I do not deem it material at this time to inquire whether the sum demanded is a tax or not. Of that question I shall speak hereafter. The character of the transaction and the meaning of the law cannot be misunderstood. If the alien chooses to remain on board, and to depart with the ship, or in any other vessel, the captain is not required to pay the money. Its payment is the condition upon which the State permits the alien passenger to come on shore and mingle with its citizens, and to reside among them. He obtains this privilege from the State by the payment of the money. It is demanded of the captain, and not from every separate passenger, for the convenience of collection. But the burden evidently falls on the passenger; and he in fact pays it, either in the enhanced price of his passage, or directly to the captain, before he is allowed to embark for the voyage. The nature of the transaction and the ordinary course of business show that this must be the case; and the present claim, therefore, comes before the court without any equitable considerations to recommend it, and does not call upon us to restore money to a party from whom it has been wrongfully exacted. If the plaintiff recovers, he will most probably obtain from the State the money which he has doubtless already received from the passenger, for the purpose of being paid to the State; and which, if the State is not entitled to it, ought to be refunded to the passenger. The writ of error, however, brings up nothing for revision here but the constitutionality of the law under which this money was demanded and paid, and that question I proceed to examine.
And the first inquiry is, whether, under the Constitution of the United States, the federal government has the power to compel the several States to receive, and suffer to remain in association with its citizens, every person or class of persons whom it may be the policy or pleasure of the United States to admit. In my judgment, this question lies at the foundation of the controversy in this case. I do not mean to say that the general government have, by treaty or act of Congress, required the State of Massachusetts to permit the aliens in question to land. *466 I think there is no treaty or act of Congress which can justly be so construed. But it is not necessary to examine that question until we have first inquired whether Congress can lawfully exercise such a power, and whether the States are bound to submit to it. For if the people of the several States of this Union reserved to themselves the power of expelling from their borders any person, or class of persons, whom it might deem dangerous to its peace, or likely to produce a physical or moral evil among its citizens, then any treaty or law of Congress invading this right, and authorizing the introduction of any person or description of persons against the consent of the State, would be an usurpation of power which this court could neither recognize nor enforce.
I had supposed this question not now open to dispute. It was distinctly decided in Holmes v. Jennison, 14 Pet. 540; in Groves v. Slaughter, 15 Pet. 449; and in Prigg v. The Commonwealth of Pennsylvania, 16 Pet. 539.
If these cases are to stand, the right of the State is undoubted. And it is equally clear, that, if it may remove from among its citizens any person or description of persons whom it regards as injurious to their welfare, it follows that it may meet them at the threshold and prevent them from entering. For it will hardly be said that the United States may permit them to enter, and compel the State to receive them, and that the State may immediately afterwards expel them. There could be no reason of policy or humanity for compelling the States, by the power of Congress, to imbibe the poison, and then leaving them to find a remedy for it by their own exertions and at their own expense. Certainly no such distinction can be found in the Constitution, and such a division of power would be an inconsistency, not to say an absurdity, for which I presume no one will contend. If the State has the power to determine whether the persons objected to shall remain in the State in association with its citizens, it must, as an incident inseparably connected with it, have the right also to determine who shall enter. Indeed, in the case of Groves v. Slaughter, the Mississippi constitution prohibited the entry of the objectionable persons, and the opinions of the court throughout treat the exercise of this power as being the same with that of expelling them after they have entered.
Neither can this be a concurrent power, and whether it belongs to the general or to the State government, the sovereignty which possesses the right must in its exercise be altogether independent of the other. If the United States have the power, then any legislation by the State in conflict with a treaty or act of Congress would be void. And if the States possess it, *467 then any act on the subject by the general government, in conflict with the State law, would also be void, and this court bound to disregard it. It must be paramount and absolute in the sovereignty which possesses it. A concurrent and equal power in the United States and the States as to who should and who should not be permitted to reside in a State, would be a direct conflict of powers repugnant to each other, continually thwarting and defeating its exercise by either, and could result in nothing but disorder and confusion.
Again: if the State has the right to exclude from its borders any person or persons whom it may regard as dangerous to the safety of its citizens, it must necessarily have the right to decide when and towards whom this power is to be exercised. It is in its nature a discretionary power, to be exercised according to the judgment of the party which possesses it. And it must, therefore, rest with the State to determine whether any particular class or description of persons are likely to produce discontents or insurrection in its territory, or to taint the morals of its citizens, or to bring among them contagious diseases, or the evils and burdens of a numerous pauper population. For if the general government can in any respect, or by any form of legislation, control or regain a State in the exercise of this power, or decide whether It has been exercised with proper discretion, and towards proper persons, and on proper occasions, then the real and substantial power would be in Congress, and not in the States. In the cases decided in this court, and herein before referred to, the power of determining who is or is not dangerous to the interests and well-being of the people of the State has been uniformly admitted to reside in the State.
I think it, therefore, to be very clear, both upon principle and the authority of adjudged cases, that the several States have a right to remove from among their people, and to prevent from entering the State, any person, or class or description of persons, whom it may deem dangerous or injurious to the interests and welfare of its citizens; and that the State has the exclusive right to determine, in its sound discretion, whether the danger does or does not exist, free from the control of the general government.
This brings me to speak more particularly of the Massachusetts law, now under consideration. It seems that Massachusetts deems the introduction of aliens into the State from foreign countries likely to produce in the State a numerous pauper population, heavily and injuriously burdensome to its citizens. It would be easy to show, from the public history of the times, that the apprehensions of the State are well founded; that a fearful amount of disease and pauperism is daily brought *468 to our shores in emigrant ships, and that measures of precaution and self-defence have become absolutely necessary on the Atlantic border. But whether this law was necessary or not is not a question for this court; and I forbear, therefore, to discuss its justice and necessity. This court has no power to inquire whether a State has acted wisely or justly in the exercise of its reserved powers. Massachusetts had the sole and exclusive right to judge for herself whether any evil was to be apprehended from the introduction of alien passengers from foreign countries. And in the exercise of her discretion, she had a right to exclude them if she thought proper to do so. Of course I do not speak of public functionaries or agents, or officers of foreign governments. Undoubtedly no State has a right to interfere with the free ingress of persons of that description. But there does not appear to have been any such among the aliens who are the subjects of this suit, and no question, therefore, can arise on that score.
Massachusetts, then, having the right to refuse permission to alien passengers from foreign countries to land upon her territory, and the right to reject them as a class or description of persons who may prove injurious to her interests, was she bound to admit or reject them without reserve? Was she bound either to repel them altogether, or to admit them absolutely and unconditionally? And might she not admit them upon such securities and conditions as she supposed would protect the interest of her own citizens, while it enabled the State to extend the offices of humanity and kindness to the sick and helpless stranger? There is certainly no provision in the Constitution which restrains the power of the State in this respect. And if she may reject altogether, it follows that she may admit upon such terms and conditions as she thinks proper, and it cannot be material whether the security required be a bond to indemnify or the payment of a certain sum of money.
In a case where a party has a discretionary power to forbid or permit an act to be done, as he shall think best for his own interests, he is never bound absolutely and unconditionally to forbid or permit it. He may always permit it upon such terms and conditions as he supposes will make the act compatible with his own interests. I know no exception to the rule. An individual may forbid another from digging a ditch through his land to draw off water from the property of the party who desires the permission. Yet he may allow him to do it upon such conditions and terms as, in his judgment, are sufficient to protect his own property from overflow; and for this purpose he may either take a bond and security, or he may accept a sum of money in lieu of it, and take upon himself the obligation *469 of guarding against the danger. The same rule must apply to governments who are charged with the duty of protecting their citizens. Massachusetts has legislated upon this principle. She requires bond and security from one class of aliens, and from another, whom she deems less likely to become chargeable, she accepts a sum of money, and takes upon herself the obligation of providing a remedy for the apprehended evil.
I do not understand that the lawfulness of the provision for taking bond, where the emigrants are actual paupers and unable to gain a livelihood, has been controverted. That question, it is true, is not before us in this case; but the right of the State to protect itself against the burden of supporting those who come to us from European almshouses seems to be conceded in the argument. Yet there is no provision in the Constitution of the United States which makes any distinction between different descriptions of aliens, or which reserves the power to the State as to one class and denies it over the other. And if no such distinction is to be found in the Constitution, this court cannot engraft one upon it. The power of the State as to these two classes of aliens must be regarded here as standing upon the same principles. It is in its nature and essence a discretionary power, and if it resides in the State as to the poor and the diseased, it must also reside in it as to all.
In both cases the power depends upon the same principles, and the same construction of the Constitution of the United States; it results from the discretionary power which resides in a State to determine from what person or description of persons the danger of pauperism is to be apprehended, and to provide the necessary safeguards against it. Most evidently this court cannot supervise the exercise of such a power by the State, nor control or regulate it, nor determine whether the occasion called for it, nor whether the funds raised have been properly administered. This would be substituting the discretion of the court for the discretionary power reserved to the State.
Moreover, if this court should undertake to exercise this supervisory power, it would take upon itself a duty which it is utterly incapable of discharging. For how could this court ascertain whether the persons classed by the boarding officer of the State as paupers belonged to that denomination or not? How could it ascertain what had been the pursuits, habits, and mode of life of every emigrant, and how far he was liable to lose his health, and become, with a helpless family, a charge upon the citizens of the State? How could it determine who was sick and who was well? who was rich and who was poor? who was likely to become chargeable and who not? Yet all *470 this must be done, and must be decided too upon legal evidence, admissible in a court of justice, if it is determined that the State may provide against the admission of one description of aliens, but not against another; that it may take securities against paupers and persons diseased, but not against those who are in health or have the means of support; and that this court have the power to supervise the conduct of the State authorities, and to regulate it and determine whether it has been properly exercised or not.
I can, therefore, see no ground for the exercise of this power by the government of the United States or any of its tribunals. In my opinion, the clear, established, and safe rule is, that it is reserved to the several States, to be exercised by them according to their own sound discretion, and according to their own views of what their interest and safety require. It is a power of self-preservation, and was never intended to be surrendered.
But it is argued in support of the claim of the plaintiff, that the conveyance of passengers from foreign countries is a branch of commerce, and that the provisions of the Massachusetts law, which meet the ship on navigable water and detain her until the bond is given and the money paid, are a regulation of commerce; and that the grant to Congress of the power to regulate commerce is of itself a prohibition to the States to make any regulation upon the subject. The construction of this article of the Constitution was fully discussed in the opinions delivered in the License Cases, reported in 5 Howard. I do not propose to repeat here what I then said, or what was said by other members of the court with whom I agreed. It will appear by the report of the case, that five of the justices of this court, being a majority of the whole bench, held that the grant of the power to Congress was not a prohibition to the States to make such regulations as they deemed necessary, in their own ports and harbours, for the convenience of trade or the security of health; and that such regulations were valid, unless they came in conflict with an act of Congress. After such opinions, judicially delivered, I had supposed that question to be settled, so far as any question upon the construction of the Constitution ought to be regarded as closed by the decision of this court. I do not, however, object to the revision of it, and am quite willing that it be regarded hereafter as the law of this court, that its opinion upon the construction of the Constitution is always open to discussion when it is supposed to have been founded in error, and that its judicial authority should hereafter depend altogether on the force of the reasoning by which it is supported. Referring to my opinion on that occasion, and the reasoning by which it is maintained, as showing what I *471 still think upon the subject, I desire now to add to it a reference to the thirty-second number of the Federalist, which shows that the construction given to this clause of the Constitution by a majority of the justices of this court is the same that was given to it at the time of its adoption by the eminent men of the day who were concerned in framing it, and active in supporting it. For in that number it is explicitly affirmed, that, "notwithstanding the affirmative grants of general authorities, there has been the most pointed care in those cases where it was deemed improper that the like authorities should reside in the States, to insert negative clauses prohibiting the exercise of them by the States." The grant of a general authority to regulate commerce is not, therefore, a prohibition to the States to make any regulations concerning it within their own territorial limits, not in conflict with the regulations of Congress.
But I pass from this objection, which was sufficiently discussed in the License Cases, and come to the next objection founded on the same clause. It is this: that the law in question is a regulation of commerce, and is in conflict with the regulations of Congress and with treaties, and must yield to the paramount authority over this subject granted to the United States.
It is a sufficient answer to this argument to say, that no treaty or act of Congress has been produced which gives, or attempts to give, to all aliens the right to land in a State. The act of March 2, 1799, ch. 23, § 46, has been referred to, and much pressed in the argument. But this law obviously does nothing more than exempt certain articles belonging to a passenger from the duties which the United States had a right to exact, if they thought proper. Undoubtedly the law presupposes that the passenger will be permitted to land. But it does not attempt to confer on him the right. Indeed, the construction contended for would be a startling one to the States, if Congress has the power now claimed for it. For neither this nor any other law of Congress prescribes the character or condition of the persons who may be taken on board in a foreign port to be brought to the United States. It makes no regulations upon the subject, and leaves the selection altogether to the discretion and pleasure of the ship-owner or ship-master. The ship-owner, as well as the ship-master, is in many cases a foreigner, acting sometimes, perhaps, under the influence of foreign governments or foreign cities, and having no common interest or sympathy with the people of the United States; and he may be far more disposed to bring away the worst and most dangerous portion of the population rather than the moral and industrious citizen. And as the act of 1799 speaks of passengers *472 generally, and makes no distinction as to their character or health, if the argument of the counsel for the plaintiff can be maintained, and this law gives every passenger which the ship-owner has selected and brought with him the right to land, then this act of Congress has not only taken away from the States the right to determine who is and who is not fit to be received among them, but has delegated this high and delicate power to foreign ship-masters and foreign ship-owners. And if they have taken on board tenants of their almshouses or workhouses, or felons from their jails, if Congress has the power contended for, and this act of Congress will bear the construction given to it, and gives to every passenger the right to land, then this mass of pauperism and vice may be poured out upon the shores of a State in opposition to its laws, and the State authorities are not permitted to resist or prevent it.
It is impossible, upon any sound principle of construction, so to interpret this law of Congress. Its language will not justify it, nor can such be supposed to have been the policy of the United States, or such its disposition towards the States. The general government merely intended to exercise its powers in exempting the articles mentioned from duties, leaving it to the States to determine whether it was compatible with their interest and safety to permit the person to land. And this power the States have always exercised before and since the passage of this act of Congress.
The same answer may be given to the argument on treaty stipulations. The treaty of 1794, article 4, referred to and relied on is no longer in force. But the same provision is, however, substantially contained in the first article of the convention with Great Britain of July 3, 1815, with this exception, that it puts British subjects in this respect on the same footing with other foreigners. But the permission there mutually given, to reside and hire houses and warehouses, and to trade and traffic, is in express terms made subject to the laws of the two countries respectively. Now, the privileges here given within the several States are all regulated by State laws, and the reference to the laws of this country necessarily applies to them, and subjects the foreigner to their decision and control. Indeed, the treaty may be said to disavow the construction now attempted to be given to it. Nor do I see how any argument against the validity of the State law can be drawn from the act of Congress of 1819. On the contrary, this act seems accurately to mark the line of division between the powers of the general and State governments over this subject; and the powers of the former have been exercised in the passage of this law without encroaching on the rights of the latter. It regulates *473 the number of passengers which may be taken on board, and brought to this country from foreign ports, in proportion to the tonnage of the vessel, and directs that, at the time of making his entry at the custom-house, the captain shall deliver to the collector a list of the passengers taken on board at any foreign port or place, stating their age, sex, and occupation, and whether they intend to become inhabitants of this country, and how many have died on the voyage; and this list is to be returned quarterly to the State Department, to be laid before Congress. But the law makes no provision for their landing, nor does it require any inspection as to their health or condition. These matters are evidently intended to be left to the State government, when the voyage has ended, by the proper custom-house entry. For it cannot be supposed that, if the legislature of the United States intended by this law to give the passengers a right to land, it would have been so regardless of the lives, and health, and interests of our own citizens as to make no inquiry and no examination upon a subject which so nearly concerned them. But it directs no inquiries, evidently because the power was believed to belong to the States. And as the landing of the passengers depended on the State laws, the inquiries as to their health and condition properly belonged to the State authorities. The act of 1819 may fairly be taken as denoting the true line of division between the two sovereignties, as established by the Constitution of the United States and recognized by Congress.
I forbear to speak of other laws and treaties referred to. They are of the same import, and are susceptible of the same answer. There is no conflict, therefore, between the law of Massachusetts and any treaty or law of the United States.
Undoubtedly, vessels engaged in the transportation of passengers from foreign countries may be regulated by Congress, and are a part of the commerce of the country. Congress may prescribe how the vessel shall be manned and navigated and equipped, and how many passengers she may bring, and what provision shall be made for them, and what tonnage she shall pay. But the law of Massachusetts now in question does not in any respect attempt to regulate this trade or impose burdens upon it. I do not speak of the duty enjoined upon the pilot, because that provision is not now before us, although I see no objection to it. But this law imposes no tonnage duty on the ship, or any tax upon the captain or passengers for entering its waters. It merely refuses permission to the passengers to land until the security demanded by the State for the protection of its own people from the evils of pauperism has been given. If, however, the treaty or act of Congress above referred to had *474 attempted to compel the State to receive them without any security, the question would not be on any conflicting regulations of commerce, but upon one far more important to the States, that is, the power of deciding who should or should not be permitted to reside among its citizens. Upon that subject I have already stated my opinion. I cannot, believe that it was ever intended to vest in Congress, by the general words in relation to the regulation of commerce, this overwhelming power over the States. For if the treaty stipulation before referred to can receive the construction given to it in the argument, and has that commanding power claimed for it over the States, then the emancipated slaves of the West Indies have at this hour the absolute right to reside, hire houses, and traffic and trade throughout the Southern States, in spite of any State law to the contrary; inevitably producing the most serious discontent, and ultimately leading to the most painful consequences. It will hardly be said, that such a power was granted to the general government in the confidence that it would not be abused. The statesmen of that day were too wise and too well read in the lessons of history and of their own times to confer unnecessary authority under any such delusion. And I cannot imagine any power more unnecessary to the general government, and at the same time more dangerous and full of peril to the States.
But there is another clause in the Constitution which it is said confers the exclusive power over this subject upon the general government. The ninth section of the first article declares that the migration or importation of such persons as any of the States then existing should think proper to admit should not be prohibited by the Congress prior to the year 1808, but that a tax or duty might be imposed on such importation, not exceeding ten dollars for each importation. The word migration is supposed to apply to alien freemen voluntarily migrating to this country, and this clause to place their admission or migration entirely in the power of Congress.
At the time of the adoption of the Constitution, this clause was understood by its friends to apply altogether to slaves. The Madison Papers will show that it was introduced and adopted solely to prevent Congress, before the time specified, from prohibiting the introduction of slaves from Africa into such States as should think proper to admit them. It was discussed on that ground in the debates upon it in the Convention; and the same construction is given to it in the forty-second number of the Federalist, which was written by Mr. Madison, and certainly nobody could have understood the object and intention of this clause better than he did.
*475 It appears from this number of the Federalist, that those who in that day were opposed to the Constitution, and endeavouring to prevent its adoption, represented the word "migration" as embracing freemen who might desire to migrate from Europe to this country, and objected to the clause because it put it in the power of Congress to prevent it. But the objection made on that ground is dismissed in a few words, as being so evidently founded on misconstruction as to be unworthy of serious reply; and it is proper to remark that the objection then made was, that it was calculated to prevent voluntary and beneficial migration from Europe, which all the States desired to encourage. Now the argument is, that it was inserted to secure it, and to prevent it from being interrupted by the States. If the word can be applied to voluntary immigrants, the construction put upon it by those who opposed the Constitution is certainly the just one; for it is difficult to imagine why a power should be so explicitly and carefully conferred on Congress to prohibit immigration, unless the majority of the States desired to put an end to it, and to prevent any particular State from contravening this policy. But it is admitted on all hands, that it was then the policy of all the States to encourage immigration, as it was also the policy of the far greater number of them to discourage the African slave-trade. And with these opposite views upon these two subjects, the framers of the Constitution would never have bound them both together in the same clause, nor spoken of them as kindred subjects which ought to be treated alike, and which it would be the probable policy of Congress to prohibit at the same time. No State could fear any evil from the discouragement of immigration by other States, because it would have the power of opening its own doors to the immigrant, and of securing to itself the advantages it desired. The refusal of other States could in no degree affect its interests or counteract its policy. It is only upon the ground that they considered it an evil, and desired to prevent it, that this word can be construed to mean freemen, and to class them in the same provision, and in the same words, with the importation of slaves. The limitation of the prohibition also shows that it does not apply to voluntary immigrants. Congress could not prohibit the migration and importation of such persons during the time specified "in such States as might think proper to admit them." This provision clearly implies that there was a well-known difference of policy among the States upon the subject to which this article relates. Now, in regard to voluntary immigrants, all the States, without exception, not only admitted them, but encouraged them to come; and the words "in such States as may think proper to admit *476 them" would have been useless and out of place if applied to voluntary immigrants. But in relation to slaves it was known to be otherwise; for while the African slave-trade was still permitted in some of the more southern States, it had been prohibited many years before, not only in what are now called Free States, but also in States where slavery still exists. In Maryland, for example, it was prohibited as early as 1783. The qualification of the power of prohibition, therefore, by the words above mentioned, was entirely appropriate to the importation of slaves, but inappropriate and useless in relation to freemen. They could not and would not have been inserted if the clause in question embraced them.
I admit that the word migration in this clause of the Constitution has occasioned some difficulty in its construction; yet it was, in my judgment, inserted to prevent doubts or cavils upon its meaning; for as the words imports and importation in the English laws had always been applied to property and things, as contradistinguished from persons, it seems to have been apprehended that disputes might arise whether these words covered the introduction of men into the country, although these men were the property of the persons who brought them in. The framers of the Constitution were unwilling to use the word slaves in the instrument, and described them as persons; and so describing them, they employed a word that would describe them as persons, and which had uniformly been used when persons were spoken of, and also the word which was always applied to matters of property. The whole context of the sentence, and its provisions and limitations, and the construction given to it by those who assisted in framing the clause in question, show that it was intended to embrace those persons only who were brought in as property.
But apart from these considerations, and assuming that the word migration was intended to describe those who voluntarily came into the country, the power granted is merely a power to prohibit, not a power to compel the States to admit.
And it is carrying the powers of the general government by construction, and without express grant or necessary implication, much farther than has ever heretofore been done, if the former is to be construed to carry with it the latter. The powers are totally different in their nature, and totally different in their action on the States. The prohibition could merely retard the growth of population in the States. It could bring upon them no danger, nor any new evil, moral or physical.
But the power of compelling them to receive and to retain among them persons whom the State may deem dangerous to its peace, or who may be tainted with crimes or infectious *477 diseases, or who may be a burden upon its industrious citizens, would subject its domestic concerns and social relations to the power of the Federal government.
It would require very plain and unambiguous words to convince me that the States had consented thus to place themselves at the feet of the general government; and if this power is granted in regard to voluntary immigrants, it is equally granted in the case of slaves. The grant of power is the same, and in the same words, with respect to migration and to importation, with the exception of the right to impose a tax upon the latter; and if the States have granted this great power in one case, they have granted it in the other; and every State may be compelled to receive a cargo of slaves from Africa, whatever danger it may bring upon the State, and however earnestly it may desire to prevent it. If the word migration is supposed to include voluntary immigrants, it ought at least to be confined to the power granted, and not extended by construction to another power altogether unlike in its character and consequences, and far more formidable to the States.
But another clause is relied on by the plaintiff to show that this law is unconstitutional. It is said that passengers are imports, and that this charge is therefore an impost or duty on imports, and prohibited to the States by the second clause of the tenth section of the first article. This objection, as well as others which I have previously noticed, is in direct conflict with decisions heretofore made by this court. The point was directly presented in the case of Miln v. The City of New York, 11 Peters, 102, and was there deliberately considered, and the court decided that passengers clearly were not imports. This decision is perfectly in accordance with the definition of the word previously given in the case of Brown v. Maryland, 12 Wheat. 419. Indeed, it not only accords with this definition, but with the long established and well settled meaning of the word. For I think it may be safely affirmed, that, both in England and this country, the words imports and importation, in statutes, in statistical tables, in official reports, and in public debates, have uniformly been applied to articles of property, and never to passengers voluntarily coming to the country in ships; and in the debates of the Convention itself, the words are constantly so used.
The members of the Convention unquestionably used the words they inserted in the Constitution in the same sense in which they used them in their debates. It was their object to be understood, and not to mislead, and they ought not to be supposed to have used familiar words in a new or unusual sense. And there is no reason to suppose that they did not *478 use the word imports, when they inserted it in the Constitution, in the sense in which it had been familiarly used for ages, and in which it was daily used by themselves. If in this court we are at liberty to give old words new meanings when we find them in the Constitution, there is no power which may not, by this mode of construction, be conferred on the general government and denied to the States.
But if the plaintiff could succeed in maintaining that passengers were imports, and that the money demanded was a duty on imports, he would at the same time prove that it belongs to the United States, and not to him, and, consequently, that he is not entitled to recover it. The tenth section of the first article prohibits a State from laying any duty on imports or exports except what may be absolutely necessary for the execution of its inspection laws. Whatever is necessary for that purpose may therefore be laid by the State without the previous consent of Congress.
If passengers are imports, then their condition may be examined and inspected by an officer of the State like any other import, for the purpose of ascertaining whether they may not when landed bring disease or pauperism into the State; for if the State is bound to permit them to land, its citizens have yet the right to know if there is danger, that they may endeavour to avert it, or to escape from it. They have, therefore, under the clause of the Constitution above mentioned, the power to lay a duty on this import, as it is called, to pay the necessary expenses of the inspection. It is, however, said, that more than sufficient to pay the necessary expenses of the inspection was collected, and that the duty was laid also for other purposes. This is true. But it does not follow that the party who paid the money is entitled to recover it back from the State. On the contrary, it is expressly provided in the clause above mentioned, that the net produce of all duties and imposts laid by any State on imports or exports shall be for the use of the treasury of the United States. If, therefore, these passengers were imports, within the meaning of this clause of the Constitution, and the money in question a duty on imports, then the net produce or surplus, after paying the necessary expenses of inspection, belongs to the treasury of the United States. The plaintiff has no right to it, and cannot maintain a suit for it. It is appropriated by the express words of the Constitution to the United States, and they, and they alone, would have a right to claim it from the State. The argument, however, that passengers are imports, is, in my judgment, most evidently without any reasonable foundation.
The only remaining topic which seems to require examination *479 is the objection, that the money demanded is a tax on the captain of the vessel, and therefore a regulation of commerce.
This argument, I think, is sufficiently answered by what I have already said as to the real and true character of the transaction, and the relative powers of the Union and the States. But I proceed to inquire whether, if the law of Massachusetts be a tax, it is not a legitimate exercise of its taxing power, putting aside for the present the other considerations herein before mentioned, and which I think amply sufficient to maintain its validity.
Undoubtedly the ship, although engaged in the transportation of passengers, is a vehicle of commerce, and within the power of regulation granted to the general government; and I assent fully to the doctrine upon that subject laid down in the case of Gibbons v. Ogden. But it has always been held that the power to regulate commerce does not give to Congress the power to tax it, nor prohibit the States from taxing it in their own ports, and within their own jurisdiction. The authority of Congress to lay taxes upon it is derived from the express grant of power, in the eighth section of the first article, to lay and collect taxes, duties, imposts, and excises, and the inability of the States to tax it arises from the express prohibition contained in the tenth section of the same article.
This was the construction of the Constitution at the time of its adoption, the construction under which the people of the States adopted it, and which has been affirmed in the clearest terms by the decisions of this court.
In the thirty-second number of the Federalist, before referred to, and several of the preceding numbers, the construction of the Constitution as to the taxing power of the general government and of the States is very fully examined, and with all that clearness and ability which everywhere mark the labors of its distinguished authors; and in these numbers, and more especially in the one above mentioned, the construction above stated is given to the Constitution, and supported by the most conclusive arguments. It maintains that no right of taxation which the States had previously enjoyed was surrendered unless expressly prohibited; that it was not impaired by any affirmative grant of power to the general government; that duties on imports were a part of the taxing power, and that the States would have had a right, after the adoption of the Constitution, to lay duties on imports and exports, if they had not been expressly prohibited.
The grant of the power to regulate commerce, therefore, did not, in the opinion of Mr. Hamilton, Mr. Madison, and Mr. Jay, prohibit the States from laying imposts and duties upon *480 imports brought into their own territories. It did not apply to the right of taxation in either sovereignty, the taxing power being a distinct and separate power from the regulation of commerce; and the right of taxation in the States remaining over every subject where it before existed, with the exception only of those expressly prohibited.
This construction, as given by the Federalist, was recognized as the true one, and affirmed by this court, in the case of Gibbons v. Ogden, 9 Wheat. 201. The passage upon this subject is so clear and forcible, that I quote the words used in the opinion of the court, which was delivered by Chief Justice Marshall.
"In a separate clause," he says, "of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power not before conferred. The Constitution then considers those powers as substantive and distinct from each other, and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject; and they might, consequently, have exercised it by levying duties on imports or exports, had the Constitution contained no prohibition upon the subject. This prohibition, then, is an exception from the acknowledged power of the States to levy taxes, not from the questionable power to regulate commerce."
With such authorities to support me, so clearly and explicitly stating the doctrine, it cannot be necessary to pursue the argument further.
I may therefore safely assume, that, according to the true construction of the Constitution, the power granted to Congress to regulate commerce did not in any degree abridge the power of taxation in the States; and that they would at this day have the right to tax the merchandise brought into their ports and harbours by the authority and under the regulations of Congress, had they not been expressly prohibited.
They are expressly prohibited from laying any duty on imports or exports, except what may be absolutely necessary for executing their inspection laws, and also from laying any tonnage duty. So far, their taxing power over commerce is restrained, but no farther. They retain all the rest; and if the money demanded is a tax upon commerce, or the instrument or vehicle of commerce, it furnishes no objection to it unless it is a duty on imports or a tonnage duty, for these alone are forbidden.
*481 And this brings me back to the question whether alien passengers from a foreign country are imports. I have already discussed that question, and need not repeat what I have said. Most clearly, in my opinion, they are not imports; and if they are not, then, according to the authorities referred to, the State has a right to tax them,  their authority to tax not being abridged in any respect by the power in the general government to regulate commerce. I say nothing as to its being a tonnage duty, for, although mentioned in the argument, I do not suppose any reliance could be placed upon it.
It is said that this is a tax upon the captain, and therefore a tax upon an instrument of commerce. According to the authorities before referred to, if it were a tax on the captain it would be no objection to it, unless it were indirectly a duty on imports or tonnage.
Unquestionably a tax on the captain of a ship, bringing in merchandise, would be indirectly a tax on imports, and consequently unlawful; but his being an instrument of commerce and navigation does not make it so; for a tax upon the instrument of commerce is not forbidden. Indeed, taxes upon property in ships are continually laid, and their validity never yet doubted. And to maintain that a tax upon him is invalid, it must first be shown that passengers are imports or merchandise, and that the tax was therefore indirectly a tax upon imports.
But although this money is demanded of the captain, and required to be paid by him or his owner before the passenger is landed, it is in no proper and legitimate sense of the word a tax on him. Goods and merchandise cannot be landed by the captain until the duties upon them are paid or secured. He may, if he pleases, pay the duty without waiting for his owner or consignee. So here the captain, if he chose, might pay the money and obtain the privilege of landing his passengers without waiting for his owner or consignee. But he was under no obligation to do it. Like the case of a cargo, he could not land his passengers until it was done. Yet the duties demanded in the former case have never been supposed to be a tax on the captain, but upon the goods imported. And it would be against all analogy, and against the ordinary construction of all statutes, to call this demand a tax on the captain. The amount demanded depends upon the number of passengers who desire to land. It is not a fixed amount on every captain or every ship engaged in the passenger trade; nor upon her amount of tonnage. It is no objection, then, to the Massachusetts law to say, that the ship is a vehicle or the captain an instrument of commerce.
The taxing power of the State is restrained only where the *482 tax is directly or indirectly a duty on imports or tonnage. And the case before us is the first in which this power has been held to be still further abridged by mere affirmative grants of power to the general government. In my judgment, this restriction on the power of the States is a new doctrine, in opposition to the contemporaneous construction and the authority of adjudged cases. And if it is hereafter to be the law of this court, that the power to regulate commerce has abridged the taxing power of the States upon the vehicles or instruments of commerce, I cannot foresee to what it may lead; whether the same prohibition, upon the same principle, may not be carried out in respect to ship-owners and merchandise in a way seriously to impair the powers of taxation which have heretofore been exercised by the States.
I conclude the subject by quoting the language of Chief Justice Marshall in the case of Billings v. The Providence Bank, in 4 Peters, 561, where, speaking upon this subject, he says:  "That the taxing power is of vital importance, that it is essential to the existence of government, are truths which it cannot be necessary to reaffirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it,  that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community is interested in retaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear."
Such has heretofore been the language of this court, and I can see nothing in the power granted to Congress to regulate commerce that shows a deliberate purpose on the part of the States who adopted the Constitution to abandon any right of taxation except what is directly prohibited. The contrary appears in the authentic publications of the time.
It cannot be necessary to say any thing upon the article of the Constitution which gives to Congress the power to establish a uniform rule of naturalization. The motive and object of this provision are too plain to be misunderstood. Under the Constitution of the United States, citizens of each State are entitled to the privileges and immunities of citizens in the several States; and no State would be willing that another State should determine for it what foreigner should become one of its citizens, and be entitled to hold lands and to vote at its elections. For, without this provision, any one State could have given the right of citizenship in every other State; and, as every citizen of a State is also a citizen of the United States, *483 a single State, without this provision, might have given to any number of foreigners it pleased the right to all the privileges of citizenship in commerce, trade, and navigation, although they did not even reside amongst us.
The nature of our institutions under the Federal government made it a matter of absolute necessity that this power should be confided to the government of the Union, where all the States were represented, and where all had a voice; a necessity so obvious that no statesman could have overlooked it. The article has nothing to do with the admission or rejection of aliens, nor with immigration, but with the rights of citizenship. Its sole object was to prevent one State from forcing upon all the others, and upon the general government, persons as citizens whom they were unwilling to admit as such.
It is proper to add, that the State laws which were under examination in the License Cases applied altogether to merchandise of the description mentioned in those laws, which was imported into a State from foreign countries or from another State; and as the States have no power to lay a tax or duty on imports, the laws in question were subject to the control of Congress until the articles had ceased to be imports, according to the legal meaning of the word. And it is with reference to such importations and regulations of Congress and the States concerning them, that the paramount power of Congress is spoken of in some of the opinions then delivered.
The questions as to the power of a State to exclude from its territories such aliens as it may deem unfit to reside among its citizens, and to prescribe the conditions on which they may enter it, and as to the power of a State to levy a tax for revenue upon alien passengers arriving from foreign ports, were neither of them involved in those cases, and were not considered or discussed in the opinions.
I come now to the case from New York.
The object of this law is to guard its citizens, not only from the burdens and evils of foreign paupers, but also against the introduction of contagious diseases. It is not, therefore, like the law of Massachusetts, confined to aliens, but the money is required to be paid for every passenger arriving from a foreign port. The tax is imposed on the passenger in this case clearly and distinctly; for although the captain who lands them is made liable for the collection, yet a right is expressly secured to him to recover it from the passenger. There can be no objection to this law upon the ground that the burden is imposed upon citizens of other States, because citizens of New York are equally liable; but embracing, as it does, its own citizens and citizens of other States, when they arrive from a *484 foreign port, the right of a State to determine what person or class of persons shall reside among them does not arise, and what I have said upon that subject in the Boston case is inapplicable to this. In every other respect, however, it stands upon the same principles, involving also other and further considerations, which I proceed to notice, and which place it upon grounds equally firm with the case from Massachusetts.
It will be admitted, I understand, that New York has the right to protect herself from contagious diseases, and possesses the right to inspect ships with cargoes, and to determine when it is safe to permit the vessel to come to the wharf, or the cargo to be discharged. In other words, it may establish quarantine laws. Consequently the State may tax the ship and cargo with the expenses of inspection, and with the costs and expenses of all measures deemed necessary by the State authorities. This is uniformly the case in quarantine regulations; and although there is not the least appearance of disease in the crew, and the cargo is free from taint, yet if the ship comes from a port where a contagious disease is supposed to exist, she is always placed under quarantine, and subjected to the delay and expenses incident to that condition, and neither the crew nor cargo suffered to land until the State authorities are satisfied that it may be done without danger. The power of deciding from what port or ports there is danger of disease, and what ship or crew shall be made subject to quarantine, on account of the port from which she sailed, and what precautions and securities are required to guard against it, must of necessity belong to the State authorities; for otherwise the power to direct the quarantine could not be executed. And this power of a State has been constantly maintained and affirmed in this court whenever the subject has been under consideration. And when the State authorities have directed the quarantine, if proof should be offered showing that the foreign ports to which it applied were free from disease, and that there was no just ground for apprehension, this court would hardly, upon that ground, feel itself authorized to pronounce the expenses charged upon the vessel to be unconstitutional, and the law imposing them to be void.
Upon every principle of reason and justice, the same rule must be applied to passengers that is applied to ships and cargoes. If, for example, while rumors were recently prevailing that the cholera had shown itself in the principal seaport towns of Europe, New York had been injudicious enough to embarrass her own trade by placing at quarantine all vessels and persons coming from those ports, and burdened them with the heavy expenses and ruinous delays incident to that measure,  *485 or if she were to do so now, when apprehensions are felt that it may again suddenly make its appearance in the great marts of European trade,  this court certainly would not undertake to determine that these fears are groundless, and precautionary measures unnecessary, and the law therefore unconstitutional, and that every passenger might land at his own pleasure. Nobody, I am sure, will contend for such a power. And however groundless the apprehension, and however injurious and uncalled for such regulations may be, still, if adopted by the State, they must be obeyed, and the courts of the United States cannot treat them as nullities.
If the State has the same right to guard itself from persons from whom infection is feared that it has to protect itself against the danger arising from ships with cargoes, it follows that it may exercise, the same power in regard to the former that it exercises in relation to the latter, and may tax them with the expense of the sanatory measures which their arrival from a foreign port is supposed to render necessary or prudent.
For the expenses imposed on ships with cargoes, or on the captain or owner, are as much a tax as the demand of a particular sum to be paid to the officer of the State, to be expended for the same purpose. It is in truth always the demand of a sum of money to indemnify the State for the expense it incurs. And, as I have already said, these charges are not always made and enforced against ships actually infected with disease, but frequently upon a particular class of vessels; that is to say, upon all ships coming from ports from which danger is apprehended,  upon the sound and healthy as well as the infected. The charge is not made upon those ships alone which bring disease with them, but upon all that come from a port or ports from which it is feared disease may be brought. It is true the expenses may and do differ in amount, according to the condition of the ship and cargo. Yet all are subjected to the tax, to the amount of the charges incurred by the State.
Now, in the great commercial emporium of New York, hundreds are almost daily arriving from different parts of the world, and that multitude of strangers (among whom are always many of the indigent and infirm) inevitably produces a mass of pauperism which, if not otherwise provided for, must press heavily on the industry of its citizens; and which, moreover, constantly subjects them to the danger of infectious diseases. It is to guard them against these dangers that the law in question was passed. The apprehensions which appear to have given rise to it may be without foundation as to some of the foreign ports from which passengers have arrived, but that *486 is not a subject of inquiry here; and it will hardly be denied that there are sufficient grounds for apprehension and for measures of precaution as to many of the places from which passenger ships are frequently arriving. Indeed, it can hardly be said that there is any European port from which emigrants usually come which can be regarded as an exception.
The danger arising from passenger ships cannot be provided against, with a due regard to the interests and convenience of trade and to the calls of humanity, by precisely the same means that are usually employed in cases of ships with cargoes. In the latter case, you may act without difficulty upon the particular ship, and charge it with the expenses which are incident to the quarantine regulations. But how are you to provide for hundreds of sick and suffering passengers? for infancy and age? for those who have no means,  who are not objects of taxation, but of charity? You must have an extensive hospital, suitable grounds about it, nurses and physicians, and provide food and medicine for them. And it is but just that these expenses should be borne by the class of persons who make them necessary; that is to say, the passengers from foreign ports. It is from them, as a class, that the danger is feared, and they occasion the expenditure. They are all entitled to share in the relief which is provided, and the State cannot foresee which of them will require it and which will not. It is provided for all that need it, and all should therefore contribute. You must deal with them as you do with ships with merchandise and crews arriving from ports where infectious diseases are supposed to exist; when, although the crew are in perfect health, and the ship and cargo free from infection, yet the ship-owner must bear the expense of the sanatory precautions which are supposed to be necessary on account of the place from which the vessel comes.
The State might, it is true, have adopted towards the passenger ships the quarantine regulations usually applied to ships with merchandise. It might have directed that the passenger ships from any foreign port should be anchored in the stream, and the passengers not permitted to land for the period of time deemed prudent. And if this had been done, the ship-owner would have been burdened with the support of his numerous passengers, and his ship detained for days, or even weeks, after the voyage was ended. And if a contagious disease had broken out on the passage, or appeared after the vessel arrived in port, the delay and expense to him would have been still more serious.
The sanatory measures prescribed by this law are far more favorable to the passengers than the ancient regulations, and *487 incomparably more so to the feeble, the sick, and the poor. They are far more favorable, also, and less burdensome, to the ship-owner; and no one, I think, can fail to see that the ancient quarantine regulations, when applied to passenger ships, are altogether unsuited to the present condition of things, to the convenience of trade, and to the enlightened policy which governs our intercourse with foreign nations. The ancient quarantine regulations were introduced when the passenger trade, as a regular occupation, was unknown, and when the intercourse between nations was totally unlike what it is at the present day. And after all, these quarantine regulations are nothing more than the mode in which a nation exercises its power of guarding its citizens from the danger of disease. It was, no doubt, well suited to the state of the world at the time when it was generally adopted; but can there be any reason why a State may not adopt other sanatory regulations in the place of them, more suitable to the free, speedy, and extended intercourse of modern times? Can there be any reason why they should not be made less oppressive to the passenger, and to the ship-owner and mariner, and less embarrassing and injurious to commerce? This is evidently what the New York law intended to accomplish, and has accomplished, while the law has been permitted to stand. It is no more a regulation of commerce, and, indeed, is far less burdensome and occasions less interruption to commerce, than the ancient quarantine regulations. And I cannot see upon what ground it can be supposed that the Constitution of the United States permits a State to use the ancient means of guarding the health of its citizens, and at the same time denies to it the power of mitigating its hardships and of adapting its sanatory regulation to the extended and incessant intercourse with foreign nations, and the more enlightened philanthropy of modern times; nor why the State should be denied the privilege of providing for the sick and suffering on shore, instead of leaving them to perish on shipboard. Quarantine regulations are not specific and unalterable powers in a State; they are but the means of executing a power. And certainly other and better means may be adopted in place of them, if they are not prohibited by the Constitution of the United States. And if the old mode is constitutional, the one adopted by the law of New York must be equally free from objection. Indeed, the case of The City of New York v. Miln, so often referred to in the argument, ought, in my judgment, to decide this. It seems to me that the present case is entirely within the principles there ruled by the court.
I had not intended to say any thing further in relation to the case of New York v. Miln, but the remarks of one of my brethren *488 have rendered it necessary for me to speak of it more particularly, since I have referred to it as the deliberate judgment of the court. It is eleven years since that decision was pronounced. After that lapse of time, I am sensible that I ought not to undertake to state every thing that passed in conference or in private conversations; because I may be mistaken in some particulars, although my impressions are strong that all the circumstances are yet in my memory. And I am the less disposed to enter upon such a statement, because, in my judgment, its judicial authority ought not to rest on any such circumstances depending on individual memory. The court at that time consisted of seven members; four of them are dead, and among them the eminent jurist who delivered the opinion of the court. All of the seven judges were present, and partook in the deliberations which preceded the decision. The opinion must have been read in conference, and assented to or acquiesced in by a majority of the court, precisely as it stood, otherwise it could not have been delivered as the court's opinion. It was delivered from the bench in open court, as usual, and only one of the seven judges, Mr. Justice Story, dissented. Mr. Justice Thompson delivered his own opinion, which concurred in the opinion of the court, but which, at the same time, added another ground, which the court declined taking and determined to leave open. This will be seen by referring to the opinions. And if an opinion thus prepared and delivered and promulgated in the official report may now be put aside, on the ground that it did not express what at that time was the opinion of the majority of the court, I do not see how the decisions, when announced by a single judge, (as is usual when the majority concur,) can hereafter command the public confidence. What is said to have happened in this case may, for aught we know, have happened in others. In Gibbons v. Ogden, for example, or Brown v. The State of Maryland, which have been so often referred to.
The question which the court determined to leave open was, whether regulations of commerce, as such, by a State within its own territories, are prohibited by the grant of the power to Congress. This appears in the opinion itself, and the law of New York was maintained on what was called the police power of the State. I ought to add, as Mr. Justice Baldwin has been particularly referred to, that the court adjourned on the day the opinion was delivered, and on the next day he called on me and said there was a sentence, or a paragraph, I do not remember which, that had escaped his attention, and which he was dissatisfied with, and wished altered. Of course nothing could be done, as the court had separated, and Mr. *489 Justice Barbour, as well as others, had left town. Mr. Justice Barbour and Mr. Justice Baldwin were both present at the next term, and for several terms after; but I never heard any further dissatisfaction expressed with the opinion by Mr. Justice Baldwin, and never at any time, until this case came before us, heard any from any other member of the court who had assented to or acquiesced in the opinion, nor any proposition to correct it. I have no reason to suppose that Mr. Justice Barbour ever heard in his lifetime that the accuracy of his opinion had been questioned, or that any alteration had been desired in it. And I have the strongest reason to suppose that Mr. Justice Baldwin had become satisfied, because, in his opinion in Groves v. Slaughter, he quotes the case of New York v. Miln with approbation, when speaking in that case of the difference between commercial and police power. The passage is in 15 Pet. 511, where he uses the following language:  "The opinion of this court in the case of Miln v. New York, 11 Pet. 130, &c., draws the true line between the two classes of regulations, and gives an easy solution to any doubt which may arise on the clause of the constitution of Mississippi which has been under consideration." I quote his words as judicially spoken, and forming a part of the official report.
I have deemed it my duty to say this much, as I am one of the three surviving judges who sat in that case. My silence would justly have created the belief that I concurred in the statement which has been made in relation to the case of which I am speaking. But I do not concur. My recollections, on the contrary, differ from it in several particulars. But it would be out of place to enter on such a discussion here. All I desire to say is, that I know nothing that, in my judgment, ought to deprive the case of New York v. Miln of its full judicial weight as it stands in the official report. Mr. Justice Barbour delivered the opinion. Mr. Justice Thompson's opinion maintains, in the main, the same principles; Mr. Justice Baldwin, four years afterwards, quoted it with approbation; and I certainly assented to it,  making a majority of the whole court. I speak of the opinion of my deceased brethren from their public acts. Of the opinions of those who sit beside me I have no right to speak, because they are yet here and have spoken for themselves. But it is due to myself to say, that certainly, at the time the opinion was delivered, I had no reason to suppose that they did not both fully concur in the reasoning and principles, as well as in the judgment. And if the decision now made is to come in conflict with the principles maintained in that case, those who follow us in these seats must hereafter decide between the two cases, and determine which of them best *490 accords with the true construction of the Constitution, and ought, therefore, to stand. The law now in question, like the law under consideration in the case of New York v. Miln, is, in all of its substantial objects and provisions, in strict analogy to the ordinary quarantine regulations in relation to ships with cargoes from places supposed to be dangerous; at least as much so as the nature of the danger brought by a passenger ship, and the means necessary to guard against it, will permit.
But if this law is held to be invalid, either because it is a regulation of commerce, or because it comes in conflict with a law of Congress, in what mode can the State protect itself? How can it provide against the danger of pestilence and pauperism from passenger ships? It is admitted that it has a right to do so; that want and disease are not the subjects of commerce, and not within the power granted to Congress. They do not obey its laws. Yet, if the State has the right, there must be a remedy, in some form or other, in its own hands, as there is in the case of ships with cargoes. The State can scarcely be required to take upon itself, and impose upon the industry of its citizens, the duty of supporting the immense mass of poverty and helplessness which is now pressing so heavily upon property in Europe, and which it is endeavouring to throw off. It cannot be expected that it should take upon itself the burden of providing buildings, grounds, food, and all the necessary comforts for the multitude of helpless and poor passengers who are daily arriving from foreign ports. Neither, I presume, will it be expected that the citizens of New York should disregard the calls of sympathy and charity, and repulse from their shores the needy and wretched who are seeking an asylum amongst them. Those who deny the legality of the mode adopted would seem to be called upon to point out another consistent with the rights and safety of the State, and with the interests of commerce in the present condition of the commercial world, and not inconsistent with the obligations of humanity. I have heard none suggested, and I think it would be difficult to devise one on the principles on which this case is decided, unless the health and the lives of the citizens of every State are made altogether dependent upon the protection of the Federal government, and the reserved powers of the States over this subject, which were affirmed by this court in Gibbons v. Ogden and Brown v. The State of Maryland, are now to be denied.
With regard to the taxing power in the State, the case of Brown v. The State of Maryland, referred to in the argument, does not apply to it. The rights of the ship-owner or the captain were in no degree involved in that suit. Nor was there *491 any question as to when the voyage terminated, as to the ship, or when passengers were entitled to land. The case turned altogether upon the rights of the importer, the owner of imported goods; and the inquiry was, how long and under what circumstances they continued, after they had been actually landed, to be imports or parts of foreign commerce, subject to the control of Congress and exempt therefore from taxation by the State. And even with regard to the importer, that case did not decide that he was not liable to be taxed for the amount of his capital employed in trade, although these imports were a part of that capital.
But here there is no owner. It is the case of passengers,  freemen. It is admitted that they are not exempt from taxation after they are on shore. And the question is, When was the voyage or passage ended, and when did the captain and passengers pass from the jurisdiction and protection of the general government and enter into that of the State. The act of 1819 regulated and prescribed the duties of the ship-owner and captain during the voyage, and until the entry was made at the custom-house and the proper list delivered. It makes no further provision in relation to any of the parties. The voyage was evidently regarded as then completed, and the captain and passengers as passing from the protection and regulations of Congress, into the protection and exclusive jurisdiction of the State. The passengers were no longer under the control of the captain. They might have landed where and when they pleased, if the State law permitted it, and the captain had no right to prevent them. If he attempted to do so, there was no law of Congress to afford redress or to grant relief. They must have looked for protection to the State law and the State authorities. If a murder had been committed, there was no law of Congress to punish it. The personal safety of the passengers and the captain, and their rights of property, were exclusively under the jurisdiction and protection of the State. If the right of taxation did not exist in this case in return for the protection afforded, it is, I think, a new exception to the general rule upon that subject. For all the parties, the captain as well as the passengers, were as entirely dependent for the protection of their rights upon the State authorities, as if they were dwelling in a house in one of its cities; and I cannot see why they should not be equally liable to be taxed, when no clause can be found in the Constitution of the United States which prohibits it.
The different provisions of the two laws, and the different circumstances of the two cases, made it necessary to say this much concerning the case from New York. In all other respects, *492 except those to which I have adverted, they stand upon the same principles, and what I have said of the Boston case is equally applicable to this.
In speaking of the taxing power in this case, I must, however, be understood as speaking of it as it is presented in the record,  that is to say, as the case of passengers from a foreign port. The provisions contained in that law relating to American citizens who are passengers from the ports of other States is a different question, and involves very different considerations. It is not now before us; yet, in order to avoid misunderstanding, it is proper to say, that, in my opinion, it cannot be maintained. Living as we do under a common government, charged with the great concerns of the whole Union, every citizen of the United States, from the most remote States or Territories, is entitled to free access, not only to the principal departments established at Washington, but also to its judicial tribunals and public offices in every State and Territory of the Union. And the various provisions in the Constitution of the United States  such, for example, as the right to sue in a federal court sitting in another State, the right to pursue and reclaim one who has escaped from service, the equal privileges and immunities secured to citizens of other States, and the provision that vessels bound to or from one State to another shall not be obliged to enter and clear or pay duties  all prove that it intended to secure the freest intercourse between the citizens of the different States. For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States. And a tax imposed by a State for entering its territories or harbours is inconsistent with the rights which belong to the citizens of other States as members of the Union, and with the objects which that Union was intended to attain. Such a power in the States could produce nothing but discord and mutual irritation, and they very clearly do not possess it.
But upon the question which the record brings up, the judgment in the New York case, as well as that from Massachusetts, ought, in my opinion, to be affirmed.
NOTE.  It has been said in the discussion of these cases, by those who maintain that the State laws are unconstitutional, that commerce means intercourse; and that the power granted to regulate it ought to be construed to include intercourse. I have never been able to see that any argument which needed *493 examination could be justly founded on this suggestion, and therefore omitted to notice it in the aforegoing opinion. But some stress was, perhaps, intended to be laid on the word intercourse thus introduced, and I therefore subjoin this brief note, in order to show that it has not been overlooked.
It has always been admitted, in the discussions upon this clause of the Constitution, that the power to regulate commerce includes navigation, and ships, and crews, because they are the ordinary means of commercial intercourse; and if it is intended by the introduction of the word intercourse merely to say that the power to regulate commerce includes in it navigation, and the vehicles and instruments of commerce, it leaves the question in dispute precisely where it stood before, and requires no further answer.
But if intercourse means something more than commerce, and would give to the general government a wider range of power over the States, no one, I am sure, will claim for this court the power to interpolate it, or to construe the Constitution as if it was found there. And if, under the authority to regulate commerce, Congress cannot compel the States to admit or reject aliens or other persons coming from foreign ports, but would possess the power if the word intercourse is, by construction, substituted in its place, every one will admit that a construction which substitutes a word of larger meaning than the word used in the Constitution could not be justified or defended upon any principle of judicial authority.
The introduction of the word intercourse, therefore, comes to this: if it means nothing more than the word commerce, it is merely the addition of a word without changing the argument; but if it is a word of larger meaning, it is sufficient to say that then this court cannot substitute it for the word of more limited meaning contained in the Constitution. In either view, therefore, of the meaning to be attached to this word intercourse, it can form no foundation for an argument to support the power now claimed for the general government.
And if commerce with foreign nations could be construed to include the intercourse of persons, and to embrace travellers and passengers, as well as merchandise and trade, Congress would also have the power to regulate this intercourse between the several States, and to exercise this power of regulation over citizens passing from one State to another. It, of course, needs no argument to prove that such a power over the intercourse of persons passing from one State to another is not granted to the Federal government by the power to regulate commerce among the several States. Yet, if commerce does not mean the intercourse of persons between the several States, *494 and does not embrace passengers or travellers from one State to another, it necessarily follows that the same word does not include passengers or travellers from foreign countries. And if Congress, under its power to regulate commerce with foreign nations, possesses the power claimed for it in the decision of this case, the same course of reasoning and the same rule of construction (by substituting intercourse for commerce) would give the general government the same power over the intercourse of persons between different States.
Allusion has been made in the course of these discussions to the exclusive power of the Federal government in relation to intercourse with foreign nations, potentates, and public authorities. This exclusive power is derived from its power of peace and war, its treaty-making power, its exclusive right to send and receive ambassadors and other public functionaries; and its intercourse in exercising this power is exclusively with governments and public authorities, and has no connection whatever with private persons, whether they be emigrants or passengers, or travellers by land or water from a foreign country. This power over intercourse with foreign governments and authorities has frequently been spoken of, in opinions delivered in this court, as an exclusive power. And I do not suppose that any of these opinions have been alluded to in this case, as furnishing any argument upon the question now before us. For an argument drawn from a mere similitude of words, which are used in relation to a subject entirely different, would be a sophism too palpable to need serious reply.
Mr. Justice DANIEL, dissenting.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
Of the decision of the court just given, a solemn sense of duty compels me to declare my disapproval. Impressed as I am with the mischiefs with which that decision is believed to be fraught, trampling down, as to me it seems to do, some of the strongest defences of the safety and independence of the States of this confederacy, it would be worse than a fault in me could I contemplate the invasion in silence. I am unable to suppress my alarm at the approach of power claimed to be uncontrollable and unlimited. My objections to the decision of the court, and the grounds on which it is rested, both at the bar and by the court, will be exemplified in detail in considering the case of Smith v. Turner, arising under the statute of New York. The provision of the statute in question is in the following words: 
*495 "The health-commissioner shall demand and be entitled to receive, and in case of neglect or refusal to pay shall sue for and recover, in his name of office, the following sums from the master of every vessel that shall arrive in the port of New York, viz.:  1. From the master of every vessel from a foreign port, for himself and each cabin passenger, one dollar and fifty cents; for each steerage passenger, mate, sailor, or mariner, one dollar." (Rev. Stat. of New York, 445.)
It is wholly irrelevant to the case before us to introduce any other provisions of this statute; such provisions have no connection with this cause, which originated in the single provision just cited; the intrusion of other provisions of the law of New York can tend only to confusion, and to the effect of diverting the mind from the only proper question for our decision.
Under this provision of the statute, an action was brought by the defendant in error, as health-officer of New York, against the plaintiff in error, to recover the amount authorized by the statute to be demanded of him for bringing within the port of the city of New York, from a foreign country, two hundred and ninety-five alien passengers. It is deemed necessary particularly to state the character of the persons with respect to whose entrance the demand originated and was made, with the view to anticipate objections which might be founded on a supposed invasion of the right of transit in American citizens from one portion of the nation to another. To raise such an objection would be the creation of a mere man of straw, for the quixotic parade of being tilted at and demolished. This case involves no right of transit in American citizens or their property; it is a question raised simply and entirely upon the right of the State to impose conditions on which aliens, or persons from foreign countries, may be introduced within her territory. When a case of a different character, touching the right of transit in citizens, shall arise, it will then, and not till then, be proper to consider it. We cannot properly take cognizance of matters existing only in imagination. Whether this statute of New York and those which have preceded it in pari materiâ, be wise, or beneficent, or equitable, or otherwise, in their provisions,  whether, under color of those statutes, more may have been collected than either justice or prudence, or the objects professed in those laws, would require,  whether the amounts collected have been diverted to purposes different from those alleged in excuse for such collection,  are not questions adjourned hither for adjudication upon this record. The legitimate and only regular inquiry before the court is this,  whether the authority claimed and exerted by New York, and *496 the mode she has chosen for its exertion, be in conformity with the provisions of the Constitution? I shall dismiss from my view of this cause every other question, as irrelevant and out of place.
The legislation of New York, and the proceedings adopted to enforce it, are assailed as violations of the Constitution, first, as being repugnant to, and an interference with, the power delegated to Congress to regulate foreign commerce. And this general proposition has been divided into two more specific grounds of objection: 
1st. The prohibition to the States to levy taxes or imposts on imports.
2d. The alleged right of Congress to regulate exclusively the admission of aliens,  a right insisted on as falling by construction within the commercial power, or within some other implication in the Constitution.
As guides in the examination of these objections, I will take leave to propound certain rules or principles regarded by myself, at least, as postulates, and conceded to be such, perhaps, by every expositor of the Constitution and of the powers of the State governments.
1st. Then, Congress have no powers save those which are expressly delegated by the Constitution, and such as are necessary to the exercise of powers expressly delegated. (Constitution, art. 1, sec. 8, clause 18, and Amendments, art. 10.)
2d. The necessary auxiliary powers vested by art. 1, sec. 8, of the Constitution cannot be correctly interpreted as conferring powers which, in their own nature, are original, independent substantive powers; they must be incident to original substantive grants, ancillary in their nature and objects, and controlled by and limited to the original grants themselves.
3d. The question, whether a law be void for its repugnancy to the Constitution, ought seldom, if ever, to be decided in the affirmative in a doubtful case. It is not on slight implication and vague conjecture, that a legislature is to be pronounced to have transcended its powers, and its acts to be considered void. The opposition between the Constitution and the law should be such, that the judge feels a clear and strong conviction of their incompatibility with each other. (6 Cranch, 128.) Various other cases might be adduced to the same effect. Governed by the above principles, whose soundness will scarcely be doubted, I proceed to inquire wherein the existing legislation of New York is in conflict with the Constitution, or with any regulation of Congress established under the authority of that instrument. Whilst, with respect to the paramount authority in Congress to regulate commerce with foreign *497 nations and amongst the several States, (with the exceptions and qualifications of internal commerce and of regulations necessary for the health and security of society,) there appears to have been great unanimity everywhere amongst all persons, much diversity of opinion has existed amongst members of this tribunal as to another characteristic of this grant to Congress; namely, as to whether it implies an exclusiveness which necessarily denies and forbids, apart from actual or practical collision or interference, every thing like the power of commercial regulation on the part of the States.
To collate or comment upon these various opinions would here be a work of detail and curiosity rather than of utility. A reference to them is no further necessary than to remark, that their preponderance is against the position of exclusiveness in the sense above mentioned, or in any acceptation beyond an actual interference or an unavoidable and essential repugnance in the nature of the separate State and Federal action.
And still more would an examination of these opinions be useless, if, indeed, it would not be irregular, since the decision at the last term but one of this court, upon the license laws of Massachusetts, Rhode Island, and New Hampshire, reported in 5 Howard, 504, in which decision the preceding cases upon this subject were reviewed, and the character of exclusiveness in the power delegated to Congress repelled and denied. It was my purpose, with this general reference to the decisions of this court, to pass from the point of exclusiveness in the power of Congress over commercial regulations to other questions involved in the present cause; but certain positions just confidently stated from the bench seem to require a pause in my progress, long enough to show the inconsistency of these positions with the Constitution,  their direct conflict, indeed, with themselves. Thus, in the argument to sustain the exclusiveness of the commercial power in Congress, it has been affirmed that, the powers of the Federal government being complete, and within the scope of their design and objects admitting of no partition, the State governments can exercise no powers affecting subjects falling within the range of Federal authority, actual or potential, or in subordination to the Federal government; yet it is remarkable that this assertion has been followed in the same breath by the concession, that the pilot laws are, to some extent, regulations of commerce, and that pilot laws, though enacted by the States, are constitutional, and are valid and operative until they shall be controlled by Federal legislation.
Again: the very language of the Constitution may be appealed to for the recognition of powers to be exercised by the *498 States, until they shall be superseded by a paramount authority vested in the Federal government. Instances of these are the powers to train the militia, to lay duties or imposts on imports or exports, so far as this shall be necessary to execute the inspection laws; and the provision in the fourth section of the first article of the Constitution, declaring that the times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof, subject to the power of Congress at any time to alter such regulation. Here, then, are examples put by the Constitution itself, which wholly overthrow this idea of necessity for universal exclusiveness in the investiture of Federal power; examples surely not of minor importance to any which can be derived from the ordinary exigencies of trade. I must stop here, too, long enough to advert to a citation which has been made, in support of the idea of exclusive commercial power, from the opinion of the late Mr. Justice Baldwin, in the case of Groves v. Slaughter, 15 Peters, 511. With regard to this opinion, it would seem to be enough to deprive it of binding influence as authority, to remark that it was a dissent by a single judge; and this opinion should have still less weight here or elsewhere, when it shall be understood to have asserted the extraordinary doctrine that the States of this Union can have no power to prohibit the introduction of slaves within their territory when carried thither for sale or traffic, because the power to regulate commerce is there asserted to reside in Congress alone. It may safely be concluded, I think, that the justice who cites, with seeming approbation, the opinion of Mr. Justice Baldwin, will hesitate to follow it to the eccentric and startling conclusion to which that opinion has attained.
In opposition to the opinion of Mr. Justice Baldwin, I will place the sounder and more orthodox views of Mr. Justice Story upon this claim to exclusive power in Congress, as expressed in the case of Houston v. Moore, 5 Wheat. 48, with so much clearness and force as to warrant their insertion here, and which must strongly commend them to every constitutional lawyer. The remarks of Justice Story are these:  "Questions of this nature are always of great importance and delicacy. They involve interests of so much magnitude, and of such deep and permanent public concern, that they cannot but be approached with uncommon anxiety. The sovereignty of a State in the exercise of its legislation is not to be impaired, unless it be clear that it has transcended its legitimate authority; nor ought any power to be sought, much less to be adjudged, in favor of the United States, unless it be clearly within the reach of its constitutional charter. Sitting here, we are *499 not at liberty to add one jot of power to the national government beyond what the people have granted by the Constitution; and, on the other hand, we are bound to support the Constitution as it stands, and to give a fair and rational scope to all the powers which it clearly contains. The Constitution containing a grant of powers in many instances similar to those already existing in the State governments, and some of these being of vital importance to State authority and State legislation, it is not to be admitted that a mere grant of such powers in affirmative terms to Congress does per se transfer an exclusive sovereignty on such subjects to the latter. On the contrary, a reasonable interpretation of that instrument necessarily leads to the conclusion, that the powers so granted are never exclusive of similar powers existing in the States, unless where the Constitution has expressly in terms given an exclusive power to Congress, or the exercise of a like power is prohibited to the States, or there is a direct repugnancy or incompatibility in the exercise of it by the States. In all other cases not falling within the classes already mentioned, it seems unquestionable that the States retain concurrent authority with Congress, not only upon the letter and spirit of the eleventh amendment of the Constitution, but upon the soundest principles of general reasoning. There is this reserve, however, that, in cases of concurrent authority, where the laws of the States and of the Union are in direct and manifest collision on the same subject, those of the Union, being the supreme law of the land, are of paramount authority, and State laws so far, and so far only, as such incompatibility exists must necessarily yield. Such are the general principles by which my judgment is guided in every investigation on constitutional points. I do not know that they have ever been seriously doubted. They commend themselves by their intrinsic equity, and have been amply justified by the opinions of the great men under whose guidance the Constitution was framed, as well as by the practice of the government of the Union. To desert them would be to deliver ourselves over to endless doubts and difficulties, and probably to hazard the existence of the Constitution itself." Here, indeed, is a commentary on the Constitution worthy of universal acceptation.
As the case of Gibbons v. Ogden has been much relied on in the argument of these cases, and is constantly appealed to as the authoritative assertion of the principle of exclusiveness in the power in Congress to regulate commerce, it is proper here to inquire how far the decision of Gibbons v. Ogden affirms this principle, so often and so confidently ascribed to it; and after all that has been said on this subject, it may be matter *500 of surprise to learn, that the court, in the decision above mentioned, so far from affirming that principle, emphatically disclaims all intention to pass upon it. It is true that the court, in speaking of the power to regulate commerce vested in Congress by the Constitution, says, that, like all other powers vested in Congress, "it is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are comprised by the Constitution." How far exclusiveness in its nature or in the modes of its exercise is indispensable to this completeness of the power itself, the court does not say; but, as has been already remarked, declares its intention not to speak on these topics. These are the words of the court:  "In discussing the question whether this power is still in the States, in the case under consideration, we may dismiss from it the inquiry whether it is surrendered by the mere grant to Congress, or is retained until Congress shall exercise the power. We dismiss that inquiry, because it has been exercised, and the regulations which Congress deemed it proper to make are now in full operation. The sole question is, Can a State regulate commerce with foreign nations and among the States, while Congress is regulating it?" And, in fine, upon this question of exclusiveness, the case of Wilson v. The Blackbird Creek Marsh Company affirms, in language too explicit for misapprehension, that the States may, by their legislation, create what may be obstructions of the means of commercial intercourse, subject to the controlling and paramount authority of Congress. The words of the court in the case last mentioned are these:  "If Congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, the object of which was to control State legislation over those small navigable creeks into which the tide flows, and which abound throughout the lower country of the Middle and Southern States, we should feel not much difficulty in saying that a State law coming in conflict with such an act would be void. But Congress has passed no such act. The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations and among the several States; a power which has not been so exercised as to affect the question. The act is not in violation of this power in its dormant state." (2 Peters, 252.)
I now proceed to inquire whether the exaction of one dollar by New York from aliens arriving within her limits from abroad by sea, can be denominated a regulation of commerce, either according to the etymological meaning of the word commerce, or according to its application in common parlance. *501 Commerce, from con and mercis, critically signifies a mutual selling or traffic, and in ordinary and practical acceptation it means trade, bargain, sale, exchange, barter; embracing these both as its means and its objects. Different and metaphorical significations of the term can doubtless be suggested by ingenious imaginations. Thus we read in a great poet of "looks commercing with the skies"; but this sublimated application of the term would badly accord with the views of commerce in a mercantile sense, or with the utilitarian spirit of this calculating and prosaic age.[*]
Does the law of New York operate either directly or necessarily upon any one of these ingredients of commerce? Does it look to them at all? With regard to the emigrant, this law institutes no inquiry either as to his pursuits, or his intentions, or his property. He may be a philosopher, an agriculturist, a mechanic, a merchant, a traveller, or a man of pleasure; he may be opulent, or he may be poor;  none of these circumstances affect his admission. It is required, upon his entering the State, that there be paid by or for him a given sum, graduated upon a calculation of benefit to himself and to others similarly situated with himself,  or, if you choose, upon a calculation of advantage to the State; but, under whatever aspect it is viewed, wholly irrespective of property or occupation. So far, then, as the emigrant himself is considered, this imposition steers entirely clear of regulating commerce, in any conceivable sense; it is literally a tax upon a person placing himself within the sphere of the taxing power, and the nature and character of the proceeding are in no wise changed where payment shall be made by the master of the vessel acting as the agent and on behalf of the emigrant. It would still be purely an exercise of the great, indefeasible right of taxation, which, it has been explicitly said by this court, would extend to every subject but for the restriction as to imports and exports imposed by the Constitution; a right, too, expressly declared to belong to a branch of power wholly different from the power to regulate commerce, and forming no part of that power. Thus, in the case of Gibbons v. Ogden, 9 Wheaton, 201, this court, speaking of the power of laying duties or imposts on imports or exports, make use of the following language:  "We think it very clear, that it is considered as a branch of the taxing power. It is so treated in the first clause *502 of the eighth section. `Congress shall have power to lay and collect taxes, duties, imposts, and excises'; and before commerce is mentioned, the rule by which the exertion of this power must be governed is declared. It is that all duties, imposts, and excises shall be uniform. In a separate clause of the enumeration, the power to regulate commerce is given, as being entirely distinct from the right to levy taxes and imposts, and as being a new power not before conferred. The Constitution, then, considers these two powers as substantive and distinct from each other, and so places them in the enumeration it contains. The power of imposing duties on imports is classed with the power to levy taxes, and that seems to be its natural place. But the power to levy taxes could never be considered as abridging the right of the States on that subject, and they might consequently have exercised it by levying duties on imports or exports had the Constitution contained no prohibition on this subject. This prohibition, then, is an exception to the acknowledged power of the States to levy taxes; not from the questionable power to regulate commerce." Again, in the same case, p. 200, it is declared that "there is no analogy between the power of taxation and the power to regulate commerce"; that the powers are not the same; that there is neither affinity nor resemblance between them (p. 198). It follows ex necessitate from this language, that the right to regulate commerce must mean something essentially distinct and separate from the power to impose duties or taxes upon imports; and that the latter might exist independently of and without the former. The assertion of the court here is too clear and emphatic to be misapprehended; and it would seem to follow by regular induction therefrom, that a tax directly upon the master himself, in consideration of the emigrants brought by him within the limits of the State, could not be within the prohibition of the Constitution, unless those emigrants could in legal or in ordinary acceptation be made to fall within the meaning of the term imports. This would be absolutely necessary, and by a different construction the authority of Gibbons v. Ogden would be wholly overthrown. It is said, upon the authority of Gibbons v. Ogden, that commerce includes navigation, as a necessary means or instrument. Let this, as a general proposition, be conceded, still it by no means follows that navigation always implies commerce, and much less does it follow that the instruments of commerce, simply because they may be instruments, either as agents or as property, are to be wholly exempted from burdens incident to all other subjects of social polity. I will not contend that the master, his vessel, and his mariners and passengers, are not *503 all subject to proper regulations of commerce enacted by Congress; the proposition I maintain is this: that regulations of commerce do not embrace taxes on any or on all the subjects above named, exacted within the just sphere of the power imposing them. Thus, then, the assessment made by New York is purely a tax, not a regulation of commerce; but it is not a tax on imports, unless passengers can be brought within this denomination; if they cannot, it is a tax simply on persons coming within the jurisdiction of the taxing power. And who shall deny or control this sovereign attribute, when operating within its legitimate sphere? When and by whom shall any restriction be put upon it beyond the point to which it has been voluntarily and expressly conceded by the Constitution? And this point, it is said, by the decision of Gibbons v. Ogden, is established singly and determinately in the prohibition to impose taxes on imports. With regard to this essential and sovereign power of taxation, it may be proper here to advert to the caution with which it was granted, and the extreme jealousy which was manifested towards any and every apprehended encroachment upon it by the Constitution when it was offered for adoption. Against such dreaded encroachment were pointed some of the most strenuous objections of the opponents of the new government. They insisted that revenue was as requisite to the purposes of the local administrations as to those of the Union, and that the former were at least of equal importance with the latter to the happiness of the people; that it was therefore as necessary that the State governments should be able to command the means of supplying their wants, as that the national government should possess the like means in respect to the wants of the Union; and they said that, as the laws of the Union were to become the supreme law of the land, and as the national government was to have power to pass all laws necessary for carrying into execution the authorities with which it was proposed to vest it, the national government might at any time abolish the taxes imposed for State objects, upon the pretence of an interference with its own. The objections just stated, and the feeling of mistrust in which they had their origin, the advocates of the Constitution found it indispensable to remove; hence it is that in the Federalist we find several numbers of that able work devoted particularly to the purpose of reconciling the existence of the power of taxation in the Federal government with its possession and exercise on the part of the States, and nothing can be more explicit than is the admission contained in these papers of the independent and unqualified power in the States in reference to this subject. In the thirty-second number *504 of the Federalist, the writer thus expresses himself:  "I am willing here to allow, in its full extent, the justness of the reasoning which requires that the individual States should possess an independent and uncontrollable authority to raise their own revenues for the supply of their own wants. And making this concession, I affirm (with the exception of duties on imports and exports) they would, under the plan of the Convention, retain that authority in the most absolute and unqualified sense; and that an attempt on the part of the national government to abridge them in the exercise of it would be a violent assumption of power, unwarranted by any article or clause of its Constitution." Again, in the same number, speaking with respect to the prohibition on the States from imposing duties on imports, it is said:  "This restriction implies an admission, that, if it were not inserted, the States would possess the power it excludes; and it implies a further admission, that as to all other taxes the authority of the States remains undiminished." Such were the principles and doctrines of the Constitution as admitted, nay, urged, by the advocates for its adoption; and it is thought that there is no candid inquirer into the history of the times who will profess to believe that, had their admission not been thus made and earnestly pressed, the Constitution could have been accepted by the States. The contemporaneous interpretation thus given by the very fabricators of the instrument itself, confirmed, as has been shown, by the decision of Gibbons v. Ogden, is perhaps more emphatically declared in the later decision of this court in the case of the Providence Bank v. Billings, 4 Peters, 561, where the court expresses itself in the following language:  "That the taxing power is of vital importance, that it is essential to the existence of government, are truths which it cannot be necessary to affirm. They are acknowledged and assented to by all. It would seem that the relinquishment of such a power is never to be assumed. We will not say that a State may not relinquish it; that a consideration sufficiently valuable to induce a partial release of it may not exist; but as the whole community are interested in maintaining it undiminished, that community has a right to insist that its abandonment ought not to be presumed in a case in which the deliberate purpose of the State to abandon it does not appear." Can it be admitted, then,  can it be established by any correct reasoning,  that this high sovereign attribute, pronounced by this court to be of vital importance, and essential to the existence of a government, must be yielded, upon mere implication, to a theory based on no express authority, but on construction alone,  not recommended by superior utility, but *505 greatly embarrassing in practice the theory of exclusive power in Congress to regulate commerce?
The inquiry next in order, and growing out of the aforegoing views, is this:  Can the emigrant, or passenger on whom the tax is assessed, on his arrival within the State be properly denominated an import? It has been contended that he may, because, according to the classical derivation of the term from importare, or in and porta, he has, like every thing else in the ship, been brought in. The advocates of this etymological interpretation should be cautious of adopting it, since it might imply too much, may lead to strange confusion, and ultimately to conclusions directly adverse to those they would deduce from it. Thus, if the alien passenger is an import, simply from the fact of being brought into the State, will not the master and mariners also be imports, precisely for the same reason, although they may be natives and inhabitants of, and merely returning to, the country and port at which the vessel arrives, and thus, if imported, must be imported home, having equally sustained, a short time previously, when temporarily leaving that home, the character also of exports? Again: under this interpretation a dilemma might arise as to whether the ship, as she had been brought in, would not likewise be an import, or whether the ship had imported the crew, or the crew the ship; for although the latter would have been conducted into port by the former, it would be literally true that they would have been brought in by her. These departures from the common and received acceptation of language may give rise to distinctions as astute as those in Scriblerius upon the famous bequest of Sir John Swale of all his black and white horses, and equally useful with those either in the development of truth or the establishment of justice. But the strict etymologists have this further difficulty to encounter. It is said by Livy, and by Varro, in his book De Linguâ Latinâ, that the Romans when they laid out a town, as a religious ceremony observed on such occasions, delineated its boundaries with a plough; and that wherever they designed there should be a gate, they took up the plough and left a space. Hence the word porta, a gate, a portando aratrum. Those, then, who will insist upon etymological acceptation, necessarily place themselves, as imported, within the gate; in other words, within the municipal authority of the State, and by consequence within the acknowledged operation of its laws. But such critical derivation cannot be admitted as accordant either with common acceptation or general experience; by these the term imports is justly applicable to articles of trade proper,  goods, chattels, property, subjects in their nature passive and having no volition,  not to *506 men whose emigration is the result of will, and could not be accomplished without their coöperation, and is as much their own act as it is the act of others; nay, much more so. The conclusion, then, is undeniable, that alien passengers, rational beings, freemen carrying into execution their deliberate intentions, never can, without a singular perversion, be classed with the subjects of sale, barter, or traffic; or, in other words, with imports.
The law of New York has been further assailed in argument, as being an infraction of the fourteenth article of the treaty of amity and commerce negotiated between Great Britain and the United States in the year 1794, by which article it is provided that "there shall be between all the dominions of his Majesty in Europe, and the territories of the United States, a reciprocal and perfect liberty of commerce and navigation. The people and the inhabitants of the two countries shall have liberty freely and securely, and without hindrance and molestation, to come with their ships and cargoes to the lands, countries, cities, ports, places, and rivers within the dominions and territories aforesaid, and to enter into the same; to resort there, and to remain and reside there without any limitation of time; also to hire and possess houses and warehouses for the purposes of their commerce; and generally the merchants and traders on each side shall enjoy the most complete protection and security for their commerce, but subject always, as to what respects this article, to the laws and statutes of the two countries respectively."
It has been insisted that the article of the treaty just cited, having stipulated that British subjects shall have liberty freely and securely, and without hindrance, to come with their ships and cargoes to the lands, countries, cities, ports, &c., and to remain and reside for the purposes of their commerce; and the second clause of the sixth article of the Constitution having declared the Constitution and the laws of the United States, made in pursuance thereof, and treaties made under the authority of the United States, to be the supreme law of the land, the laws of New York, being in derogation of the fourteenth article of the treaty of 1794, are unconstitutional and void. The fourteenth article of the treaty of 1794, having expired by limitation of time anterior to the enactment of the statutes complained of, it cannot in terms, as a part of that compact, be brought to bear upon this case. The same provision, however, with the single variation that British subjects are placed on the same footing with other foreigners who shall be admitted to enter American ports, was renewed by the first article of the treaty of 1815, and by the third article of the same treaty was *507 continued for four years. Subsequently, by the fourth article of the Convention with Great Britain of 1818, it was extended for ten years, and finally, by the first article of the Convention with the same power of the 6th of August, 1827, for an indefinite period, but liable to be terminated upon notice, from either of the contracting parties, of twelve months from and after the 20th day of October, 1828. The fourteenth article of the treaty of 1794, or rather its effect and meaning, with the variation above, engrafted on the treaty of 1815, may be considered as subsisting at the present time. Before examining particularly the force of the objection founded upon this stipulation, and of the effect sought to be imparted to it from the clause of the Constitution adduced in its support, I cannot forbear to recur to my opinion expressed on a former occasion, it being the view I still entertain as to what should be the interpretation of the second clause of the sixth article of the Constitution. The opinion referred to is as follows: 
"This provision of the Constitution, it is to be feared, is sometimes expounded without those qualifications which the character of the parties to that instrument, and its adaptation to the purposes for which it was created, necessarily imply. Every power delegated to the Federal government must be expounded in coincidence with a perfect right in the States to all that they have not delegated; in coincidence, too, with the possession of every power and right necessary for their existence and preservation; for it is impossible to believe that these ever were, either in intention or in fact, ceded to the general government. Laws of the United States, in order to be binding, must be within the legitimate powers vested by the Constitution. Treaties, in order to be valid, must be made within the scope of the same powers; for there can be no authority of the United States, save what is derived mediately or immediately, and regularly and legitimately, from the Constitution. A treaty no more than an ordinary statute can arbitrarily cede away any one right of a State, or of any citizen of a State." (5 Howard, 613.)
Admitting this fourteenth article of the treaty to be in full force, and that it purported to take from the State of New York the right to tax aliens coming and commorant within her territory, it would be certainly incompetent for such a purpose, because there is not, and never could have been, any right in any other agent than her own government to bind her by such a stipulation. In the next place, the right of taxation claimed by New York can by no rational construction of it be made to conflict with a correct comprehension of the treaty stipulations in question. These neither express nor imply any thing more *508 than security for free, but regular, legitimate commercial intercourse, between the people of the contracting nations, and exemption from burdens or restrictions inconsistent with such intercourse; for this was the sole purpose either contemplated or professed. If these stipulations can be extended beyond this meaning, and, under the terms "shall have liberty freely and securely to come and enter the ports of the country, and to remain and reside and to hire and occupy houses for the purposes of their commerce," there can be claimed the right to withdraw, for an indefinite period, either the persons or the property of aliens from the power of taxation in the States, then there is asserted for Congress or the executive the power of exerting, through foreign governments and foreign subjects, a control over the internal rights and polity of the States, which the framers of the Constitution and the decisions of this court, already quoted, have denied to the government in the exercise of its regular domestic functions. It would be difficult to limit, or even to imagine, the mischiefs comprised in such an interpretation of the treaty stipulations above mentioned. As one example of these, if it should suit the commercial speculations of British subjects to land within the territory of any of the States cargoes of negroes from Jamaica, Hayti, or Africa, it would be difficult, according to the broad interpretation of the commercial privileges conferred by those stipulations, to designate any legitimate power in the States to prevent this invasion of their domestic security. According to the doctrines advanced, they could neither repulse nor tax the nuisance.
The argument constructed by counsel and by some of the judges upon the provisions of the act of Congress authorizing the importation of the tools of mechanics, their clothing, &c.; free from duties, presents itself to my mind as wanting in logical integrity, and as utterly destructive of positions which those who urge this argument elsewhere maintain. The exemption allowed by Congress can correctly be made to signify nothing more than this: that the general government will not levy duties on the private effects of certain classes of persons who may be admitted into the country. But, by any rule of common sense, can this exemption be made to signify permission to those persons to land at all events in the States? It asserts or implies no such thing; much less does it convey a command, or the power to issue a command, to the States to admit them. Must not this benefit of exemption from duties be always in enjoyment subordinate to and dependent upon the right of the owner of the property exempted to enter the country? This is inevitable, unless it be contended that a mere forbearance to exact duties on the property is identical with *509 ordering the admission of its owner; thus making the man the incident of the property, and not the property that of the man,  a reductio in absurdum, which cannot be escaped from by those who deduce the right of admission from the act of Congress. But are those who assume this ground aware that it is destructive of other positions which they themselves have not only conceded, but even insist upon? They have admitted the power or right of self-preservation in the States, and, as a means of securing this right, the power of excluding felons, convicts, paupers, and persons infected; but according to this argument, based upon the acts of Congress and on the treaty stipulations for free access and commorancy, all must be permitted to land and to remain; for these acts of Congress and treaty stipulations contain no exceptions in favor of the safety of the States; they are general, and in their terms ride over all such considerations as health, morals, or security amongst the people of the States. This argument cannot be maintained. The true interpretation of the act of Congress referred to is this: tools, clothing, and personal property of mechanics, are goods, chattels, imports, in the known and proper sense of the term imports; Congress, having under the Constitution the power to impose duties on these, possess the correlative right of exempting them from duties; this they have done, and nothing beyond this. Congress have not pretended to declare permission to the mechanic, or to any other description of person, directly, to come into the States, because they have no such direct power under the Constitution, and cannot assume or exercise it indirectly.
I will now consider the second head of objection to the legislation of New York, as propounded in the division stated in the commencement of this opinion, namely, the alleged right of Congress to regulate exclusively the admission of aliens, as a right comprehended within the commercial power, or within some other implication in the Constitution.
Over aliens, qua aliens, no direct authority has been delegated to Congress by the Constitution. Congress have the right to declare war, and they are bound to the duty of repelling invasions. They have the power, too, to establish a uniform rule of naturalization. By an exercise of the former power, Congress can place in the condition of alien enemies all who are under allegiance to a nation in open war with the United States; by an exercise of the second, they can extend to alien friends the common privileges of citizens. Beyond these predicaments put by the Constitution, and arising out of the law of nations, where is the power in Congress to deal with aliens, as a class, at all? and much more the power, when falling within *510 neither of the aforegoing predicaments, to invite them to or to repel them from our shores, or to prescribe the terms on which, in the first instance, they shall have access to, and, if they choose, residence within, the several States,  and this, too, regardless of the considerations either of interest or safety deemed important by the States themselves? The Constitution, confessedly, has delegated no such direct power to Congress, and it never can be claimed as auxiliary to that which, in a definite and tangible form, can nowhere be found within that instrument.
The power to regulate the admission, as implied in the right of banishment or deportation, of aliens, not the citizens or subjects of nations in actual war with the United States, was at one period of our history assumed by the Federal government; and a succinct review of the arguments by which this pretension was sought to be sustained must expose its absolute fallacy.
Congress, it was insisted, could exert this power under the law of nations, to which aliens are properly amenable. To this it was answered, that, under the law of nations, aliens are responsible only for national offences,  offences in which their nation bears a part; they are then alien enemies. That alien friends, on the other hand, owe a temporary allegiance to the government under which they reside, and for their individual offences committed against the laws of that government they are responsible, as other members of the community, to the municipal laws.
Again, it was asserted that the right was vested in Congress under the power to make war, and under the power and the duty to prevent invasion. The obvious refutation of this argument was furnished in the reply, that alien friends could not be the subjects of war (public national conflict), nor in any sense the instruments of hostile invasion, such invasion being an operation of war. Neither could they fall within the power vested by the Constitution to grant letters of marque and reprisal, as an equivocal authority partaking of the characters of war and peace; "reprisal being a seizure of foreign persons and property, with a view to obtain that justice for injuries done by one state or its members, for which a refusal of the aggressors requires such a resort to force under the law of nations. It must be considered as an abuse of words to call the removal of persons from a country a seizure or a reprisal on them; nor is the distinction to be overlooked between reprisal on persons within the country, and under the faith of its laws, and on persons out of the country." (Madison's Report.) It may, then, be correctly-affirmed, that by no direct delegation of *511 power by the Constitution,  not by the power to declare war, not by the power to make reprisals, not by the more general power to punish offences against the laws of nations, nor by the power and duty of repelling invasion,  has the right been given to Congress to regulate either the admission or the expulsion of alien friends. Does such a right result from any rational or necessary implication contained in the Constitution? We find that, even anterior to the adoption of this instrument, attempts were made to ascribe to it the delegation of such a power by the ninth section of the first article, and this ascription was strenuously urged as a reason against its adoption. The objection, whether fairly or uncandidly urged, was founded, no doubt, upon some ambiguity of language of the ninth section; an ambiguity perfectly explained by contemporaneous exposition, and by the written history of its progress and ultimate adoption. Let us see how this section has been interpreted at its date by those who bore the chief part in the formation of the Constitution; and who, to commend it when completed to their countrymen, undertook and accomplished an able and critical exposition of its every term. We shall see, by the almost unanimous declaration of these sages, that the clause and article in question was intended to apply to the African slave-trade, and to no other matter whatever. Thus, in the forty-second number of the Federalist, it is said by Mr. Madison, speaking of the section and article in question:  "It were doubtless to be wished that the power of prohibiting the importation of slaves had not been postponed until the year 1808, or rather that it had been suffered to have immediate operation. But it is not difficult to account, either for this restriction on the general government, or for the manner in which the whole clause is expressed. It ought to be considered as a great point gained in favor of humanity, that a period of twenty years may terminate for ever within these States a traffic which has so long and so loudly upbraided the barbarism of modern policy." Again he says,  "Attempts have been made to pervert this clause into an objection against the Constitution, by representing it on one side as a criminal toleration of an illicit practice, and on another, as calculated to prevent voluntary and beneficial emigrations from Europe to America. I mention these misconstructions, not with a view to give them an answer,  for they deserve none,  but as specimens of the manner and spirit in which some have thought fit to conduct their opposition to the proposed government."
Before proceeding farther with the history of this article, it will be well to contrast the view of its scope and objects, as given in the quotation just made from the Federalist with the *512 arguments of the counsel who press this article as evidence of an intention to vest in Congress the sole power of controlling the admission of aliens; subsequently, at least, to the year 1808. It is strenuously urged by them, that the introduction of aliens has always been accordant with the policy of the government, and so highly promotive of advantage to the country in clearing and cultivating its forests, and increasing its physical strength, that the power of interfering with these important objects should not be subjected to the hazard of State abuses, but that they should be intrusted to the Federal government alone. Yet the learned counsel will be somewhat surprised to hear that the migration or importation he so zealously advocates is proved (by contemporaneous authority, on which he rests his argument) to be "an unnatural traffic, which has so long and so loudly upbraided the barbarism of modern policy"; and that "it ought to be regarded as a great point gained in favor of humanity, that a period of twenty years might terminate it for ever in these States." For such, and such only, is the migration limited to the States for twenty years, by the ninth section of the fourth article, on which counsel found themselves; such only the migration over which the Constitution has given power to Congress, as the natural meaning of the section signifies, and which alone it was intended to convey, as we are told by those who framed it.[*]
If the history of the ninth section of article fourth be traced, in the proceedings of the Convention, from its introduction into that body until finally moulded and engrafted upon the Constitution (3 Madison Papers, from p. 1388 to p. 1673), it will be found that not one member of the Convention ever treated this section in other terms, or as designed for any other purpose, than as a power specially given to Congress by that section alone to abolish the foreign slave-trade from the period limited by that section, with the exception of a single observation of Colonel Mason of Virginia, that the provision as it stood might be necessary in order to prevent the introduction of convicts; but not pretending to extend the power of Congress beyond these and the foreign slave-trade.
*513 The migration or importation embraced in it is in the debates uniformly and plainly called the slave-trade by certain Southern States, which the Convention would have abolished by the Constitution itself, but for the avowed necessity of propitiating those States by its toleration for twenty years. There, too, it will be seen that Mr. Gouverneur Morris, with a frankness and sagacity highly creditable, objected to the ambiguous language in which the section was proposed and adopted. He said "he was for making the clause read at once, `the importation of slaves' into North Carolina, South Carolina, and Georgia shall not be prohibited, &c. This, he said, was most fair, and would avoid the ambiguity by which, under the power with regard to naturalization, the liberty reserved to the States might be defeated. He wished it to be known, also, that this part of the Constitution was a compliance with those States." (3 Madison Papers, 1427 and 1478.) A portion of the Convention objected to an open sanction of the slave-trade upon the very face of the Constitution, whilst the Southern States would not yield their views of their own interests or necessities; hence, in the spirit of compromise, the section was unfortunately permitted to retain the ambiguity objected to by Mr. Morris; and hence, too, the color given for those misconstructions of the restriction on the general government, and the manner in which it is expressed, so decidedly reprehended in the number of the Federalist already quoted. This ninth section of the fourth article of the Constitution has, on a former occasion, been invoked in support of the power claimed for the Federal government over alien friends. The supporters in Congress of the alien law, passed in 1798, endeavoured to draw from this very section a justification of that extraordinary enactment; and as their argument deduced from it is, perhaps, as cogent as any likely to be propounded at this day, it may be properly adverted to as a fair sample of the pretension advanced in this case, and of the foundation on which it seeks to plant itself. The argument alluded to was by a committee of the House of Representatives, and is in these words:  "That as the Constitution has given to the States no power to remove aliens during the period of the limitation under consideration, in the mean time, on the construction assumed, there would be no authority in the country to send away dangerous aliens, which cannot be admitted." Let the comment of a truly great man on these startling heresies expose their true character. "It is not," says Mr. Madison, "the inconclusiveness of the general reasoning on this passage which chiefly calls the attention to it. It is the principle assumed by it, that the powers held by the States *514 are given to them by the Constitution of the United States, and the inference from this principle, that the powers supposed to be necessary, which are not so given to the State governments, must reside in the government of the United States. The respect which is felt for every portion of the constituted authorities forbids some reflections which this singular paragraph might excite; and they are the more readily suppressed, as it may be presumed with justice, perhaps, as well as candor, that inadvertence may have had its share in the error. It would be unjustifiable delicacy, nevertheless, to pass by so portentous a claim without a monitory notice of the fatal tendency with which it would be pregnant." (Madison's Report.) The assertion of a general necessity for permission to the States from the general government, either to expel from their confines those who are mischievous or dangerous, or to admit to hospitality and settlement whomsoever they may deem it advantageous to receive, carries with it either a denial to the former, as perfect original sovereignties, of the right of self-preservation, or presumes a concession to the latter, the creature of the States, wholly incompatible with its exercise.
This authority over alien friends belongs not, then, to the general government, by any express delegation of power, nor by necessary or proper implication from express grants. The claim to it is essentially a revival of what public sentiment so generally and decisively condemned as a usurpation in the alien law of 1798; and however this revival may at this time be freed from former imputations of foreign antipathies or partialities, it must, nevertheless, be inseparable from  nay, it must be the inevitable cause of far greater evils  jealousy, illfeeling, and dangerous conflict between the members of this confederacy and their common agent.
Thus far I have preferred to consider this case as depending rather upon great fundamental principles, inseparable from the systems of government under which this country is placed, than as dependent upon forms of pleading, and conclusions deducible from those forms. But judging of the case in the latter aspect as moulded by those forms, it seems to fall directly within the operation of a precedent settled by this court, which must, if regarded, decide the law to be with the defendant in error. By the second count in the declaration, it is averred that the defendant below (the plaintiff in error), being the master of the ship Henry Bliss, in violation of the laws of New York, brought into the port of New York, and there actually landed the same, two hundred and ninety-five passengers; the demurrer to the declaration, admitting the truth of these averments, places the locale of the origin, as well as the infraction *515 of the obligation declared on, within the municipal authority of the State, and without the pale of the authority of Congress to regulate commerce with foreign nations. In this view, this case is brought, not only within the reasoning, but within the literal terms, of the decision of The City of New York v. Miln, and must be sustained upon the authority of that decision, were there no other grounds on which it could be supported. But as it is manifest that this case involves the high, and what this court has asserted (with the single exception of taxes on imports) to be the perfect and undiminished and indispensable, power of taxation in a sovereign State, it would have seemed to me a species of delinquency not to make that right the prominent and controlling subject of investigation and decision, or to have forborne to vindicate it in its full integrity.
Between this case and that of Norris v. The City of Boston, there are some shades of difference; they are such, however, as by me are not regarded as essential; both the cases rest in reality upon the right of taxation in the States, and as the latter case has been examined with so much more of learning and ability than I could have brought to its investigation, by his Honor the Chief Justice, I shall content myself with declaring my entire concurrence in his reasonings and conclusions upon it.
It is my opinion that the judgment of the Court for the Trial of Impeachments and Correction of Errors in New York, and the judgment of the Supreme Judicial Court of Massachusetts, should be affirmed.
NOTE.  In the opinions placed on file by some of the justices constituting the majority in the decision of this case, there appearing to be positions and arguments which are not recollected as having been propounded from the bench, and which are regarded as scarcely reconcilable with the former then examined and replied to by the minority, it becomes an act of justice to the minority that those positions and arguments, now for the first time encountered, should not pass without comment. Such comment is called for, in order to vindicate the dissenting justices, first, from the folly of combating reasonings and positions which do not appear upon the record; and, secondly, from the delinquency of seeming to recoil from exigencies, with which, however they may be supposed to have existed, the dissenting justices never were in fact confronted. It is called for by this further and obvious consideration, that, should the modification or retraction of opinions delivered in court obtain in practice, it would result in this palpable irregularity; namely, that opinions, which, as those of the *516 court, should have been premeditated and solemnly pronounced from the bench antecedently to the opinions of the minority, may in reality be nothing more than criticisms on opinions delivered subsequently in the order of business to those of the majority, or they may be mere afterthoughts, changing entirely the true aspect of causes as they stood in the court, and presenting through the published reports what would not be a true history of the causes decided.
Examples of diversity between the opinions in this cause, comprehended as they were delivered in court, and as subsequently modified, will now be adverted to. The first is found in the solecism, never propounded, perhaps, from any tribunal,  one, indeed, which it might have been supposed no human imagination, not the most fruitful in anomalies, could ever conceive,  "that the action of the Federal government by legislation and treaties is the action of the States and their inhabitants." If this extraordinary proposition can be taken as universally or as generally true, then State sovereignty, State rights, or State existence even, must be less than empty names, and the Constitution of the United States, with all its limitations on Federal power, and as it has been heretofore generally understood to be a special delegation of power, is a falsehood or an absurdity. It must be viewed as the creation of a power transcending that which called it into existence; a power single, universal, engrossing, absolute. Every thing in the nature of civil or political right is thus ingulfed in Federal legislation, and in the power of negotiating treaties. History tells us of an absolute monarch who characterized himself and his authority by the declaration, "I am the State." This revolting assertion of despotism was, even in the seventeenth century, deemed worthy of being handed down for the reprobation of the friends of civil and political liberty. What, then, must be thought in our day, and in future time, of a doctrine which, under a government professedly one of charter exclusively, claims beyond the terms of that charter, not merely the absolute control of civil and political rights, but the power to descend to and regulate ad libitum the private and personal concerns of life. Thus the ground now assumed in terms for the Federal government is, that the power to regulate commerce means still "more especially" the power to regulate "personal intercourse." Again, it is asserted that the Federal government, in the regulation of commerce, "may admit or may refuse foreign intercourse partially or entirely." If those who resort to this term intercourse mean merely commercial transactions as generally understood, their argument is an unmeaning variation of words, and is worth nothing. They obtain by the attempted *517 substitution no new power. They have the power to regulate commerce, and nothing beyond this. Commercial intercourse is simply commerce. But if they adopt the word intercourse singly, in its extended and general acceptation, and without the proper qualifying adjunct, they violate the text and the meaning of the Constitution, and grasp at powers greatly beyond the scope of any authority legitimately connected with commerce as well understood. The term commerce, found in the text of the Constitution, has a received, established, and adjudged acceptation. The wise men who framed the Constitution designed it for practical application. They preferred, therefore, to convey its meaning in language which was plain and familiar, and avoided words and phrases which were equivocal, unusual, or recondite, as apt sources of future perplexity. They well understood the signification of the word intercourse, and knew it was by no means synonymous with the word commerce; they shunned, therefore, the ambiguity and seeming affectation of adopting it, in order to express their meaning when speaking of commerce. This word intercourse, nowhere found in the Constitution, implies infinitely more than the word commerce Intercourse "with foreign nations, amongst the States, and with the Indian tribes." Under this language, not only might national, commercial, or political intercourse be comprehended, but every conceivable intercourse between the individuals of our own country and foreigners, and amongst the citizens of the different States, might be transferred to the Federal government. And thus we see that, with respect to intercourse with aliens, in time of peace, too, it is now broadly asserted that all power has been vested exclusively in the Federal government. The investiture of power in Congress under this term would not be limited by this construction to this point. It would extend, not only to the right of going abroad to foreign countries, and of requiring licenses and passports for that purpose; it would embrace also the right of transit for persons and property between the different States of the Union, and the power of regulating highways and vehicles of transportation. We have here a few examples of the mischiefs incident to the doctrine which first interpolates into the Constitution the term intercourse in lieu of the word commerce contained in that instrument, and which then, by an arbitrary acceptation given to this term, claims for Congress whatsoever it may be thought desirable to comprise within its meaning. By permitting such an abuse, every limit may be removed from the power of the Federal government, and no engine of usurpation could be more conveniently devised than the introduction of a favorite word which the interpolator *518 would surely have as much right to interpret as to introduce. This would be fulfilling almost to the letter the account in the Tale of a Tub, of Jack, Peter, and Martin engaged in the interpretation of their father's will. Once let the barriers of the Constitution be removed, and the march of abuse will be onward and without bounds.
Mr. Justice NELSON, dissenting.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
I have examined particularly the opinion of the Chief Justice delivered in these cases of Smith v. Turner, and Norris v. The City of Boston, and have concurred, not only in its conclusions, but in the grounds and principles upon which it is arrived at; and am in favor of affirming the judgments in both cases.
Mr. Justice WOODBURY, dissenting.

NORRIS v. CITY OF BOSTON, AND SMITH v. TURNER.
In relation to the case of Turner v. Smith, from New York, I wish merely to express my non-concurrence with the opinions pronounced by the majority of this court. But standing more intimately connected with the case of Norris v. Boston, by my official duties in the First Circuit, I feel more obliged to state, in some detail, the reasons for my opinion, though otherwise content to acquiesce silently in the views expressed by the Chief Justice; and though not flattering myself with being able, after the elaborate discussions we have just heard, to present much that is either novel or interesting.
The portion of the statute of Massachusetts which in this case is assailed, as most questionable in respect to its conformity with the Constitution, is the third section. The object of that is to forbid alien passengers to land in any port in the State, until the master or owner of the vessel pays "two dollars for each passenger so landing." The provisions in the other sections, and especially the second one, requiring indemnity for the support of lunatics, idiots, and infirm persons on board of vessels before they are landed, if they have been or are paupers, seem admitted by most persons to be a fair exercise of the police powers of a State.
This claim of indemnity is likewise excused or conceded as a power which has long been exercised by several of the Atlantic States in self-defence against the ruinous burdens which would otherwise be flung upon them by the incursions of paupers from abroad, and their laws are often as stringent against the introduction of that class of persons from adjoining *519 States as from foreign countries. (Revised Statutes of New Hampshire, ch. 67, § 5; 5 Howard, 629.)
Such legislation commenced in Massachusetts early after our ancestors arrived at Plymouth. It first empowered the removal of foreign paupers. (See Colonial Charters and Laws, 1639, p. 173, and 1692, p. 252.) It extended next to the requisition of indemnity from the master, as early as the year 1701. (See Statute of 13 Wm. III., Ibid. 363.) But while it embraced removals of paupers not settled in the Colony, and indemnity required from the master for the support of foreigners introduced by sea, I do not think it assumed the special form used in the third section of this statute, until the year 1837, after the decision in the case of The City of New York v. Miln, 11 Peters, 107. I shall not, therefore, discuss further the provisions in the second section of the statute; for, at all events, the requisitions of that section, if not by all admitted to be constitutional, are less objectionable than those of the third; and if the last can be vindicated, the first must be, and hence the last has constituted the burden of the arguments on both sides.
It will be remembered that this third section imposes a condition on landing alien passengers, or, in other words, levies a toll or fee on the master for landing them, whether then paupers or not, and that the present action is to recover back the money which has been collected from the master for landing such passengers.
After providing, in the following words, that, "when any vessel shall arrive at any port or harbour within the State, from any port or place without the same, with alien passengers on board, the officer or officers whom the mayor and aldermen of the city, or the selectmen of the town, where it is proposed to land such passengers, are hereby authorized and required to appoint, shall go on board such vessel and examine into the condition of said passengers." The third section of the statute declares that "no alien passenger, other than those spoken of in the preceding section, shall be permitted to land, until the master, owner, consignee, or agent of such vessel shall pay to the regularly appointed boarding officer the sum of two dollars for each passenger so landing; and the money so collected shall be paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers."
It is conceded that the sum paid here on account of "alien passengers" was demanded of them, when coming in some "vessel," and was collected after she arrived at a "port or harbour within the State." Then, and not till then, the master was required to pay two dollars for each before landing, "to be *520 paid into the treasury of the city or town, to be appropriated as the city or town may direct for the support of foreign paupers."
By a subsequent law, as the foreign paupers had been made chargeable to the State treasury, the balances of this fund in the different towns were required to be transferred to that treasury.
After careful examination, I am not satisfied that this exercise of power by a State is incapable of being sustained as a matter of right, under one or all of three positions.
1st. That it is a lawful exercise of the police power of the State to help to maintain its foreign paupers.
2d. If not, that it may be regarded as justified by the sovereign power which every State possesses to prescribe the conditions on which aliens may enjoy a residence within, and the protection of, the State.
3d. Or it may be justified under the municipal power of the State to impose taxes within its limits for State purposes. I think, too, that this power has never been ceded to the general government, either expressly or by implication, in any of the grants relied on for that purpose, such as to lay duties on imports, or to prohibit the importation of certain persons after the year 1808, or to regulate commerce.
Under the first ground of vindication for the State, the whole statute was most probably enacted with the laudable design to obtain some assistance in maintaining humanely the large number of paupers, and persons likely soon to become paupers, coming to our shores by means furnished by the municipal authorities in various parts of Europe. (See 3 Ex. Doc. of 29th Congress, 2d Session, No. 54.) Convicts were likewise sent, or preparing to be sent, hither from some cities on the Continent. (Ibid.)
A natural desire, then, would exist, and would appear by some law, to obtain, first, indemnity against the support of emigrants actually paupers, and likely at once to become chargeable; and, secondly, funds to maintain such as, though not actually paupers, would probably become so, from this class of aliens.
It is due to the cause of humanity, as well as the public economy of the State, that the maintenance of paupers, whether of foreign or domestic origin, should be well provided for. Instead of being whipped or carted back to their places of abode or settlement, as was once the practice in England and this country in respect to them; or, if aliens, instead of being reshipped over a desolate waste of ocean, they are to be treated with kindness and relieved or maintained. But still, if feasible, it should, in justice, be at the *521 expense of those introducing them, and introducing the evils which may attend on them. This seems to have been the attempt in this statute, and as such was a matter of legitimate police in relation to paupers.
But those persons affected by the third section not being at the time actual paupers, but merely alien passengers, the expediency or right to tax the master for landing them does not seem so clear, in a police view, as it is to exact indemnity against the support of those already paupers. Yet it is not wholly without good reasons, so far as regards the master or owner who makes a profit by bringing into a State persons having no prior rights there, and likely in time to add something to its fiscal burdens and the number of its unproductive inhabitants. He who causes this danger, and is the willing instrument in it, and profits by it, cannot, in these views, object to the condition or tax imposed by the State, who may not consider the benefits likely to arise from such a population a full counterbalance to all the anticipated disadvantages and contingencies. But the aspect of the case is somewhat different, looking at the tax as falling wholly on the passenger. It may not be untrue, generally, that some portion of a burden like this rests eventually on the passenger, rather than the master or owner. (Neil v. State of Ohio, 3 Howard, 741-743.) Yet it does not always; and it is the master, and the owners through him, who complain in the present action, and not the passengers; if it fell on the latter alone, they would be likely, not only to complain, but to go in vessels to other States where onerous conditions had not been imposed. Supposing, however, the burden in fact to light on them, it is in some, though a less degree, and in a different view, as a matter of right, to be vindicated.
Were its expediency alone the question before us, some, and among them myself, would be inclined to doubt as to the expediency of such a tax on alien passengers in general, not paupers or convicts. Whatever may be their religion, whether Catholic or Protestant, or their occupation, whether laborers, mechanics, or farmers, the majority of them are believed to be useful additions to the population of the New World, and since, as well as before our Revolution, have deserved encouragement in their immigration by easy terms of naturalization, of voting, of holding office, and all the political and civil privileges which their industry and patriotism have in so many instances shown to be usefully bestowed. (See Declaration of Independence; Naturalization Law; 1 Lloyd's Debates, Gales and Seaton's ed., p. 1147; Taylor v. Carpenter, 2 Woodbury & Minot.) If a design existed in any statute to thwart this policy, or if *522 such were its necessary consequence, the measure would be of very questionable expediency. But the makers of this law may have had no such design, and such does not seem to be the necessary consequence of it, as large numbers of emigrants still continue to arrive in Massachusetts when they would be likely to ship for ports in other States where no such law exists, if this operated on them as a discouragement, and like other taxes when felt, or when high, had become in some degree prohibitory.
The conduct of the State, too, in this measure, as a matter of right, is the only question to be decided by us, and may be a very different one from its expediency. Every sovereign State possesses the right to decide this matter of expediency for itself, provided it has the power to control or govern the subject. Our inquiry, therefore, relates merely to that power or right in a State; and the ground now under consideration to support the exercise of it is her authority to prescribe terms, in a police view, to the entry into her boundaries of persons who are likely to become chargeable as paupers, and who are aliens.
In this view, as connected with her police over pauperism, and as a question of mere right, it may be fairly done by imposing terms which, though incidentally making it more expensive for aliens to come here, are designed to maintain such of them and of their class as are likely, in many instances, ere long to become paupers in a strange country, and usually without sufficient means for support in case either of sickness, or accident, or reverses in business. So it is not without justification that a class of passengers from whom much expense arises in supporting paupers should, though not at that moment chargeable, advance something for this purpose at a time when they are able to contribute, and when alone it can with certainty be collected. (See New York v. Miln, 11 Peters, 156.) When this is done in a law providing against the increase of pauperism, and seems legitimately to be connected with the subject, and when the sum required of the master or passenger is not disproportionate to the ordinary charge, there appears no reason to regard it as any measure except what it professes to be,  one connected with the State police as to alien passengers, one connected with the support of paupers, and one designed neither to regulate commerce nor be a source of revenue for general purposes. (5 Howard, 626.)
The tax is now transferred to the State treasury, when collected, for the reason that the support of foreign paupers is transferred there; and this accords with an honest design to collect the money only for that object.
*523 The last year, so fruitful in immigration and its contagious diseases of ship-fever and the terrific cholera, and the death of so many from the former, as well as the extraordinary expense consequent from these causes, furnish a strong illustration that the terms required are neither excessive nor inappropriate.
There are many other reasons showing that this is legitimately a police measure, and, as such, competent for the State to adopt. It respects the character of those persons to come within the limits of the State,  it looks to the benefits and burdens deemed likely to be connected with their presence,  it regards the privileges they may rightfully claim of relief, whenever sick or infirm, though on shipboard, if within the boundaries of the State,  it has an eye to the protection they will humanely receive if merely in transitu through the State to other governments, and the burdens which, in case of disease or accidents, without much means, they may thus throw upon the State. And the fund collected is expressly and wholly applied, after deducting the expenses of its collection, to "the support of foreign paupers."
A police measure, in common parlance, often relates to something connected with public morals; and in that limited view would still embrace the subject of pauperism, as this court held in 16 Peters, 625. But in law, the word police is much broader, and includes all legislation for the internal policy of a State. (4 Bl. Com., ch. 13.)
The police of the ocean belongs to Congress and the admiralty powers of the general government; but not the police of the land or of harbours. (Warning v. Clarke, 5 Howard, 471.)
Nor is it any less a police measure because money, rather than a bond of indemnity, is required as a condition of admission to protection and privileges. The payment of money is sometimes imposed in the nature of a toll or license fee, but it is still a matter of police. It is sometimes demanded in the nature of charges to cover actual or anticipated expenses. Such is the case with all quarantine charges. Substantially, too, it is demanded under the indemnity given by the second section, if the person becomes chargeable; and if that be justifiable, so must be this; the fact that one is contingent and the other absolute cannot affect their constitutionality. Neither is it of consequence that the charge might be defrayed otherwise, if the State pleased, as from other taxes or other sources. This is a matter entirely discretionary with the State. This might be done with respect to quarantine expenses or pilotage of vessels; yet the State, being the sole judge of what is most expedient in respect to this, can legally impose it on the vessel, or *524 master, or passengers, rather than on others, unless clearly forbidden by the Federal Constitution. And it can be none the less a police measure than is a quarantine charge, because the master or owner is required to pay it, or even the passengers, rather than the other people of the State by a general tax.
Even to exclude paupers entirely has been held to be a police measure, justifiable in a State. (Prigg v. Pennsylvania, 16 Peters, 625; 5 Howard, 629.) Why, then, is not the milder measure of a fee or tax justifiable in respect to those alien passengers considered likely to become paupers, and to be applied solely to the support of those who do become chargeable from that class? And why is not this as much a police measure as the other? If such measures must be admitted to be local, are of State cognizance, belong to State interests, they clearly are among State rights.
Viewed as a mere police regulation, then, this statute does not conflict with any constitutional provision. Measures which are legitimately of a police character are not pretended to be ceded anywhere in the Constitution to the general government in express terms; and as little can it be argued that they are impliedly to be considered as ceded, if they be honestly and truly police measures. Hence, in all the decisions of this tribunal on the powers granted to the general government, either expressly or by implication, measures of that character have been regarded as not properly to be included. (License Cases, 5 Howard, 624; Baldwin's Views, 184, 188; cases cited in The United States v. New Bedford Bridge, 1 Woodb. & Min. 423.)
Thus viewed, the case also comes clearly within the principles settled in New York v. Miln, 11 Peters, 102, and is fortified by the views in the License Cases, 5 Howard, 504. The fact that the police regulation in the case of Miln was enforced by a penalty instead of a toll, and in the License Cases by a prohibition at times, as well as a fee, does not alter the principle, unless the mode of doing it in the present case should be found, on further examination, before closing, to be forbidden to the States.
But if this justification should fail, there is another favorable view of legislation such as that of the third section of the statute of Massachusetts, which has already been suggested, and which is so important as to deserve a separate consideration. It presents a vindication for it different from that of a mere police regulation, connected with the introduction or support of aliens, who are or may afterwards become paupers, and results from the power of every sovereign State to impose such terms as she pleases on the admission or continuance of foreigners *525 within her borders. If this power can be shown to exist, and it is in its nature and character a police power also, then we have already demonstrated that the States can rightfully continue to exercise it. But if it be not such a power, and hence cannot be ranked under that title and enjoy the benefit of the decisions exempting police powers from control by the general government, yet if it exists as a municipal rather than a police power, and has been constantly exercised by the States, they cannot be considered as not entitled to it, unless they have clearly ceded it to Congress in some form or other.
First, then, as to its existence. The best writers on national law, as well as our own decisions, show that this power of excluding emigrants exists in all states which are sovereign. (Vattel, B. 1, ch. 19, § 231; 5 Howard, 525, 629; New York v. Miln, 11 Peters, 142; Prigg v. Pennsylvania, 16 Peters, 625; and Holmes v. Jennison, 14 Peters, 565.)
Those coming may be voluntary emigrants from other nations, or travelling absentees, or refugees in revolutions, party exiles, compulsory victims of power, or they may consist of cargoes of shackled slaves, or large bands of convicts, or brigands, or persons with incendiary purposes, or imbecile paupers, or those suffering from infectious diseases, or fanatics with principles and designs more dangerous than either, or under circumstances of great ignorance, as liberated serfs, likely at once, or soon, to make them a serious burden in their support as paupers, and a contamination of public morals. There can be no doubt, on principles of national law, of the right to prevent the entry of these, either absolutely or on such conditions as the State may deem it prudent to impose. In this view, a condition of the kind here imposed, on admission to land and enjoy various privileges, is not so unreasonable, and finds vindication in the principles of public law the world over. (Vattel, B. 1, ch. 19, §§ 219, 231, and B. 2, ch. 7, §§ 93, 94.)
In this aspect it may be justified as to the passengers, on the ground of protection and privileges sought by them in the State, either permanently or transiently, and the power of the State to impose conditions before and while yielding it. When we speak here or elsewhere of the right of a State to decide and regulate who shall be its citizens, and on what terms, we mean, of course, subject to any restraint on her power which she herself has granted to the general government, and which, instead of overlooking, we intend to examine with care before closing.
It having been, then, both in Europe and America, a matter of municipal regulation whether aliens shall or shall not reside in any particular state, or even cross its borders, it follows *526 that, if a sovereign state pleases, it may, as a matter of clear right, exclude them entirely, or only when paupers or convicts, (Baldwin's Views, 193, 194,) or only when slaves, or, what is still more common in America, in Free States as well as Slave States, exclude colored emigrants, though free. As further proof and illustration that this power exists in the States, and has never been parted with, it was early exercised by Virginia as to others than paupers, (1 Bl. Com., by Tucker, pt. 2, App., p. 33,) and it is now exercised, in one form or another, as to various persons, by more than half the States of the Union. (11 Peters, 142; 15 ib. 516; 16 ib. 625; 1 Brockenbrough, 434; 14 Peters, 568; 5 Howard, 629.)
Even the old Congress, September 16th, 1788, recommended to the States to pass laws excluding convicts; and they did this, though after the new Constitution was adopted, and that fact announced to the country. "Resolved, That it be, and it is hereby, recommended to the several States to pass proper laws for preventing the transportation of convicted malefactors from foreign countries into the United States." (Journal of Congress for 1788, p. 867.)
But the principle goes further, and extends to the right to exclude paupers, as well as convicts, by the States (Baldwin's Views, 188, 193, 194); and Mr. Justice Story, in the case of New York v. Miln, 11 Peters, 56, says as to the States,  "I admit that they have a right to pass poor-laws, and laws to prevent the introduction of paupers into the States, under like qualifications."
Many of the States also exercised this power, not only during the Revolution, but after peace; and Massachusetts especially did, forbidding the return of refugees, by a law in 1783, ch. 69. Several of the States had done the same as to refugees. (See Federalist, No. 42.)
The first naturalization laws by Congress recognized this old right in the States, and expressly provided that such persons could not become naturalized without the special consent of those States which had prohibited their return. Thus in the first act:  "Provided, also, that no person heretofore proscribed by any State shall be admitted a citizen as aforesaid, except by an act of the legislature of the State in which such person was proscribed." (March 26, 1790, 1 Stat. at Large, 104. See a similar proviso to the third section of the act of 29th January, 1795, 1 Stat. at Large, 415.)
The power given to Congress, as to naturalization generally, does not conflict with this question of taxing or excluding alien passengers, as acts of naturalization apply to those aliens only who have already resided here from two to five years, and not *527 to aliens not resident here at all, or not so long. (See acts of 1790, 1795, and 1800.)
And it is not a little remarkable, in proof that this power of exclusion still remains in the States rightfully, that while, as before stated, it has been exercised by various States in the Union,  some as to paupers, some as to convicts, some as to refugees, some as to slaves, and some as to free blacks,  it never has been exercised by the general government as to mere aliens, not enemies, except so far as included in what are called the Alien and Sedition Laws of 1798. By the former, being "An act concerning aliens," passed June 15th, 1798, (1 Stat. at Large, 571,) power was assumed by the general government, in time of peace, to remove or expel them from the country; and that act, no less than the latter, passed about a month after, (Ibid. 596,) was generally denounced as unconstitutional, and suffered to expire without renewal; on the ground, among others assigned for it, that, if such a power existed at all, it was in the States, and not in the general government, nnless under the war power, and then against alien enemies alone. (4 Elliot's Deb. 581, 582, 586; Virginia Resolutions of 1798.)
It deserves special notice, too, that, when it was exercised on another occasion by the general government, not against aliens as such, but slaves imported from abroad, it was in aid of State laws passed before 1808, and in subordination to them. The only act of Congress on this subject before 1808 expressly recognized the power of the State alone then to prohibit the introduction or importation "of any negro, mulatto, or other person of color," and punished it only where the States had. (See act of Feb. 28, 1803, 2 Stat. at Large, 205.) In further illustration of this recognition and coöperation with the States, it provided, in the third section, that all officers of the United States should "notice and be governed by the provisions of the laws now existing in the several States, prohibiting the admission or importation of any negro, mulatto, or other person of color as aforesaid; and they are hereby enjoined vigilantly to carry into effect said laws," i.e. the laws of the States. (See 1 Brockenbrough, 432.)
The act of March 2d, 1807, forbidding the bringing in of slaves, (2 Stat. at Large, 426,) was to take effect on the 1st of January, 1808, and was thus manifestly intended to carry into operation the admitted power of prohibition by Congress, after that date, of certain persons contemplated in the ninth section of the first article, and as a branch of trade or commerce which Congress, in other parts of the Constitution, was empowered to regulate. That act was aimed solely at the foreign slave-trade, *528 and not at the bringing in of any other persons than slaves, and not as if Congress supposed that, under the ninth section, it was contemplated to give it power, or recognize its power, over any thing but the foreign slave-trade. But of this more hereafter.
It will be seen also in this, that the power of each State to forbid the foreign slave-trade was expressly recognized as existing since, no less than before, 1808, being regarded as a concurrent power, and that by this section no authority was conferred on Congress over the domestic slave-trade, either before or since 1808.
If the old Congress did not suppose it was right and proper for the States to act in this way on the introduction of aliens, after the new Constitution went into operation, why did they, by their resolution of 1787, recommend to the States to forbid the introduction of convicts from abroad, rather than recommend it to be done by Congress under the new Constitution?
It is on this principle that a State has a right, if it pleases, to remove foreign criminals from within its limits, or allow them to be removed by others. (Holmes v. Jennison, 14 Peters, 568.) Though the obligation to do so is, to be sure, an imperfect one, of the performance of which she is judge, and sole judge, till Congress make some stipulation with foreign powers as to their surrender (11 Peters, 391); and if States do not surrender this right of affixing conditions to their ingress, the police authorities of Europe will proceed still further to inundate them with actual convicts and paupers, however mitigated the evil may be at times by the voluntary immigration with the rest of many of the enterprising, industrious, and talented. But if the right be carried beyond this, and be exercised with a view to exclude rival artisans, or laborers, or to shut out all foreigners, though persecuted and unfortunate, from mere naked prejudice, or with a view to thwart any conjectural policy of the general government, this course, as before suggested, would be open to much just criticism.
Again: considering the power to forbid as existing absolutely in a State, it is for the State where the power resides to decide on what is sufficient cause for it,  whether municipal or economical, sickness or crime; as, for example, danger of pauperism, danger to health, danger to morals, danger to property, danger to public principles by revolutions and change of government, or danger to religion. This power over the person is much less than that exercised over ships and merchandise under State quarantine laws, though the general government regulates, for duties and commerce, the ships and their *529 cargoes. If the power be clear, however others may differ as to the expediency of the exercise of it as to particular classes or in a particular form, this cannot impair the power.
It is well considered, also, that if the power to forbid or expel exists, the power to impose conditions of admission is included as an incident or subordinate. Vattel (B. 2, ch. 8, § 99) observes, that, "since the lord of the territory may, whenever he thinks proper, forbid its being entered, he has, no doubt, a power to annex what conditions he pleases to the permission to enter." (Holmes v. Jennison, 14 Peters, 569, 615, Appendix.)
The usage in several States supports this view. Thus the State of Maryland now, of Delaware since 1787, of Pennsylvania since 1818, if not before, and of Louisiana since 1842, besides New York and Massachusetts, pursue this policy in this form. (7 Smith's Laws of Pennsylvania, 21; 2 Laws of Delaware, 167, 995; 1 Dorsey's Laws of Maryland, 6, 10.) And though it is conceded that laws like this in Massachusetts are likely, in excited times, to become of a dangerous character, if perverted to illegitimate purposes, and though it is manifestly injudicious to push all the powers possessed by the States to a harsh extent against foreigners any more than citizens, yet, in my view, it is essential to sovereignty to be able to prescribe the conditions or terms on which aliens or their property shall be allowed to remain under its protection, and enjoy its municipal privileges. (Vattel, B. 1, ch. 19, §§ 219, 231.)
As a question of international law, also, they could do the same as to the citizens of other States, if not prevented by other clauses in the Constitution reserving to them certain rights over the whole Union, and which probably protect them from any legislation which does not at least press as hard on their own citizens as on those of other States. Thus, in article fourth, section second:  "The citizens of each State shall be entitled to all privileges and immunities of citizens in the several States." And the old Confederation (article fourth) protected the ingress and egress of the citizens of each State with others, and made the duties imposed on them the same.
Such is the case of Turner v. Smith, considered in connection with this, collecting the same of its own citizens as of others; and to argue that States may abuse the power, by taxing citizens of other States different from their own, is a fallacy, because Congress would also be quite as likely to abuse the power, because an abuse would react on the State itself, and lessen or destroy this business through it, and because the abuse, instead of being successful, would probably *530 be pronounced unconstitutional by this court, whenever appealed to.
With such exceptions, I am aware of no limitations on the powers of the States, as a matter of right, to go to the extent indicated in imposing terms of admission within their own limits, unless they be so conducted as to interfere with some other power, express or implied, which has been clearly granted to Congress, and which will be considered hereafter.
The last ground of vindication of this power, as exercised by Massachusetts in the third section, is under its aspect as imposing a tax.
Considering this, the inquiry may be broad enough to ascertain whether the measure is not constitutional, under the taxing power of the State generally, independent of its authority, already examined, as to a police, over the support of paupers, and, as to municipal regulations, over the admission of travellers and non-residents.
It deserves remark, in the outset, that such a tax, under the name of a toll or passport fee, is not uncommon in foreign countries on alien travellers when passing their frontiers. In that view it would be vindicated under long usage and numerous precedents abroad, and several in this country, already referred to.
It requires notice, also, that this provision, considered as a license fee, is not open to the objection of not being assessed beforehand at stated periods, and collected at the time of other taxes. When fees of a specific sum are exacted for licenses to sell certain goods, or exercise certain trades, or exhibit something rare, or for admissions to certain privileges, they are not regarded so much in the light of common taxes as of fees or tolls. They resemble this payment required here more than a tax on property, as they are not always annual, or collected at stated seasons; they are not imposed on citizens only, or permanent residents, but frequently are demanded as often as an event happens, or a certain act is done, and at any period, and from any visitor or transient resident. But fees or tolls thus collected are still legitimate taxes.
Another view of it as a tax is its imposition on the master of the vessel himself, on account of his capital or business in trade, carrying passengers, and not a tax on the passengers themselves. The master is often a citizen of the State where he arrives with a cargo and passengers. In such a case, he might be taxed on account of his business, like other citizens; and so, on other general principles, might masters of vessels who are not citizens, but who come within the limits and jurisdiction and protection of the State, and are hence, on that account, *531 rightfully subjected to its taxation, and made to bear a share of its burdens. It is customary in most countries, as before named, to impose taxes on particular professions and trades or businesses, as well as on property; and whether in the shape of a license or fee, or an excise or poll-tax, or any other form, it is of little consequence when the object of the tax is legitimate, as here, and its amount reasonable.
States, generally, have the right also to impose poll-taxes, as well as those on property, though they should be proportionate and moderate in amount. This one is not much above the usual amount of poll-taxes in New England. Nor need they require any length of residence before a person is subject to such a tax; and sometimes none is required, though it is usual to have it imposed only on a fixed day.
The power of taxation, generally, in all independent states, is unlimited as to persons and things, except as they may have been pleased, by contract or otherwise, to restrict themselves. Such a power, likewise, is one of the most indispensable to their welfare, and even their existence.
On the extent of the cession of taxation to the general government, and its restriction on the States, more will be presented hereafter; but in all cases of doubt, the leaning may well be towards the States, as the general government has ample means ordinarily by taxing imports, and the States limited means, after parting with that great and vastly increased source of revenue connected with imposts. The States may, therefore, and do frequently, tax every thing but exports, imports, and tonnage, as such. They daily tax things connected with foreign commerce as well as domestic trade. They can tax the timber, cordage, and iron of which the vessels for foreign trade are made; tax their cargoes to the owners as stock in trade; tax the vessels as property, and tax the owners and crew per head for their polls. Their power in this respect travels over water as well as land, if only within their territorial limits.
It seems conceded, that, if this tax, as a tax, had not been imposed till the passenger had reached the shore, the present objection must fail. But the power of the State is manifestly as great in a harbour within her limits to tax men and property as it is on shore, and can no more be abused there than on shore, and can no more conflict there than on shore with any authority of Congress as a taxing power not on imports as imports. Thus, after emigrants have landed, and are on the wharves, or on public roads, or in the public hotels, or in private dwelling-houses, they could all be taxed, though with less ease; and they could all, if the State felt so disposed to abuse the power, be taxed out of their limits as quickly and effectually *532 as have been the Jews in former times in several of the most enlightened nations of modern Europe.
To argue, likewise, that the State thus undertakes to assess taxes on persons not liable, and to control what it has not got, is begging the question, either that these passengers were not within its limits, or that all persons actually within its limits are not liable to its laws and not within its control. To contend, also, that this payment cannot be exacted, on the ground that the great correction of excessive taxation is its oppression on the constituent, which causes a reaction to reduce it (4 Wheat. 316, 428), and in this case the tax does not operate on a constituent, is another fallacy, to some extent. For most taxes operate on some classes of people who are not voters, as, for example, women, and especially resident aliens; and if this reasoning would exempt these passengers, when within the limits of the State, it would also exempt all aliens, and others not voters, however long resident there, or however much property they possess.
It seems likewise well settled, that, by the laws of national intercourse and as a consequence of the protection and hospitality yielded to aliens, they are subject to ordinary reasonable taxation in their persons and property by the government where they reside, as fully as citizens. (Vattel, B. 2, ch. 10, § 132, p. 235; Taylor v. Carpenter, 2 Woodbury & Minot.) But I am not aware of the imposition of such a tax in this form, except as a toll or a passport; it being, when a poll-tax, placed on those who have before acquired a domicile in the State, or have come to obtain one animo manendi. Yet, whatever its form, it would not answer hastily to denounce it as without competent authority, when imposed within the usual territorial limits of the State.
In short, the States evidently meant still to retain all power of this kind, except where, for special reasons at home, neither government was to tax exports, and, for strong reasons both at home and abroad, only the general government was to tax imports and tonnage.
Having explained what seem to me the principal reasons in favor of a power so vital to the States as that exercised by Massachusetts in this statute, whether it be police or municipal, regulating its residents or taxing them, I shall proceed to the last general consideration, which is whether this power has in any way been parted with to Congress entirely, or as to certain objects, including aliens.
It is not pretended that there is eo nomine any express delegation of this power to Congress, or any express prohibition of it to the States. And yet, by the tenth amendment of the *533 Constitution, it is provided, in so many words, that "the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." If, in the face of this, Congress is to be regarded as having obtained a power of restriction over the States on this subject, it must be by mere implication, and this either from the grant to impose taxes and duties, or that which is usually considered a clause only to prohibit and tax the slave-trade, or that to regulate commerce. And this statute of Massachusetts, in order to be unconstitutional, must be equivalent to one of these, or conflicting with one of them.
In relation, first, to the most important of these objections, regarding the statute in the light of a tax, and as such supposed to conflict with the general power of taxation conferred on Congress, as well as the exclusive power to tax imports, I would remark, that the very prohibition to the States, in express terms, to tax imports, furnishes additional proof that other taxation by the States was not meant to be forbidden in other cases and as to other matters. Expressio unius, exclusio est alterius. It would be very extraordinary, also, that, when expressly ceding powers of taxation to the general government, the States should refrain from making them exclusive in terms, except as to imports and tonnage, and yet should be considered as having intended, by mere implication, there or elsewhere in the instrument, to grant away all their great birthright over all other taxation, or at least some most important branches of it. Such has not been the construction or practical action of the two governments for the last half-century, but the States have continued to tax all the sources of revenue ceded to Congress, when not in terms forbidden. This was the only safe course. (Federalist, No. 32.)
One of the best tests that this kind of tax or fee for admission to the privileges of a State is permissible, if not expressly forbidden, is the construction in two great cases of direct taxes on land imposed by Congress, in 1798 and 1813. The States, on both of those occasions, still continued to impose and collect their taxes on lands, because not forbidden expressly by the Constitution to do it. And can any one doubt, that, so far as regards taxation even of ordinary imports, the States could still exercise it if they had not been expressly forbidden by this clause? (Collet v. Collet; 2 Dallas, 296; Gibbons v. Ogden, 9 Wheat. 201.) If they could not, why was the express prohibition made? Why was it deemed necessary? (Federalist, No. 32.)
This furnishes a striking illustration of the true general rule of construction, that, notwithstanding a grant to Congress is *534 express, if the States are not directly forbidden to act, it does not give to Congress exclusive authority over the matter, but the States may exercise a power in several respects relating to it, unless, from the nature of the subject and their relations to the general government, a prohibition is fairly or necessarily implied. This power in some instances seems to be concurrent or coördinate, and in others subordinate. On this rule of construction there has been much less doubt in this particular case as to taxation, than as a general principle on some other matters, which will hereafter be noticed under another head. The argument for it is unanswerable, that, though the States have, as to ordinary taxation of common subjects, granted a power to Congress, it is merely an additional power to their own, and not inconsistent with it.
It has been conceded by most American jurists, and, indeed, may be regarded as settled by this court, that this concurrent power of taxation, except on imports and exports and tonnage, (the last two specially and exclusively resigned to the general government,) is vital to the States, and still clearly exists in them. In support of this may be seen the following authorities:  McCulloch v. State of Maryland, 4 Wheat. 316, 425; Gibbons v. Ogden, 9 Wheat. 1, by Chief Justice Marshall; Providence Bank v. Billings, 4 Peters, 561; Brown v. State of Maryland, 12 Wheat. 441; 4 Gill & Johns. 132; 2 Story's Com. on Const., § 437; 5 Howard, 588; Weston v. City of Charleston, 2 Peters, 449; Federalist, No. 42.
Nor is the case of Brown v. Maryland, so often referred to, opposed to this view. It seems to have been a question of taxation, but the decision was not that, by the grant to the general government of the power to lay taxes and imposts, it must be considered, from "the nature of the power," "that it [taxation generally] should be exercised exclusively by Congress." On the contrary, all the cases before and hereafter cited, bearing on this question, concede that the general power of taxation still remains in the States; but in that instance it was considered to be used so as to amount to a tax on imports, and, such a tax being expressly prohibited to the States, it was adjudged there that for this reason it was unconstitutional. Under this head, then, as to taxation, it only remains to ascertain whether the toll or tax here imposed on alien passengers can be justly considered a tax on imports, as it was in the case of Brown v. Maryland, when laid on foreign goods. If so considered, it is conceded that this tax has been expressly forbidden to be imposed by a State, unless with the consent of Congress, or to aid in enforcing the inspection laws of the State. Clearly it does not come within either of those last exceptions, *535 and therefore the right to impose it must depend upon the question, whether it is an "impost," and whether passengers are "imports," within the meaning of the Constitution. An impost is usually an ad valorem or specific duty, and not a fee like this for allowing a particular act, or a poll-tax like this,  a fixed sum per head. An import is also an article of merchandise, goods of some kind,  property, "commodities." (Brown v. Maryland, 12 Wheat. 437. See McCulloch's Dict., Imports; 5 Howard, 594, 614.) It does not include persons unless they are brought in as property,  as slaves, unwilling or passive emigrants, like the importation referred to in the ninth section of the first article of the Constitution. (New York v. Miln, 11 Peters, 136; Case of the Brig Wilson, 1 Brock. 423.)
Now there is no pretence that mere passengers in vessels are of this character, or are property; otherwise they must be valued, and pay the general ad valorem duty now imposed on non-enumerated articles. They are brought in by no owner, like property generally, or like slaves. They are not the subject of entry or sale. The great objection to the tax in Brown v. Maryland was, that it clogged the sale of the goods. They are not like merchandise, too, because that may be warehoused, and reexported or branded, or valued by an invoice. They may go on shore anywhere, but goods cannot. A tax on them is not, then, in any sense, a tax on imports, even in the purview of Brown v. Maryland. There it was held not to be permitted until the import in the original package or cask is broken up, which it is difficult to predicate of a man or passenger. The definition there, also, is "imports are things imported," not persons, not passengers; or they are "articles brought in," and not freemen coming of their own accord. (12 Wheat. 437.) And when "imports" or "importation" is applied to men, as is the case in some acts of Congress, and in the ninth section of the first article of the Constitution, it is to men or "persons" who are property and passive, and brought in against their will or for sale as slaves,  brought as an article of commerce, like other merchandise. (New York v. Miln, 11 Peters, 136; 15 Peters, 505; 1 Bl. Com., by Tucker, pt. 2, App. 50.)
But, so far from this being the view as to free passengers taxed in this statute,  that they are merchandise or articles of commerce, and so considered in any act since 1808, or before,  it happens that, while the foreign import or trade as to slaves is abolished, and is made a capital offence, free passengers are not prohibited, nor their introduction punished as a crime. (4 Elliot's Deb. 119.) If "importation" in the ninth section applied to one class of persons; and "migration" to another, as has been argued, then allowing a tax by Congress on the "importation" *536 of any person was meant to be confined to slaves, and is not allowed on "migration," either in words or spirit, and hence it confers no power on Congress to tax other persons (see Iredell's remarks, 4 Elliot's Deb. 119); and a special clause was thought necessary to give the power to tax even the "importation" of slaves, because "a duty or impost" was usually a tax on things, and not persons. (1 Bl. Com., by Tucker, App. 231.)
Indeed, if passengers were "imports" for the purpose of revenue by the general government, then, as was never pretended, they should and can now be taxed by our collectors, because they are not enumerated in the tariff acts to be admitted "free" of duty, and all non-enumerated imports have a general duty imposed on them at the end of the tariff; as, for instance, in the act of July 30, 1846, section third, "a duty of twenty per cent. ad valorem" is laid "on all goods, wares, and merchandise imported from foreign countries, and not specially provided for in this act."
To come within the scope of a tariff, and within the principle of retaliation by or towards foreign powers, which was the cause of the policy of making imposts on imports exclusive in Congress, the import must still be merchandise or produce, some rival fruit of industry, an article of trade, a subject, or at least an instrument, of commerce. Passengers, being neither, come not within the letter or spirit or object of this provision in the Constitution.
It is, however, argued, that, though passengers may not be imports, yet the carrying of them is a branch of commercial business, and a legitimate and usual employment of navigation.
Grant this, and still a tax on the passenger would not be laying a duty on "imports" or on "tonnage"; but it might be supposed to affect foreign commerce at times, and in some forms and places, and thus interfere with the power to regulate that, though not with the prohibition to tax imports and tonnage. Consequently, when hereafter considering the meaning of the grant "to regulate commerce," this view of the objection will be examined.
But there seems to be another exception to this measure, as conflicting with the powers of the general government, which partly affects the question as a tax, and partly as a regulation of commerce. It is, that the tax was imposed on a vessel before the passengers were landed, and while under the control of the general government. So far as it relates to the measure as a tax, the exception must be regarded as applying to the particular place where it is collected, in a vessel on the water, *537 though after her arrival within a port or harbour. It would seem to be argued, that, by some constitutional provision, a State possesses no power in such a place. But there is nothing in the taxing part of the Constitution which forbids her action in such places on matters like this. If forbidden at all, it must be by general principles of the common and of national law, that no State can assess or levy a tax on what is without the limits of its jurisdiction, or that, if within its territorial limits, the subject-matter is vested exclusively by the Constitution in the general government.
It will be seen, that, if the first exception be valid, it is not one connected with the Constitution of the United States, and hence not revisable here. It was not, and could not properly be, set up as a defence in the court of a State, except under its own constitution, and hence not revisable in this court by this writ of error. But as it may be supposed to have some influences on the other and commercial aspect of the objection, it may be well to ascertain whether, as a general principle, a vessel in a port, or its occupants, crew, or passengers, are in fact without the limits and jurisdiction of a State, and thus beyond its taxing power, and are exclusively for all purposes under the government of the United States. One of the errors in the argument of this part of the cause has been an apparent assumption that this tax  considered as a tax  was collected at sea, before the voyage ended, and was not collected within the limits and jurisdiction of the State. But, ex concesso, this vessel then was in the harbour of Boston, some miles within the limits of the State, and where this court itself has repeatedly decided that Massachusetts, and not the general government, has jurisdiction. First, jurisdiction to punish crimes. (See in Waring v. Clarke, 5 Howard, 441; Ibid. 628; Coolidge's case, 1 Wheat. 415; Bevans's case, 3 Wheat. 336; 1 Woodbury & Minot, 401, 455, 481, 483.) Next, the State would have jurisdiction there to enforce contracts. So must she have to collect taxes, for the like reason (5 Howard, 441); because it was a place within the territorial limits and jurisdiction of the State. Chief Justice Marshall, in 12 Wheat. 441, speaks of "their [the States'] acknowledged power to tax persons and property within their territory." (Ibid. 444.)
The tax in this case does not touch the passenger in transitu on the ocean, or abroad,  never till the actual arrival of the vessel with him in port. An arrival in port, in other acts of Congress using the term, is coming in, or anchoring within, its limits, with a view to discharge the cargo. (2 Sumner, 419; 5 Mason, 445; 4 Taunton, 662, 722; Toler v. White, Ware, 277.)
*538 For aught that appears, this vessel, before visited, had come in and was at anchor in the port. The person so going into port abroad is considered to have "arrived," so as to be amenable to his consul, and must deposit his papers. He has come under or into the control of shore power, and shore authority, and shore laws, and shore writs, and shore juries; at least concurrently with other authorities, if not exclusively. In common parlance, the voyage for this purpose at least is not interrupted; for then it has ended, and the State liabilities and powers begin, or the State becomes utterly imbecile. Hence, speaking of a country as distinguished from the sea, and of a nation as a state, Vattel (B. 1, ch. 23, § 290) says:  "Ports and harbours are manifestly an appendage to, and even a part of the country, and consequently are the property of the nation. Whatever is said of the land itself will equally apply to them, so far as respects the consequences of the domain and of the empire." If the ports and harbours of a State are intra fauces terr, within the body of a country, the power of taxation is as complete in them as it is on land, a hundred miles in the interior. Though on tide waters, the vessels are there subject for many purposes to State authority rather than Federal, are taxed as stock in trade, or ships owned, if by residents; the cargo may be there taxed; the officers and crew may be there taxed for their polls, as well as estate; and, on the same principle, may be the master for the passengers, or the passengers themselves. Persons there, poor and sick, are also entitled to public relief from the city or State. (4 Metcalf, 290, 291.) No matter where may be the place, if only within the territorial boundaries of the State, or, in other words, within its geographical limits. The last is the test, and not whether it be a merchant-vessel or a dwelling-house, or something in either, as property or persons. Unless beyond the borders of the State, or granted, as a fort or navy-yard within them, to a separate and exclusive jurisdiction, or used as an authorized instrument of the general government, the State laws control and can tax it. (United States v. Ames, 1 Woodb. & Minot, 76, and cases there cited.)
It is true there are exceptions as to taxation which do not affect this question; as where something is taxed which is held under the grants to the United States, and the grants might be defeated if taxed by the State. That was the point in McCulloch v. Maryland, 4 Wheat. 316; Weston v. City of Charleston, 2 Peters, 449; Dobbins v. Commissioners of Erie County, 16 Peters, 435; Osborn v. Bank of the United States, 9 Wheat. 738. But that is not the question here, as neither passengers nor the master of the vessel can be considered as official instruments of the government.
*539 In point of fact, too, in an instance like this, it is well known that the general jurisdiction of the States for most municipal purposes within their territory, including taxation, has never been ceded to the United States nor claimed by them; but they may anchor their navies there, prevent smuggling, and collect duties there, as they may do the last on land. But this is not inconsistent with the other, and this brings us to the second consideration under this head,  how far such a concurrent power in that government, for a particular object, can, with any propriety whatever, impair the general rights of the States there on other matters.
These powers exist in the two governments for different purposes, and are not at all inconsistent or conflicting. The general government may collect its duties, either on the water or the land, and still the State enforce its own laws without any collision, whether they are made for local taxation, or military duty, or the collection of debts, or the punishment of crimes. There being no inconsistency or collision, no reason exists to hold either, by mere construction, void. This is the cardinal test.
So the master may not always deliver merchandise rightfully, except on a wharf; nor be always entitled to freight till the goods are on shore; yet this depends on the usage, or contract, or nature of the port, and does not affect the question of jurisdiction. (Abbott on Shipping, 249; 4 Bos. & Pul. 16.) On the contrary, some offences may be completed entirely on the water, and yet the State jurisdiction on land is conceded. (United States v. Coombs, 12 Peters, 72.)
So a contract with the passenger may or may not be completed on arriving in port, without landing, according as the parties may have been pleased to stipulate. (Brig Lavinia, 1 Peters, Adm. 126.)
So the insurance on a cargo of a ship may not in some cases terminate till it is landed, though in others it may, depending on the language used. (Reyner v. Pearson, 4 Taunton, 662, and Levin v. Newnham, Ib. 722.) But none of these show that the passengers may not quit the vessel outside the harbour in boats or other vessels, and thus go to the land, or go to other ports. Or that, if not doing this, and coming in the same vessel within the State limits, they may not be subject to arrests, punishments, and taxation or police fees, or other regulations of the State, though still on board the vessel. Nor do any of them show that the vessel and cargo, after within the State limits, though not on the shore, are not within the jurisdiction of the State, and liable, as property of the owner, to be taxed in common with other stock in trade.
*540 I will not waste a moment in combating the novel idea, that taxes by the States must be uniform, or they are void by the Constitution on that account; because clearly that provision relates only to taxes imposed by the general government. It is a fallacy, also, to argue that the vessels, crews, and passengers, when within the territory of a State, are not amenable to the State laws in these respects, because they are enrolled as belonging to the United States, and their flag is the flag of the United States. For though they do belong to the United States in respect to foreign nations and our statistical returns and tables, this does not prevent the vessels at the same time from being owned by citizens of the State of Massachusetts, and the crew belonging there, and all, with the passengers, after within her limits, from being amenable generally to her laws.
If taking another objection to it as a tax, and arguing against the tax imposed on the vessel, because it may be abused to injure emigration and thwart the general government, it would still conflict with no particular clause in the Constitution or acts of Congress. It should also be remembered that this was one objection to the license laws in 5 Howard, and that the court held unanimously they were constitutional, though they evidently tended to diminish importations of spirituous liquor and lessen the revenue of the general government from that source. But that being only an incident to them, and not their chief design, and the chief design being within the jurisdiction of the States, the laws were upheld.
It is the purpose which Mr. Justice Johnson thinks may show that no collision was intended or effected. "Their different purposes mark the distinction between the powers brought into action, and while frankly exercised they can produce no serious collision." (Gibbons v. Ogden, 9 Wheat. 235.) "Collision must be sought to be produced." "Wherever the powers of the respective governments are frankly exercised, with a distinct view to the end of such powers, they may act on the same subject, or use the same means, and yet the powers be kept perfectly distinct." (p. 239.) See 1 Woodbury & Minot, 423, 433.
The next delegation of power to Congress, supposed by some to be inconsistent with this statute, is argued to be involved in the ninth section of the first article of the Constitution. This they consider as a grant of power to Congress to prohibit the migration from abroad of all persons, bond or free, after the year 1808, and to tax their importation at once and for ever, not exceeding ten dollars per head. (See 9 Wheat. 230, by Mr. Justice Johnson; 15 Peters, 514.) The words are:  *541 "The migration or importation of such persons as any of the States now existing shall think proper to admit shall not be prohibited by the Congress prior to the year 1808; but a tax or duty may be imposed on such importation, not exceeding ten dollars for each person." But it deserves special notice, that this section is one entirely of limitation on power, rather than a grant of it; and the power of prohibition being nowhere else in the Constitution expressly granted to Congress, the section seems introduced rather to prevent it from being implied except as to slaves, after 1808, than to confer it in all cases. (1 Brockenbrough, 432.)
If to be implied elsewhere, it is from the grant to regulate commerce, and by the idea that slaves are subjects of commerce, as they often are. Hence, it can go no further than to imply it as to them, and not as to free passengers.
Or if to "regulate commerce" extends also to the regulation of mere navigation, and hence to the business of carrying passengers, in which it may be employed, it is confined to a forfeiture of the vessel, and does not legitimately involve a prohibition of persons, except when articles of commerce, like slaves. (1 Brockenbrough, 432.) Or finally, however far the power may extend under either view, it is still a power concurrent in the States, like most taxation and much local legislation as to matters connected somewhat with commerce, and is well exercised by them when Congress does not, as here, legislate upon the matter either of prohibition or of taxation of passengers. It is hence that, if this ninth section is a grant of the power to prevent the migration or importation of other persons than slaves, it is not an exclusive one, any more than that to regulate commerce, to which it refers; nor has it ever been exercised so as to conflict with State laws, or with the statute of Massachusetts now under consideration. This clause itself recognizes an exclusive power of prohibition in the States until the year 1808. And a concurrent and subordinate power on this by the States, after that, is nowhere expressly forbidden in the Constitution, nor is it denied by any reason or necessity for such exclusiveness. The States can often use it more wisely than Congress in respect to their own interests and policy. They cannot protect their police, or health, or public morals without the exercise of such a power at times and under certain exigencies, as forbidding the admission of slaves and certain other persons within their borders. One State, also, may require its exercise, from its exposures and dangers, when another may not. So it may be said, as to the power to tax importation, if limited to slaves, the States could continue to do the same when they pleased if men are not deemed "imports."
*542 But to see for a moment how dangerous it would be to consider a prohibitory power over all aliens as vested exclusively in Congress, look to some of the consequences. The States must be mute and powerless.
If Congress, without a coordinate or concurrent power in the States, can prohibit other persons as well as slaves from coming into States, they can of course allow it, and hence can permit and demand the admission of slaves, as well as any kind of free person, convicts or paupers, into any State, and enforce the demand by all the overwhelming powers of the Union, however obnoxious to the habits and wishes of the people of a particular State. In view of an inference like this, it has therefore been said that, under this section, Congress cannot admit persons whom a State pleases to exclude. (9 Wheaton, 230; Justice Johnson.) This rather strengthens the propriety of the independent action of the State, here excluding conditionally, than the idea that it is under the control of Congress.
Besides this, the ten dollars per head allowed here specially to be collected by Congress on imported slaves is not an exclusive power to tax, and would not have been necessary or inserted, if Congress could clearly already impose such a tax on them as "imports," and by a "duty" on imports. It would be not a little extraordinary to imply by construction a power in Congress to prohibit the coming into the States of others than slaves, or of mere aliens, on the principle of the alien part of the Alien and Sedition Laws, though it never has been exercised as to others permanently; but the States recommended to exercise it, and seventeen of them now actually doing it. And equally extraordinary to imply, at this late day, not only that Congress possesses the power, but that, though not exercising it, the States are incapable of exercising it concurrently, or even in subordination to Congress. But beyond this, the States have exercised it concurrently as to slaves, no less than exclusively in respect to certain free persons, since as well as before 1808, and this as to their admission from neighbouring States no less than from abroad. (See cases before cited, and Butler v. Hopper, 1 Wash. C.C. 500.)
The word "migration" was probably added to "importation" to cover slaves when regarded as persons rather than property, as they are for some purposes. Or if to cover others, such as convicts and redemptioners, it was those only who came against their will, or in a quasi servitude. And though the expression may be broad enough to cover emigrants generally, (3 Madison State Papers, 1429; 9 Wheat. 216, 230; 1 Brockenbrough, 431,) and some thought it might cover convicts, *543 (5 Elliot's Deb. 477; 3 Madison State Papers, 1430,) yet it was not so considered by the mass of the Convention, but as intended for "slaves," and calling them "persons" out of delicacy. (5 Elliot's Deb. 457, 477; 3 ib. 251, 541; 4 ib. 119; 15 Peters, 113, 506; 11 ib. 136; 1 Bl. Com., by Tucker, App. 290.) It was so considered in the Federalist soon after, and that view regarded as a "misconstruction" which extended it to "emigration" generally. (Federalist, No. 42.) So afterwards thought Mr. Madison himself, the great expounder and framer of most of the Constitution. (3 Elliot's Deb. 422.) So it has been held by several members of this court (15 Peters, 508); and so it has been considered by Congress, judging from its uniform acts, except the unfortunate Alien Law of 1798, before cited, and which, on account of its unconstitutional features, had so brief and troubled an existence. (4 Elliot's Deb. 451.)
In the Constitution, in other parts as in this, the word "persons" is used, not to embrace others as well as slaves, but slaves alone. Thus, in the second section of the first article, "three fifths of all other persons" manifestly means slaves; and in the third section of the fourth article, "no person held to service or labor in one State," &c., refers to slaves. The word slave was avoided, from a sensitive feeling; but clearly no others were intended in the ninth section. Congress so considered it, also, when it took up the subject of this section in 1807, just before the limitation expired, or it would then probably have acted as to others, and regulated the migration and importation of others as well as of slaves. By forbidding merely "to import or bring into the United States, or territories thereof, from any foreign kingdom, place, or country, any negro, mulatto, or person of color, with intent to hold, sell, or dispose of such negro, mulatto, or person of color as a slave, or to be held to service or labor," it is manifest that Congress then considered this clause in the Constitution as referring to slaves alone, and then as a matter of commerce; and it strengthens this idea, that Congress has never since attempted to extend this clause to any other persons, while the States have been in the constant habit of prohibiting the introduction of paupers, convicts, free blacks, and persons sick with contagious diseases, no less than slaves; and this from neighbouring States as well as from abroad.
There was no occasion for that express grant, or rather recognition, of the power to forbid the entry of slaves by the general government, if Congress could, by other clauses of the Constitution, for what seemed to it good cause, forbid the entry of every body, as of aliens generally; and if Congress could *544 not do this generally, it is a decisive argument that the State might do it, as the power must exist somewhere in every independent country.
Again, if the States had not such power under the Constitution, at least concurrently, by what authority did most of them forbid the importation of slaves from abroad into their limits between 1789 and 1808? Congress has no power to transfer such rights to States. And how came Congress to recognize their right to do it virtually by the first article and ninth section, and also by the act of 1803? It was because the States originally had it as sovereign States, and had never parted with it exclusively to Congress. This court, in Groves v. Slaughter, 15 Peters, 511, is generally understood as sustaining the right of States since 1808, no less than before, to prohibit the bringing into their limits of slaves for sale, even from other States, no less than from foreign countries.
From the very nature of State sovereignty over what is not granted to Congress, and the power of prohibition, either as to persons or things, except slaves after the year 1808, not being anywhere conferred on, or recognized as in, the general government, no good reason seems to exist against the present exercise of it by the States, unless where it may clearly conflict with other clauses in the Constitution. In fact, every Slave State in the Union, long before 1808, is believed to have prohibited the further importation of slaves into her territories from abroad (Libby's Case, 1 Woodb. & Min. 235; Butler v. Hopper, 1 Wash. C.C. 499); and several, as before stated, have since prohibited virtually the import of them from contiguous States. Among them may be named Kentucky, Missouri, and Alabama, as well as Mississippi, using, for instance, as in the constitution of the last, such language as the following:  "The introduction of slaves into this State as merchandise, or for sale, shall be prohibited from and after the first day of May, 1833." (See Constitutions of the States, and 15 Peters, 500.)
Coming by land or sea to be sold, slaves are equally articles of commerce, and thus bringing them in is an "importation or migration of persons"; and if the power over that is now exclusive in Congress, more than half the States in the Union have violated it. If a State can do this as to slaves from abroad or a contiguous State, why not, as has often been the case, do it in respect to any other person deemed dangerous or hostile to the stability and prosperity of her institutions? They can, because they act on these persons when within their limits, and for objects not commercial, and doing this is not disturbing the voyage, which brings them in as passengers, nor *545 taxing the instrument used in it, as the vessel, nor even the master and crew, for acts done abroad, or any thing without her own limits. The power of the State in prohibiting rests on a sovereign right to regulate who shall be her inhabitants,  a right more vital than that to regulate commerce by the general government, and which, as independent or concurrent, the latter has not disturbed, and should not disturb. (15 Peters, 507, 508.)
But the final objection made to the collection of this money by a State is a leading and difficult one. It consists in this view, that, though called either a police regulation, or a municipal condition to admission into a State, or a tax on an alien visitor, it is in substance and in truth a regulation of foreign commerce, and, the power to make that being exclusively vested in Congress, no State can properly exercise it.
If both the points involved in this position could be sustained, this proceeding of the State might be obliged to yield. But there are two answers to it. One of them is, that this statute is not a regulation of commerce; and the other is, that the power to regulate foreign commerce is not made exclusive in Congress.
As to the first, this statute does not eo nomine undertake "to regulate commerce," and its design, motive, and object were entirely different.
At the formation of the Constitution, the power to regulate commerce attracted but little attention, compared with that to impose duties on imports and tonnage; and this last had caused so much difficulty, both at home and abroad, that it was expressly and entirely taken away from the States, but the former was not attempted to be. The former, too, occupies scarce a page in the Federalist, while the latter engrosses several numbers. A like disparity existed in the debates in the Convention, and in the early legislation of Congress. Nor did the former receive much notice of the profession in construing the Constitution till after a quarter of a century; and then, though considered in the case of Gibbons v. Ogden (9 Wheaton, 1) as a power clearly conferred on Congress, and to be sustained on all appropriate matters, yet it does not appear to have been held that nothing connected in any degree with commerce, or resembling it, could be regulated by State legislation; but only that this last must not be so exercised as to conflict directly with an existing act of Congress. (See the text, and especially the mandate in 9 Wheat. 239, 240.) On the contrary, many subjects of legislation are of such a doubtful class, and even of such an amphibious character, that one person would arrange and define them as matters of police, *546 another as matters of taxation, and another as matters of commerce. But all familiar with these topics must know, that laws on these by States for local purposes, and to operate only within State limits, are not usually intended, and should not be considered, as laws "to regulate commerce." They are made entirely diverso intuitu. Hence, much connected with the local power of taxation, and with the police of the States as to paupers, quarantine laws, the introduction of criminals or dangerous persons, or of obscene and immoral prints and books, or of destructive poisons and liquors, belongs to the States at home. It varies with their different home policies and habits, and is not either in its locality or operation a matter of exterior policy, though at times connected with, or resulting from, foreign commerce, and over which, within their own borders, the States have never acted as if they had parted with the power, and never could with so much advantage to their people as to retain it among themselves. (9 Wheaton, 203.) Its interests and influences are nearer to each State, are often peculiar to each, better understood by and for each, and, if prudently watched over, will never involve them in conflicts with the general government or with foreign nations.
The regulation and support of paupers and convicts, as well as their introduction into a State through foreign intercourse, by vessels, are matters of this character. (New York v. Miln, 11 Peters, 141; License Cases, 5 Howard; Baldwin's Views, 184.) Some States are much exposed to large burdens and fatal diseases and moral pollution from this source, while others are almost entirely exempt. Some, therefore, need no legislation, State or national, while others do and must protect themselves when Congress cannot or will not. This matter, for instance, may be vital to Massachusetts, New York, Louisiana, or Maryland; but it is a subject of indifference to a large portion of the rest of the Union, not much resorted to from abroad; and this circumstance indicates, not only why those first-named States, as States, should, by local legislation, protect themselves from supposed evils from it where deemed necessary or expedient, but that it is not one of those incidents to our foreign commerce in most of the Union which, like duties, or imposts, or taxes on tonnage, require a uniform and universal rule to be applied by the general government.
A uniform rule by Congress not being needed on this particular point, nor being just, is a strong proof that it was not intended Congress should exercise power over it; especially when paupers, or aliens likely to become paupers, enter a State that has not room or business for them, but they merely pass through to other places, the tax would not be needed to *547 support them or help to exclude them; and hence such a State would not be likely to impose one for those purposes. But considering the power to be in Congress, and some States needing legislator, and that being required to be uniform, if Congress were to impose a tax for such purposes, and pay a ratable proportion of it over to such a State, it would be unjust. If, to avoid this, Congress were to collect such a tax, and itself undertake to support foreign paupers out of it, Congress would transcend the powers granted to her, as none extend to the maintenance of paupers, and it might as well repair roads for local use and make laws to settle intestate estates, or, at least, estates of foreigners. And if it can do this because passengers are aliens and connected with foreign commerce, and, this power being exclusive in it, State taxes on them are therefore void, it must follow that State laws are void also in respect to foreign bills of exchange, a great instrument of foreign commerce, and in respect to bankrupt laws, another topic connected with foreign commerce,  neither of which, but directly the reverse, is the law.
"To regulate" is to prescribe rules, to control. But the State by this statute prescribes no rules for the "commerce with foreign nations." It does not regulate the vessel or the voyage while in progress. On the contrary, it prescribes rules for a local matter, one in which she, as a State, has the deepest interest, and one arising after the voyage has ended, and not a matter of commerce or navigation, but rather of police, or municipal, or taxing supervision.
Again, it is believed that in Europe, in several instances of border states, so far from the introduction of foreigners who are paupers, or likely soon to be so, being regarded as a question of commerce, it is deemed one of police merely; and the expenses of alien paupers are made a subject of reclamation from the contiguous government to which they belong.
This view, showing that the regulation of this matter is not in substance more than in words to regulate foreign commerce, is strengthened by various other matters, which have never been regarded as regulating commerce, though nearer connected in some respects with that commerce than this is. But like this, they are all, when provided for by the States, regulated only within their own limits, and for themselves, and not without their limits, as of a foreign matter, nor for other States. Such are the laws of the States which have ever continued to regulate several matters in harbours and ports where foreign vessels enter and unload. (Vanderbilt v. Adams, 7 Wendell, 349.) The whole jurisdiction over them when within the headlands on the ocean, though filled with salt water and *548 strong tides, is in the States. We have under another head already shown that it exists there exclusively for most criminal prosecutions, and also for all civil proceedings to prosecute trespasses and recover debts of the owners of the ship or cargo, or of the crew or passengers, and whether aliens or citizens. And though the general government is allowed to collect its duties and enforce its specific requirements about them there, as it is authorized to do, and does, under acts of Congress, even on land, (Gibbons v. Ogden, 9 Wheat.; United States v. Coombs, 12 Peters, 72,) yet it can exercise no power there, criminal or civil, under implication, or under a construction that its authority to regulate commerce there is exclusive as to matters like these. No exclusive jurisdiction has been expressly ceded to it there, as in some forts, navy-yards, and arsenals. Nor is any necessary. Not one of its officers, fiscal or judicial, can exert the smallest authority there in opposition to the State jurisdiction, and State laws, and State officers, but only in public vessels of war, or over forts and navy-yards ceded, or as to duties on imports, and other cases, to the extent specifically `bestowed on them by constitutional acts of Congress. And to regulate these local concerns in this way by the States is not to regulate foreign commerce, but home concerns. The design is local; the object a State object, and not a foreign or commercial one; and the exercise of the power is not conflicting with any existing actual enactment by Congress.
The States also have and can exercise there, not only their just territorial jurisdiction over persons and things, but make special officers and special laws for regulating there in their limits various matters of a local interest and bearing, in connection with all the commerce, foreign as well as domestic, which is there gathered. They appoint and pay harbourmasters, and officers to regulate the deposit of ballast, and anchorage of vessels, (7 Wendell, 349,) and the building of wharves; and are often at great expense in removing obstructions. (1 Bl. Com., by Tucker, 249.)
These State officers have the power to direct where vessels shall anchor, and the precautions to be used against fires on board; and all State laws in regard to such matters must doubtless continue in force till conflicting with some express legislation by Congress. (1 Bl. Com., by Tucker, 252.) I allude to these with the greater particularity, because they are so directly connected with foreign commerce, and are not justified more, perhaps, under police, or sanatory, or moral considerations, than under the general principle of concurrent authority in the States on many matters granted to Congress,  *549 taking care not to attempt to regulate the foreign commerce, and not to conflict directly and materially with any provision actually made by Congress,  nor to do it in a case where the grant is accompanied by an express prohibition to the States, or is in its nature and character such as to imply clearly a total prohibition to the States of every exercise of power connected with it. To remove doubts as to the design to have the power of the States remain to legislate on such matters within their own limits, the old Confederation, in article ninth, where granting the power of regulating "the trade and managing all affairs with the Indians, not members of any of the States," provided that "the legislative right of any State, within its own limits, be not infringed or violated." The same end was meant to be effected in the new Constitution, though in a different way; and this was, by not granting any power to Congress over the internal commerce, or police, or municipal affairs of the States, and declaring expressly, in the tenth amendment, that all powers not so granted were reserved to the people of the States.
It follows from what has been said, that this statute of Massachusetts, if regarded as a police measure, or a municipal regulation as to residents or visitors within its borders, or as a tax or any local provision for her own affairs, ought not to be considered as a regulation of commerce; but it is one of those other measures still authorized in the States, and still useful and appropriate to them. Such measures, too, are usually not conflicting with that commerce, but adopted entirely diverso intuitu, and so operating.
Conceding, then, that the power to regulate foreign commerce may include the regulation of the vessel as well as the cargo, and the manner of using the vessel in that commerce, yet the statute of Massachusetts does neither. It merely affects the master or passengers after their arrival, and for some further act than proposed to be done. And though vessels are instruments of commerce, passengers are not. And though regulating the mode of carrying them on the ocean may be to regulate commerce and navigation, yet to tax them after their arrival here is not. Indeed, the regulation of any thing is not naturally or generally to tax it, as that usually depends on another power. It has been well held in this court, that under the Constitution the taxing of imports is not a regulation of commerce, nor to be sustained under that grant, but under the grant as to taxation. (Gibbons v. Ogden, 9 Wheat. 201.) Duties may, to be sure, be imposed at times to regulate commerce, but oftener are imposed with a view to revenue; and therefore, under that head, duties as taxes were prohibited to the States. (9 Wheat. 202, 203.)
*550 It is a mistaken view to say, that the power of a State to exclude slaves, or free blacks, or convicts, or paupers, or to make pecuniary terms for their admission, may be one not conflicting with commerce, while the same power, if applied to alien passengers coming in vessels, does conflict. Slaves now excepted, though once not entirely, they are all equally and frequently passengers, and all oftener come in by water in the business and channels of ocean commerce than by land. But if the transit of persons coming into the States as passengers, by water, is a branch of commerce, so is their coming in by land; and this, whether from other nations on our land frontier, or from other States. And if Mississippi and Ohio can rightfully impose prohibitions, taxes, or any terms to such coming by land or water from other States, so may Massachusetts and New York, if thus coming from foreign nations by water. Congress, also, has like power to regulate commerce between the States, as between this country and other nations, and if persons coming in by water as passengers belong to the subject of commerce and navigation on the Atlantic, so do they on the Lakes and large rivers; and if excluding or requiring terms of them in one place interferes with commerce, so it does in the other.
Again, if any decisive indication, independent of general principles, exists as to which government shall exercise the taxing power in respect to the support of paupers, it is that the States, rather than the general government, shall exercise it (9 Wheat. 206, 216); and exercise it as such a power, and not, by a forced construction, as a power "to regulate commerce." The States have always continued to exercise the various powers of local taxation and police, and not Congress; and have maintained all paupers. And this, though the general authority to regulate commerce, no less than to lay taxes, was granted to Congress. But police powers and powers over the internal commerce and municipal affairs of States were not granted away; and under them, and the general power of taxation, States continued to control this subject, and not under the power to regulate commerce. Nor did Congress, though possessing this last power, ever attempt to interfere, as if to do so was a branch of that power or justifiable under it, because in terms using language connected with commerce. Thus, in the Kentucky constitution, and substantially in several others, it is provided that the legislature "shall have full power to prevent slaves from being brought into this State as merchandise," and Congress sanctioned that Constitution, and the rest, with such provisions in them.
These affairs are a part of the domestic economy of States, *551 belong to their interior policy, and operate on matters affecting the fireside, the hearth, and the altar. The States have no foreign relations, and need none, as to this. (1 Bl. Com., by Tucker, App. 249.)
The fair exercise of such powers rightfully belonging to a State, though connected often with foreign commerce and indirectly or slightly affecting it, cannot therefore be considered, in any point of view, hostile, by their intent or origin, as regulations of such commerce. See in point, Gibbons v. Ogden, 9 Wheat. 203; 11 Peters, 102.
In this view, it is immaterial whether this tax is imposed on the passenger while in the ship, in port, or when he touches the wharf, or reaches his hotel. All these places, being within the territory, are equally within the jurisdiction of the State for municipal purposes such as these, and not with a view to regulate foreign commerce; it being conceded that a tax may be imposed on a passenger after quitting the vessel and on the land, why may it not before, when he is then within the limits of the State? In either instance, the tax has no concern with the foreign voyage, and does not regulate the foreign commerce; whereas, if otherwise, it might be as invalid when imposed on land as on water.
Much of the difficulty in this case arises, I apprehend, from a misconception, as if this tax was imposed on the passenger at sea and before within the territorial limits of the State. But this, as before suggested, is an entire misapprehension of the extent of those limits, or of the words and meaning of the law.
If, then, as is argued, intercourse by merchants in person, and by officers in their vessels, boats, and wagons, is a part of commerce, and the carrying of passengers is also a branch of navigation or commerce, still the taxing of these after the arrival in port, though Congress there has power to collect its duties as it has on land, is not vested at all in Congress; or, if at all, not exclusively.
Who can point to the cession to the United States of the jurisdiction, by Massachusetts or New York, of their own ports and harbours for purposes of taxation, or any other local and municipal purpose?
So far from interfering at all here with the foreign voyage, the State power begins when that ends and the vessel has entered the jurisdictional limits of the State. Her laws reach the consequences and results of foreign commerce, rather than the commerce itself. They touch not the tonnage of the vessel, nor her merchandise, nor the baggage or tools of the aliens; nor do they forbid the vessels carrying passengers. *552 But as a condition to their landing and remaining within the jurisdiction of the State, enough is required by way of condition or terms for that privilege, and the risk of their becoming chargeable, when aliens, (though not chargeable at the time,) to cover in some degree the expenses happening under such contingency. This has nothing to do with the regulation of commerce itself,  the right to carry passengers to and fro over the Atlantic Ocean,  but merely with their inhabitancy or residence within a State so as to be entitled to its charity, its privileges, and protection. Such laws do not conflict directly with any provision by the general government as to foreign commerce, because none has been made on this point, and they are not in clear collision with any made by that government on any other point. When, as here, they purport to be for a different purpose from touching the concerns of the general government,  when they are, as here, adapted to another local and legitimate object,  it is unjust to a sovereign State, and derogatory to the character of her people and legislature, to impute a sinister and illegitimate design to them concerning foreign commerce, different from that avowed, and from that which the amount of the tax and the evil to be guarded against clearly indicate as the true design. Hence, as before remarked, Mr. Justice Johnson, in the same opinion which was cited by the original defendants, says the purpose is the test; and if that be different, and does not clash, the law is not unconstitutional.
So Chief Justice Marshall, in 9 Wheat. 204, says, that Congress for one purpose and a State for another may use like means and both be vindicated. And though Congress obtains its power from a special grant, like that of the power "to regulate commerce," the State may obtain it from a reserved power over internal commerce or over its police. Hence, while Congress regulates the number of passengers to the size of the vessel, as a matter of foreign commerce, and may exempt their baggage and tools from duties as a matter of imposts on imports, yet this is not inconsistent with the power of a State, after passengers arrive within her limits, to impose terms on their landing, with a view to benefit her pauper police, or her fiscal resources, or her municipal safety and welfare. And the two powers, thus exercised separately by the two governments, may, as Mr. Justice Johnson says, "be perfectly distinct." So, in the language of Chief Justice Marshall, "if executed by the same means," "this does not prove that the powers themselves are identical."
The measures of the general government amount to a regulation of the traffic, or trade, or business, of carrying passengers, *553 and of the imposts on imports; but those of the States amount to neither, and merely affect the passengers or master of the vessel after their arrival within the limits of a State, and for State purposes, State security, and State policy.
As we have before explained, then, if granting that the bringing of passengers is a great branch of the business of navigation, and that to regulate commerce is to regulate navigation, yet this statute of Massachusetts neither regulates that navigation employed in carrying passengers, nor the passengers themselves, either while abroad in foreign ports, or while on the Atlantic Ocean, but merely taxes them, or imposes conditions on them, after within the State. These things are done, as Mr. Justice Johnson said in another case, "with a distinct view." And it is no objection that they "act on the same subject" (9 Wheat. 235); or, in the words of Chief Justice Marshall, "although the means used in their execution may sometimes approach each other so nearly as to be confounded" (p. 204). But where any doubt arises, it should operate against the uncertain and loose, or what the late chief justice called "questionable power to regulate commerce," (9 Wheat. 202,) rather than the more fixed and distinct police or taxing power.
In cases like this, if, amidst the great complexity of human affairs, and in the shadowy line between the two governments over the same people, it is impossible for their mutual rights and powers not to infringe occasionally upon each other, or cross a little the dividing line, it constitutes no cause for denouncing the acts on either side as being exercised under the same power or for the same purpose, and therefore unconstitutional and void. When, as is seldom likely, their laws come in direct and material collision, both being in the exercise of distinct powers, which belong to them, it is wisely provided, by the Constitution itself, and consequently by the States and the people themselves, as they framed it, that the States, being the granting power, must recede. (9 Wheat. 203; License Cases, 5 Howard; United States v. New Bedford Bridge, 1 Woodb. & Minot, 423.) Here we see no such collision.
There are other cases of seeming opposition which are reconcilable, and not conflicting, as to the powers exercised both by the States and the general government, but for different purposes. Thus hides may be imported under the acts of Congress taxing imports and regulating commerce; but this does not deprive a State of the right, in guarding the public health, to have them destroyed if putrefied, whether before they reach the land or after. So as to the import of gunpowder by the authority of one government, and the prohibition *554 by the other, for the public safety, to keep it in large quantities. (4 Metcalf, 294.) Neither of these acts by the State attempts to interfere with the commerce abroad, but after its arrival here, and for other purposes, local and sanatory, or municipal.
In short, it has been deliberately held by this court, that the laying a duty on imports, if this was of that character, is an exercise of the taxing power, and not of that to regulate commerce. (Gibbons v. Ogden, 9 Wheat. 201, by Chief Justice Marshall.) And if, in Brown v. Maryland, 12 Wheat. 447, the tax or duty imposed there can be considered as held to violate both, it was because it was not only a tax on imports, but provided for the treatment of goods themselves, or regulated them as imported in foreign commerce, and while in bulk.
But if the power exercised in this law by Massachusetts could, by a forced construction, be tortured into a regulation of foreign commerce, the next requisite to make the law void is not believed to exist in the fact that the States do not retain some concurrent or subordinate powers, such as were here exercised, though connected in certain respects with foreign commerce. Beside the reasons already assigned for this opinion, it is not opposed to either the language or the spirit of the Constitution in connection with this particular grant. Accompanying it are no exclusive words, nor is the further action of the States, or any thing concerning commerce, expressly forbidden in any other way in the Constitution. But both of these are done in several other cases, such as "no State shall coin money," or no State "engage in war," and these are ordinary modes adopted in the Constitution to indicate that a power granted is exclusive, when it was meant to be so.
If this reasoning be not correct, why was express prohibition to the States used on any subject where authority was granted to Congress? The only other mode to ascertain whether a power thus granted is exclusive "is to look at the nature of each grant, and if that does not clearly show the power to be exclusive, not to hold it to be so." We have seen that was the rule laid down by one of the makers and great expounders of the instrument. (Federalist, No. 82. See also 14 Peters, 575.)
It held out this as an inducement to the States to adopt the Constitution, and was urged by all the logic and eloquence of Hamilton. It was, that a grant of power to Congress, so far from being ipso facto exclusive, never ousted the power of the States previously existing, unless "where an exclusive authority is in express terms granted to the Union, or where a particular authority is granted to the Union and the exercise *555 of a like authority is prohibited to the States; or where an authority is granted to the Union, with which a similar authority in the States would be utterly incompatible."
This rule has been recognized in various decisions on constitutional questions by many of the judges of this court. 2 Cranch, 397; 3 Wheat. 386; 5 Wheat. 49; Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245; Prigg v. Pennsylvania, 16 Peters, 627, 655, 664; New York v. Miln, 11 Peters, 103, 132; Groves v. Slaughter, 15 Peters, 509; Holmes v. Jennison, 14 Peters, 579. So by this court itself, in Sturges v. Crowninshield, 4 Wheat. 193. And also by other authorities entitled to much respect. 4 Elliot's Deb. 567; 3 Jefferson's Life, 425-429; 3 Serg. & Rawle, 79; Peck's Trial, 86, 87, 291-293, 329, 404, 434, 435; Calder v. Bull, 3 Dall. 386; 1 Kent's Com. 364; 9 Johns. 568.
In other cases it is apparently contravened. 9 Wheat. 209; 15 Peters, 504, by Mr. Justice McLean, and 511, by Mr. Justice Baldwin; Prigg v. Pennsylvania, 16 Peters, 543; New York v. Miln, 11 Peters, 158, by Mr. Justice Story; The Chusan, 2 Story, 465; Golden v. Prince, 3 Wash. C.C. 325.
But this is often in appearance only, and not in reality. It is not a difference as to what should be the true rule, but in deciding what cases fall within it, and especially the branch of it as to what is exclusive by implication and reasoning from the nature of the particular grant or case; or in the words of Hamilton, "where an authority is granted to the Union, with which a similar authority in the States would be utterly incompatible."
Thus, in the celebrated case of Sturges v. Crowninshield, the rule itself is laid down in the same way substantially as in the Federalist; namely, that the power is to be taken from the State only when expressly forbidden, or where "the terms in which a power is granted to Congress, or the nature of the power, require that it should be exercised exclusively by Congress." (4 Wheat. 122, 193, by Chief Justice Marshall; Prigg v. Commonwealth of Pennsylvania, 16 Peters, 626, by Chief Justice Taney, and 650, by Mr. Justice Daniel.)
And Chief Justice Marshall on another occasion considered this to be the true rule. That was in the case of Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245, though a commercial question. And Judge Story did the same in Houston v. Moore, 5 Wheat. 49,  a militia question. So, many of the other grants in this same section of the Constitution, under like forms of expression, have been virtually held not to be exclusive; such as that over weights and measures; that over bankruptcy (Sturges v. Crowninshield, 4 Wheat. 122); *556 that over taxation (see cases already cited); that to regulate the value of foreign coins; that to discipline the militia (Houston v. Moore, 5 Wheat. 1; 3 Stor. Com. on Constitution, § 1202; 15 Peters, 499; Rawle on the Constitution, ch. 9, p. 111); that "to provide for the punishment of counterfeiting coin" (Fox v. State of Ohio, 5 How. 410); and robbing the mail when punished as highway robbery (5 Wheat. 34). Why, then, hold this to be otherwise than concurrent?
There are still other grants, in language like this, which never have been considered exclusive. Even the power to pass uniform naturalization laws was once considered by this court as not exclusive (Collet v. Collet, 2 Dallas, 296); and though doubt has been flung on this since by the United States v. Villato, 2 Dall. 372, Chirac v. Chirac, 2 Wheat. 269, and by some of the court in 5 Howard, 585, and Golden v. Prince, 3 Wash. C.C. 314; and though these doubts may be well founded unless the State naturalization be for local purposes only in the State, as intimated in Collet v. Collet, and more favorable than the law of the United States, and not to give rights of citizenship out of the State, (1 Bl. Com., by Tucker, App. 3, 4, 255, 296,) which were the chief objections in 3 Wash. C.C. 314; yet this change of opinion does not impugn in principle the ground for considering the local measure in their case as not conflicting with foreign commerce. The reasoning for a change there does not apply here.
So, it is well settled that no grant of power to Congress is exclusive, unless expressly so, merely because it may be broad enough in terms to cover a power which clearly belongs to the State; e.g. police, quarantine, and license laws. They may relate to a like place and subject, and by means somewhat alike, yet, if the purposes of the State and of Congress are different and legitimate for each, they are both permissible and neither exclusive. (See cases before cited, 4 Wheat. 196; 3 Ell. Deb. 259; Baldwin's Views, 193, 194.)
This very grant of the power "to regulate commerce" has also been held by this court not to prevent bridges or ferries by the States where waters are navigable. (Wilson v. Blackbird Creek Marsh Company, 2 Peters, 245.) So elsewhere, (Corfield v. Ccryell, 4 Wash. C.C. 371; 1 Woodb. & Min. 417, 424, 425; 9 Wheat. 203. See also Warren Bridge Case, 11 Peters, 420; 17 Conn. 64; S. Cowen, 146; 1 Pick. 180; 7 N. Hamp. 35.) And it has been considered elsewhere not to confer, though in navigable waters, any right or control over the fisheries therein, within the limits of a State. (4 Wash. C.C. 383. See also Martin v. Waddell, 16 Peters, 367; 3 Wheat. 383; Angell on Tide Waters, 105.) So the *557 States have been accustomed to legislate as to pilots, and Congress has concurred in it. But if the acts of the States alone as to pilots are not valid, on the ground of a concurrent power in them, it is difficult to see how Congress can transfer or cede to the States an authority on this which the Constitution has not given to them. (Chief Justice Taney, in 5 Howard, 580.) The real truth is, that, each possessing the power in some views and places, though not exclusively, Congress may declare it will not exercise the power on its part, either by an express law or by actual omission, and thus leave the field open to the States, on their reserved or concurrent rights, and not on any rights ceded to them by Congress. This reconciles the whole matter, and tends strongly to sustain the same view in the case now under consideration.
Nor has it ever been seriously contended, that, where Congress has chosen to legislate about commerce and navigation on our navigable waters as well as the sea-coast, and to introduce guards against steam explosions and dangers in steam vessels, the law is not to be enforced as proper under the power to regulate commerce, and when not in conflict with any State legislation. This power in Congress is at least concurrent, and extends to commerce on rivers, and even on land, as well as at sea, when between our own States or with foreign countries. Whether this could be done as to vessels on waters entirely within any one State is a different question, which need not be here considered. (See Waring v. Clark, 5 Howard, 441.)
As a general rule of construction, then, the grants to Congress should never be considered as exclusive, unless so indicated expressly in the Constitution by the nature or place of the thing granted, or by the positive prohibition usually resorted to when that end is contemplated, as that "no State shall enter into any treaty," or "coin money," &c.; "no State shall, without the consent of Congress, lay any imposts or duties on imports," &c. (Art. 1, § 9. United States v. New Bedford Bridge, 1 Woodb. & Min. 432.)
It is also a strong argument, after using this express prohibition in some cases, that, when not used in others, as it is not here, it is not intended. Looking at the nature of this grant, likewise, in order to see if it can or should be entirely exclusive, we are forced to the same conclusions.
There is nothing in the nature of much which is here connected with foreign commerce that is in its character foreign, or appropriate for the action of a central and single government; on the contrary, there is matter which is entirely local,  something which is seldom universal, or required to be *558 either general or uniform. For though Congress is empowered to regulate commerce, and ought to legislate for foreign commerce as for all its leading incidents and uniform and universal wants, yet "to regulate commerce" could never have been supposed by the framers of the Constitution to devolve on the general government the care of any thing except exterior intercourse with foreign nations, with other States, and the Indian tribes. Every thing else within State limits was, of course, to be left to each State, as too different in so large a country to be subjected to uniform rules, too multifarious for the attention of the central government, and too local for its cognizance over only general matters.
It was a difference between the States as to imposts or duties on imports and tonnage which embarrassed their intercourse with each other and with foreign nations, and which mainly led to the new Constitution, and not the mere regulation of commerce. (9 Wheat. 225.) It was hence that the States in respect to duties and imposts were not left to exercise concurrent powers, and this was prevented, not by merely empowering Congress to tax imports, but by expressly forbidding the States to do the same; and this express prohibition would not have been resorted to, or been necessary, if a mere grant to Congress of the power to impose duties or to "regulate commerce" was alone deemed exclusive, and was to prevent taxation of imports by the States, or assessing money by them on any kind of business or traffic by navigation, such as carrying passengers.
Congress, in this way, resorted to a special prohibition where they meant one (as to taxes on imports); but where they did not, as, for example, in other taxation or regulating commerce, they introduced no such special prohibition, and left the States to act also on local and appropriate matters, though connected in some degree with commerce. Where, at any time, Congress had not legislated or preoccupied that particular field, the States acted freely and beneficially, yielding, however, to Congress when it does act on the same particular matter, unless both act for different and consistent objects. (Gibbons v. Ogden, 9 Wheat. 204, 239.) In this way much was meant to be left in the States, and much ever has been left, which partially related to commerce, and an expansive, and roving, and absorbing construction has since been attempted to be given to the grant of the power to regulate commerce, apparently never thought of at the time it was introduced into the Constitution. When I say much was left, and meant to be left, to the States in connection with commerce, I mean, concerning details and local matters, inseparable in *559 some respects from foreign commerce, but not belonging to its exterior or general character, and not conflicting with any thing Congress has already done. (Vanderbilt v. Adams, 7 Wendell, 349; New Bedford Bridge Case, 1 Woodb. & Min. 429.) Such is this very matter as to taxation to support foreign paupers, with many other police matters, quarantine, inspections, &c. (See them enumerated in the License Cases, 5 Howard.)
The provisions in the State laws in 1789, on these and kindred matters, did not therefore drop dead on the adoption of the Constitution, but only those relating to duties expressly prohibited to the States, and to foreign and general matters which were then acted on by Congress. Chief Justice Marshall, in Sturges v. Crowninshield, (4 Wheat. 195,) considered "the power of the States as existing over such cases as the laws of the Union may not reach."
So far as reasons exist to make the exercise of the commercial power exclusive, as on matters of exterior, general, and uniform cognizance, the construction may be proper to render it exclusive, but no further, as the exclusiveness depends in this case wholly on the reasons, and not on any express prohibition, and hence cannot extend beyond the reasons themselves. Where they disappear, the exclusiveness should halt. In such case, emphatically, cessante ratione, cessat et ipsa lex.
It nowhere seems to have been settled that this power is exclusive in Congress, so that the States can enact no laws on any branch of the subject, whether conflicting or not with any acts of Congress. But, on the contrary, the majority of the court in the License Cases (5 Howard, 504) appear to have held that it is not exclusive as to several matters connected in some degree with commerce. The case of New York v. Miln (11 Peters, 141) seems chiefly to rest on a like principle, and likewise to hold that measures of the character now under consideration are not regulations of commerce.
Indeed, besides these cases, and on this very subject of commerce, a construction has at times been placed, that it is not exclusive in all respects, as will soon be shown, and if truly placed, it is not competent to hold that the State legislation on such incidental, subordinate, and local matters is utterly void when it does not conflict with some actual legislation by Congress. For the silence of Congress, which some seem to regard as more formidable than its action, is, whether in full or in part, to be respected and obeyed only where its power is exclusive, and the States are deprived of all authority over the matter. The power must first be shown to be exclusive before any inference can be drawn that the silence of Congress *560 speaks, and a different course of reasoning begs the question attempted to be proved. In other cases, when the power of Congress is not exclusive and that of the States is concurrent, the silence of Congress to legislate on any mere local or subordinate matter within the limits of a State, though connected in some respects with foreign commerce, is rather an invitation for the States to legislate upon it,  is rather leaving it to them for the present, and assenting to their action in the matter,  than a circumstance nullifying and destroying every useful and ameliorating provision made by them.
Such, in my view, is the true rule in respect to the commercial grant of power over matters not yet regulated by Congress, and which are obviously local. In the case of Wilson v. The Blackbird Creek Marsh Co., Chief Justice Marshall not only treated this as the true rule generally, but held it applicable to the grant to Congress of the power "to regulate commerce," and that this grant was not exclusive nor prohibitory on the action of the States, except so far as it was actually exercised by Congress, and thus came in conflict with the laws of the States. These are some of his words:  "The repugnancy of the law of Delaware to the Constitution is placed entirely on its repugnancy to the power to regulate commerce with foreign nations, and among the several States, a power which has not been so exercised as to affect the question." (2 Peters, 252.)
The Chief Justice in another case held that a power being vested in Congress was not enough to bar State action entirely, and that it did not forbid by silence as much as by action. He says,  "It is not the mere existence of the power, but its exercise, which is incompatible with the exercise of the same power by the States. It is not the right to establish these uniform laws, but their actual establishment, which is inconsistent with the partial acts of the States." (Sturges v. Crowninshield, 4 Wheaton, 195, 196.) And in 16 Peters, 610, Justice Story admits "that no uniform rule of interpretation can be applied to it [the Constitution], which may not allow, even if it does not positively demand, many modifications in its actual application to particular clauses."
Hence, if the power "to regulate commerce" be regarded by us as exclusive, so far as respects its operations abroad, or without the limits of the country, because the nature of the grant requires it to be exclusive there, and not exclusive so far as regards matters consequent on it which are within the limits of a State, and not expressly prohibited to it nor conflicting with any thing done by Congress, because the nature of the grant does not require it to be so there, we exercise *561 then what appears to be the spirit of a wise conciliation, and are able to reconcile several opinions elsewhere expressed, some as to the concurrent and some as to the exclusive character of the power "to regulate commerce." It may thus be exclusive as to some matters and not as to others, and every thing can in that aspect be reconciled and harmonious, and accord, as I have before explained, with the nature and reason of each case, the only constitutional limits where no express restrictions are imposed. I am unable to see any other practical mode of administering the complicated, and sometimes conflicting, relations of the Federal and State governments, but on a rule like this. And thus deciding the cases as they arise under it, according to the nature and character of each case and each grant, some indicating one to be exclusive, and some indicating another not to be exclusive; and this, also, at times, as to different kinds of exercise of power under one and the same grant. (See Justice Johnson, 9 Wheat. 235-239.) There is another view of this question which leads to like results. If the opposite opinions mean only that the States cannot, after express grants to the general government, legislate on them for and in behalf of the general government, and not simply for themselves in local matters,  cannot legislate for other States without their own limits, extra territorium, or as to general uniformity, general conduct, or the subject-matter over the whole country, like naturalization and bankruptcy,  then there is no difference between the spirit of those opinions and my own. But if they are construed to mean, that after such a grant, with no express prohibition on a State to act for itself alone on the matter, and none implied from their relations to the general government and the nature of the subject, a State cannot make such regulations and laws for itself, and its own people, and local necessities, as do not violate any act of Congress in relation to the matter, I do not think they are supported either by sound principle or precedents.
Necessities for a different course have existed, and ever must exist, in the complex movements of a double set of legislators for one and the same people.
They may crowd against each other in their measures slightly and doubtingly, but that, as before shown, is not sufficient to annul and override those of the States, as there must be for that disagreeable consequence a direct conflict, a plain incompatibility. (3 Stor. Com. on Const. 434; New Bedford Bridge Case, 1 Woodb. & Min. 417, 418; 9 Wheaton, 238.)
This circumstance shows, also, that the argument to avoid State legislation is not sufficient when it discovers some different *562 spirit or policy in the general measures of the States from that in the general government. The States have a right to differ in opinion,  some are very likely often to differ. But what clause in the Constitution makes such an instance of independence a nullity, or makes a different object an illegitimate one? To be a nullity, it must oppose what has been actually done or prescribed by Congress, and in a case where it has no reserved power to act differently from Congress. We have already seen that an indirect reduction of the revenue of the general government by the license laws, when passed under a legitimate power, and with a different legitimate view, did not render them unconstitutional, nor does this, under like circumstances, though it may indirectly operate in some measure against emigration.
If it did, a law by a State to favor the consumption of its own products would be pronounced void, and so would be a high tax by a State on wharves or stores, as all these would somewhat embarrass and render more expensive the business connected with foreign commerce. So this condition imposed on passengers after their arrival might in some degree affect the business and commerce of carrying them to that State, when the alien passengers are taxed before they are permitted to land.
There are two classes of grants to which this rule now under consideration is applicable, and the force of it will be more striking when they are examined separately. One includes grants where Congress has acted, and continues to act, in relation to them; and the other, where it has never acted, or, if it has once acted, has ceased to do so.
Now, the vindication for the States to act in the last class is, that, unless each State is considered authorized still to legislate for itself, the subject-matter will be without any regulation whatever, and a lawless condition of things will exist within the heart of the community, and on a matter vital to its interests. Such is now the case as to weights and measures, Congress never having legislated to produce uniformity concerning them, though the power is expressly granted to it in the Constitution.
Now, on the construction that such a grant of power is exclusive, and, whether exercised or not, it is unconstitutional for any State to legislate on the subject for itself; and, moreover, that Congress does in truth regulate by its silence as much as by its action, and when doing nothing about it virtually enacts that nothing shall be done about it by any of the States, it will follow that not only all the legislation by the States on weights and measures since 1789 is illegal and void, but all *563 their legislation now existing on matters of bankruptcy, and in respect to the disciplining of the militia, and imposing taxes on land, is also void. For the powers over all these are expressly ceded to Congress, and are not now regulated by any existing acts of Congress, though all except weights and measures once have been. The argument alluded to, if sound, would thus be strong, that Congress, having once acted on these and ceased to, means that nothing more shall be done.
On this exclusive principle, though the action of the States on them is not forbidden expressly in the Constitution, nor impliedly beyond what grows out of any express grant, all the States in the Union are disarmed from any action whatever on such matters, and all their laws on these topics, so essential to their domestic industry and trade, their public security and political existence by means of revenue, are to be considered null and void.
The catastrophe which would follow on such a construction has led this court, as heretofore explained, to hold that the States still possess a concurrent power to act on matters of bankruptcy, the discipline of the militia, taxation of land, and some subjects of commerce; and like considerations would undoubtedly lead them, when the cases arise, to hold, that, notwithstanding such grants, the laws of the States, not conflicting with any passed by the general government on many other such topics, must be considered valid. Indeed, it seems conceded by some of the members of the court in this case, that the States are, by some power coördinate or subordinate, rightfully legislating on weights and measures, pilots, bankruptcy, the militia, &c. But if they have not this power without any grant or license by Congress, they cannot have it by any such grant, because Congress is not empowered by the Constitution to grant away powers vested in it by the people and the States; and how can it hereafter, by legislation, give any power to them over this subject if not having it now?
Again, in the other class of cases, where Congress has already legislated, and still legislates, some time elapsed before it passed laws on any subject, and years before it acted at all on some of them; and in almost the whole, its first legislation was only a beginning and in part, doing more and more from time to time, as experience and the exigencies of the country seemed to require. It is not necessary to repeat here several detailed illustrations and cases on this collected in the case of the United States v. New Bedford Bridge, 1 Woodb. & Min. 430. In the mean time, the States continued to exercise their accustomed powers, and have ever since done it on all matters not forbidden expressly in the Constitution, not exclusive in *564 their nature, and not conflicting with actual provisions in relation to them already made under the general government. (14 Peters, 594.)
To show, further, that these grants of power are not always and necessarily exclusive, and that legislation on them by Congress to any extent is not as prohibitory on the States where it is silent as where it enacts, the States have not only continued to punish crimes which Congress could punish, but they have, in numerous instances, regulated matters connected, locally at least, with commerce abroad, and between the States, and with the Indians.
In so large a territory as the jurisdiction of the general government embraces, in so many and so diversified topics as come before it, and in the nature of its supervisory powers on certain subjects, requiring action only on what is general and foreign, and to produce uniformity merely as to that, it becomes almost inevitable that many local matters and details must be left to be regulated by some local authorities. Yet, as explained in the License Cases, like the by-laws of corporations, made by them and not the legislature, they must not conflict with the general regulations or laws prescribed by the paramount power. But, so far from being exclusive, even while it is exercised, and much less while it is dormant or unexercised, the paramount power summons to its aid, in order to be effective, the contemporaneous and continued action of others. Thus not only moneyed corporations, but towns and cities, must make numerous by-laws in order to enforce the general provisions laid down by the legislation of the State. Thus, too, this court must make numerous rules to carry into effect the legislation of Congress in respect to it; and the War and the Navy Departments must compile and enforce volumes of regulations of a like kind and for a like purpose, taking care, as all subordinate power in such cases must, not to violate any general law prescribed on the subject. (See 1 Woodb. & Min. 423.)
The condition of this whole country when colonies of England furnishes another illustration of the relation and character of such powers. The parent government at home was sovereign, and provided general regulations, either in acts of Parliament or charters, but still left the several colonies (and surely our States have as much power as they) to legislate as to details, and introduce any regulations suited to their own condition and interests, not conflicting with the general provisions made by the paramount power at home. (1 Bl. Com., by Tucker, App. 109, 110.
Indeed, what becomes of the whole doctrine of concurrent powers on this hypothesis of exclusiveness in all mere grants, *565 and of the usage that the States may act in such concurrent cases or local matters till their measures conflict directly with those of Congress? (Ibid. 179.) Where is the line of distinction between a measure by the State which is void, whether it conflict or not, and one which is not void till it comes into actual collision with some law passed by the general government? What becomes of the idea, that the power to regulate foreign commerce is exclusive, and Congress may prohibit the introduction of obscene prints under it, and yet the States may do the latter also, but touch nothing connected with commerce? Is not the introduction of these connected with it? Cannot the States, too, patronize science and the arts in various ways, though a like power is conferred on Congress by means of patents and copyrights. (Livingston v. Van Ingen, 9 Johns. 572.)
Nor do I understand the words of Mr. Justice Johnson, in the case of Gibbons v. Ogden, in the sense attributed to them by some. "The practice of our government," says he, "has been, on many subjects, to occupy so much only of the field open to them as they think the public interests require." (9 Wheat. 234.) It is argued that this means to exclude State action, where Congress has not occupied the field, as well as where it has. Yet it seems plainly to be inferred, from other words connected, that he considers "the power of the States must be at an end so far as the United States have by their legislative act taken the subject under their immediate superintendence." This means the subject then under consideration. But where have they so taken the subject of the admission of alien passengers into States, and the terms of it, "under their immediate superintendence"? They may have regulated the manner of their coming here, but where their maintenance here when sick or poor, or likely to be poor? where their taxation here?
They have regulated also their naturalization in this country, but not under the grant of the power "to regulate commerce," or impose imposts on imports; but, knowing it was not involved in either, a separate and express grant was wisely inserted in the Constitution to empower Congress to make uniform rules on this subject.
It will be seen, that, where Congress legislates about foreign commerce or passengers as connected with it, that legislation need not, and does not, forbid the States to legislate on other matters not conflicting. Thus all will harmonize, unless we interpolate, by mere construction, a prohibitory clause either in the law or in the Constitution. You may, if you please, call the power so exercised by Congress exclusive in one sense or *566 to one extent, but it is not in others. It may be considered as exclusive so far as it goes, and still leave the rest of the field concerning them open to the States. Thus the right to regulate the number of passengers in vessels from abroad in proportion to the tonnage has been exercised by Congress, and may be deemed the use of a legitimate authority. (3 Statutes at Large, 448; 9 Wheat. 216.) So has it been exercised to exempt their personal "baggage" and "tools" from imposts, not, as some seem to suppose, their goods or merchandise. (1 Statutes at Large, 661.) But this statute of Massachusetts conflicts with neither. So Congress provides for uniform naturalization of aliens, but this statute does not interfere with that. So Congress does not forbid passengers to come from abroad; neither does this statute.
Again, Congress nowhere stipulates or enacts, or by the Constitution can do it, probably, as before suggested, that passengers shall not in their persons be taxed on their arrival within a State, nor terms be made as to their residence within them. Again, the objection to this view involves another apparent absurdity,  that, though the regulation of commerce extends to passengers, it is not entirely exclusive in the general government if they come with yellow-fever and the cholera, and that they are then subject to State control and its quarantine expenses and fees; but are not, if they come with what the State deems equally perilous. That is, if they endanger the health of the body, the power over them is not exclusive in Congress, but if they endanger only the police of the State, its pauper securities, and its economy, morals, and public peace, the power is exclusive in Congress, and goes to strip the State of all authority to resist the introduction of either convicts, slaves, paupers, or refugees. If these last only come in the tracks of commerce in vessels from abroad, and are enrolled as passengers, the States cannot touch them, but may seize on them at once if their bodies are diseased. It would be useful to have that clause in the Constitution pointed out which draws such a novel line of discrimination.
In holding this measure to be a regulation of commerce, and exclusive, and hence void, wherever the power of Congress over commerce extends, a most perilous principle is adopted in some other respects; for that power extends over the land as well as water, and to commerce among the States and with the Indian tribes, no less than to foreign commerce. (See art. 1, § 8.) And if it can abrogate a tax or terms imposed by States in harbours over persons there, it may do so whenever the power over commerce goes into the interior, and as to matters connected with it, and also between States.
*567 On this reasoning, passengers there in vessels, boats, wagons stages, or on horseback, are as much connected with commerce as if they come in by sea; and they may consist of paupers, slaves, or convicts, as well as of merchants or travellers for pleasure and personal improvement; and thus all the laws of Ohio, Mississippi, and many other States, either forbidding or taxing the entrance of slaves or liberated blacks, will be nullified, as well as those of almost every Atlantic State, excluding paupers coming in from without their limits.
Congress has sanctioned at least five constitutions of States exercising a power to exclude slaves, and the introduction of them as merchandise and for commerce. And how can this be reconciled by those who would reverse the judgments below, on the ground that the commercial power is exclusive in Congress, and not either concurrent in one view or independent in another, in some particulars, in the States.
Another consequence from the opposite doctrine is, that, if Congress by regulating commerce acts exclusively upon it, and can admit whom it pleases as passengers, independent of State wishes, it can force upon the States slaves or criminals, or political incendiaries of the most dangerous character. And furthermore, that it can do this only by admitting their personal baggage free, as doing that, it is argued here by some, shows the owner must come in free, and neither be excluded nor taxed by the State after within her limits.
This makes the owner of the personal baggage a mere incident or appurtenant to the baggage itself, and renders, by analogy, any legislation as to taxing property more important than taxing the person, and, indeed, overruling and governing the person as subordinate and inferior. So, if Congress by making baggage free exonerates passengers from a State tax, it exonerates all the officers and crews of vessels from State taxes; for their personal baggage is as free as that of passengers. They, too, are as directly connected with commerce as the passengers; and by a parity of reasoning, the absurdity follows, that, by admitting American vessels free of tonnage duties, the owners of them are also made free from State taxes.
Every person acquainted with the tariff of the general government knows that specially declaring a box or chest of apparel "free" does not exonerate any thing else or any other article, much less can it any person, if taxed by a State law. On the contrary, all things not specially taxed, nor specially declared "free," have a duty imposed on them by Congress as non-enumerated articles, and so would passengers, if imports, and if Congress had a right to tax them. And if saying nothing about passengers would imply that they were free from *568 taxes of the United States, much more of the States, why is it necessary to declare in terms any article "free," when silence would make it so? The real truth rather is, that Congress has no right to tax alien friends, or exclude them, and hence the silence. This statute, then, contravenes no act of Congress on this matter of passengers.
And while all the legislation of Congress as to passengers operates on them at sea during the voyage, except imposts being forbidden on their baggage, which is solely within the jurisdiction of Congress, all the legislation of Massachusetts operates on them after their arrival in port, and without any attempt then to impose any duty on their baggage. The former legislation by Congress, regulating their number in proportion to the tonnage, is, as it should be, extra territorium; the latter, as it should be, infra territorium; and thus both are proper, and the jurisdiction over either is not exclusive of that exercised by the other, or conflicting materially with it.
Having considered the different general grounds which can be urged in support of this statute, and the objections made in opposition to them, I shall proceed, before closing, to submit a few remarks on some miscellaneous topics relied on to impeach its provisions. One is a supposed conflict between this statute and some treaties of the general government.
I am aware that a tax or fee on alien passengers, if large, might possibly lead to collision with those foreign governments, such as Great Britain and Prussia, with whom we have treaties allowing free ingress and egress to our ports. (See 8 Stat. at Large, 116, 228, 378.) But neither of them complains in this instance, and I do not consider this law as conflicting with any such provisions in treaties, since none of them profess to exempt their people or their property from State taxation after they arrive here.
If such a stipulation were made by the general government, it would be difficult to maintain the doctrine, that, by an ordinary treaty, it has power to restrict the rights and powers of the several States any further than the States have by the Constitution authorized, and that this has ever been authorized. But it has not here been attempted; and these particular treaties are subject to the ordinary laws of the States, as well as of the general government, and enable the citizens of those countries merely to have free ingress and egress here for trade, (see Treaty of 1794, art. 3; 8 Stat. at Large, 117,) having no relation to their coming here as passengers to reside or for pleasure. Nor can they apply in the present case at all, as the record now stands, finding only that the master was a British subject or his vessel British, but not that his passengers belonged to Great Britain.
*569 The Prussian treaty does not appear to contemplate any thing beyond the establishment of reciprocal duties, and a treatment in other respects like "the most favored nations." (8 Stat. at Large, 164.)
And who ever thought that these treaties were meant to empower, or could in any moral or political view empower, Great Britain to ship her paupers to Massachusetts, or send her free blacks from the West Indies into the Southern States or into Ohio, in contravention of their local laws, or force on the States, so as to enjoy their protection and privileges, any persons from abroad deemed dangerous, such as her felon convicts and the refuse of her jails? Again, so far as regards the liberty of commerce secured to British subjects in Europe by the fourteenth article of the treaty of 1794, it does not apply to those coming from the British Provinces in America, as did this vessel, (8 Stat. at Large, 124,) and by the eighteenth article of that treaty was to last only ten years (p. 125). And while it did last, it was expressly made "subject always, as to what respects this article, to the laws and statutes of the two countries respectively" (p. 124).
Besides this, the whole of the treaty of 1794, including the third article, probably was suspended by the war of 1812, and exists now only as modified in that of 1815, which gives to British subjects no higher rights than "other foreigners." (Art. 1; 8 Stat. at Large, 228.) The old Articles of Confederation contained a clause which indicated in a different form like views as to what was proper in treaties, and indicates a wise jealousy of power exercised in hostility to the policy of a State. That policy is never intended to be thwarted by any arrangements with foreign nations by reciprocal treaties, as they relate merely to the imposts on tonnage and cargoes by the national governments, requiring them to be equal, and do not concern the port and harbour fees or expenses imposed by the local authorities for local purposes. The best security that these fees and taxes will never be unreasonably high and injurious to foreigners is the tendency they would then have to drive trade to other ports or countries contiguous, where they might be lower.
The same right exists also in states to impose conditions on the selling of certain articles by foreigners and others within their limits, as a state may prefer to encourage its own products, or may deem the use of some foreign articles of bad influence in other respects. (Grotius on the Rights of Peace and War, B. 2, ch. 2, § 20; License Cases, 5 Howard.)
Nor can I see, as has been urged, any collision between this statute and the act of Congress to carry into effect our commercial *570 arrangement of 1830 with Great Britain. (4 Stat. at Large, 419.) The intention of that act does not in any respect seem to go beyond that of the treaties just referred to, and in some respects is to have matters stand as they did before. Each side imposed charges and duties. They existed in England and her colonies, as well as with us; but this arrangement sought only to have them not unequal nor prohibitory of trade, and not to discriminate against each other by general legislation. (See 1 Commerce and Navigation, State Papers, 158; 4 Stat. at Large, 419.)
A few remarks as to some objections urged against the large amount and the motive of this tax, and I have done.
If the payment was to be vindicated under the general taxing power alone, it is clear that the amount could not affect the question of the constitutionality of the tax. And if it was very high, considering its professed object "for the support of foreign paupers," and was applied in part to other objects, that is a matter within the discretion of the State, and if it proved oppressive, and thus diverted this kind of business to the ports of other States, it would, like all high taxes, react, and be likely in time to remedy in a great degree the evil. But viewed as a police measure, the amount of the payment and the application of it may, in my view, have an important bearing.
Thus a State is authorized to impose duties on imports sufficient to defray the expenses of her inspection laws, but not an amount disproportionate to them, nor to apply the money thus collected to other purposes.
It would seem that the same rule would govern her assessments to enforce her quarantine laws, and it could hardly be tolerated, under the right to enforce them and demand sufficient to defray their charges, that they should be justified to collect enough more for other purposes, and thus apply the quarantine funds to make roads or maintain schools.
In such events in these cases, either this court would be obliged to declare void assessments which were clearly perverted and improperly collected and applied, or Congress could direct the excess to be paid into the treasury of the general government. (3 Elliot's Deb. 291.) Congress is in the Constitution expressly empowered to revise and control the sums collected by the States to defray the expenses of their inspection laws. (Art. 1, § 10)
A mere pretext in a law colorably for one object, but really for another, as in condemning lands for public purposes when the true object was different, though not to be presumed to be done by any sovereign state, must, if clearly proved, be difficult *571 to uphold. (West River Bridge v. Dix, 6 Howard, 548.) But here the amount of the tax, compared with the burden flung on the State by foreign paupers, does not look so much like a wish to prohibit entirely the entrance of alien passengers, and thus disclose a covert design, hostile to the policy of the general government, as like a wish to obtain enough to cover the expenses and trouble of maintaining such of them as, though not paupers, are likely to become so in the ordinary couse of human events. This is a highly important consideration in judging whether the law throughout looked really to the subject of pauperism, and not to hostility towards emigration, nor, under the third section, to revenue from foreign commerce, independent of the pauper system. It is unjust to regard such provisions as intended to conflict with foreign commerce, when there is another and local matter which they profess to reach, and can and do honestly reach.
It is, therefore, too broad in some cases to say that the object and motive of the State in requiring the payment, or the amount demanded, is of no importance; because, though the great question is a question of power, yet the object and motive may bring it within some existing power, when a different object or motive would not. The different purpose in a State often shows that there is no collision or wrong, and justifies the measure. (4 Wheat. 196; 9 Wheat. 335; Baldwin's Views, 193.)
So, as to the amount demanded, it might be sufficient only for a legitimate State object, and hence might be constitutional, as, for instance, to pay the expenses of inspection laws, when a much larger amount would not be permissible, if too much for the particular object deemed constitutional. But in this case, as no excess is shown on the record, a conclusive opinion on this point is unnecessary.
This construction of the Constitution, upholding concurrent laws by a State where doubts exist and it is fairly open for adoption, has much to commend it in this instance, as the States, which singly become feebler and weaker daily as their number and the whole Union increases, being now thirty to one, instead of thirteen to one, will not thus be rendered still feebler, and the central government, daily becoming more powerful and strong, will not thus be rendered still stronger. So the authority of the latter will not thus, by mere construction, be made to absorb and overwhelm the natural and appropriate rights of sovereign States, nor mislead them by silence. Leaving this matter also to each will not conflict with any existing action of the general government, but promote and sustain the peaceful operations of both in their appropriate spheres.
*572 It will operate justly among the States, no less than between them and the general government, as it will leave each to adopt the course best suited to its peculiar condition, and not leave one helplessly borne down with expenses from foreign sources while others are entirely free, nor draw the general government, in order to remedy such inequalities, into a system of police and local legislation, over which their authority is doubtful, as well as their ability to provide so well for local wants as the local governments, and those immediately interested in beneficial results.
A course of harshness towards the States by the general government, or by any of its great departments,  a course of prohibitions and nullifications as to their domestic policies in doubtful cases, and this by mere implied power,  is a violation of sound principle, will alienate and justly offend, and tend ultimately, no less than disastrously, to dissolve the bands of that Union so useful and glorious to all concerned.

"Libertas ultima mundi, Quo steterit, ferienda loco."
In conclusion, therefore, I think that, in point of law, the conduct of the State in imposing this condition or payment on alien passengers can be vindicated under its police rights to provide for the maintenance of paupers, and under its authority as a sovereign State to decide on what conditions or terms foreigners, not citizens of any of the United States, shall be allowed to enjoy its protection and privileges, and under its concurrent powers of taxation over every thing but imports and tonnage. I think, too, that this power in the State is not taken away by the authority ceded to Congress, either to tax imports and tonnage, or to prohibit the importation of persons (usually limited to slaves), or to regulate commerce.

Orders.

SMITH v. TURNER.
This cause came on to be heard on the transcript of the record of the Court for the Trial of Impeachments and the Correction of Errors of the State of New York, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the statute law of New York, by which the health-commissioner of the city of New York is declared entitled to demand and receive, from the master of every vessel from a foreign port that should arrive in the port of said city, the sum of one dollar for each steerage passenger brought in such vessel, is repugnant to the Constitution and laws of the United States, and therefore void. Whereupon, it is now here ordered *573 and adjudged by this court, that the judgment of the said Court for the Trial of Impeachments and the Correction of Errors be and the same is hereby reversed, with costs, and that this cause be and the same is hereby remanded to the said Court for the Trial of Impeachments and the Correction of Errors, in order that further proceedings may be had therein, in conformity to the aforesaid opinion and judgment of this court.

NORRIS v. CITY OF BOSTON.
This cause came on to be heard on the transcript of the record of the Supreme Judicial Court of Massachusetts, and was argued by counsel. On consideration whereof, it is the opinion of this court, that the third section of the act of the legislature of the Commonwealth of Massachusetts of the 20th of April, 1837, entitled, "An act relating to alien passengers," under which the money mentioned in the record and pleadings was demanded of the plaintiff in error, and paid by him, is repugnant to the Constitution and laws of the United States, and therefore void. Whereupon, it is now here ordered and adjudged by this court, that the judgment of the said Supreme Judicial Court of Massachusetts be and the same is hereby reversed, with costs, and that this cause be and the same is hereby remanded to the said Supreme Judicial Court, in order that further proceedings may be had therein in conformity to the aforesaid opinion and judgment of this court.
NOTES
[*] Commerce, from con and merx, which Vossius derives from the Hebrew, to divide a part of his own for a part of another's, to exchange, to bargain and sell, to trade or traffic, to have intercourse for purposes of traffic. Merchant, or merchant, from merx or mercs, contracted from mercis, is by some derived from mercari, by others from the Greek ______, pars, quia res per partes venditur. To merchand, to buy, to trade, to traffic.  Richardson's Dictionary.
[*] 3 Madison Papers, August 21st, 1787.

1. Proposition by Mr. Martin against article 7. Motion to exclude slave-trade (Vol. III. p. 1388). Mr. Rutledge, Mr. Ellsworth, and Mr. Pinckney, all opposed to Mr. Martin's motion (pp. 1388 and 1389). August 22.  Mr. Sherman, though against slave-trade, was opposed to taking it from the States (p. 1390). Colonel Mason thought it immoral and dangerous, and was for its immediate abolition (pp. 1390, 1391). Mr. Ellsworth opposed to interference; if it was so immoral as to require interference, they ought to abolish it, and free all slaves (p. 1391); that slaves were necessary, and must be imported for use in the sickly rice-swamps of South Carolina and Georgia (p. 1392). Mr. Pinckney, General Pinckney, Mr. Baldwin, Mr. Wilson, Mr. Gerry, Mr. Dickinson, Mr. Williamson, Mr. Rutledge, Mr. Sherman, (Vol. III. pp. 1392-1397,) all treat of this article as applicable only to the slave-trade.